UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

    -against-                         MEMORANDUM & ORDER
                                        19-CR-0382(JS)
MATTHEW JAMES,

                  Defendant.
-------------------------------X
APPEARANCES
For United States:        Catherine Mary Mirabile, Esq.
                        Antoinette N. Rangel, Esq.
                        United States Attorney's Office
                        Eastern District of New York
                        271 Cadman Plaza East
                        Brooklyn, New York 11201

                        Miriam Glaser Dauermann, Esq.
                        United States Department of Justice,
                        Criminal Division
                        271A Cadman Plaza East
                        Brooklyn, New York 11201

For Defendant:            Paul Matthew Krieger, Esq.
                        Adam M. Gitlin, Esq.
                        Georgia V. Kostopoulos, Esq.
                        Krieger Kim & Lewin LLP
                        500 Fifth Avenue, 34th Floor
                        New York, New York 10110

        Defendant Matthew James ("Defendant") is charged by a nine-count Superseding Indictment, dated December 12, 2019, with conspiracy to commit health care fraud, health care fraud, wire fraud, aggravated identity theft, and conspiracy to commit money laundering. (Superseding Indictment, ECF No. 26.) In particular, the Government alleges that Defendant, through his ownership of a third-party medical billing company, submitted claims for payment to health insurance companies that falsely reflected the medical

services provided to beneficiaries.  (Id. ¶¶ 8-9.)  Defendant is also alleged to have impersonated patients and their relatives to induce health insurance companies to pay claims.  (Id. ¶¶ 17-21.)

Trial in this case is scheduled to commence on June 13, 2022.  Currently before the Court are the motions in limine filed by the Government and by Defendant.  (Gov't Mot., ECF No. 110; Def. Mot., ECF No. 116.)  For the reasons that follow, the parties' motions are GRANTED in part and DENIED in part.  The Court has also RESERVED decision on several aspects of the parties' motions.

BACKGROUND

The Court presumes the parties' familiarity with the underlying allegations and procedural history of this case.[1]

The Government, by motion in limine dated May 1, 2022, requests that the Court: (1) admit evidence concerning Defendant's "abusive language" used in recorded phone conversations with health insurance company representatives; (2) preclude Defendant from introducing evidence regarding health insurance company policies; (3) preclude Defendant from introducing evidence and arguments concerning potential punishments or adverse consequences he may face upon conviction; and (4) preclude Defendant from

---

[1] For a thorough recitation of the factual background of this case, the Court refers the parties to its January 19, 2021 Memorandum & Order ("M&O") regarding Defendant's motion for a bill of particulars.  (Jan. 19, 2021 M&O at 2-4, ECF No. 69.)

introducing evidence or argument concerning his background, unless he testifies.  (Gov't Mot. at 1.)  Defendant opposes the Government's motion, except as to the Government's third request, which the Court deems moot.  (Def. Opp'n at 16, ECF No. 115 ("The defense does not intend to offer any evidence or argument regarding the specific punishment or sentence Mr. James faces if convicted.").)  The Government submitted a reply, and, after obtaining leave from the Court,[2] Defendant filed a sur-reply. (Gov't Reply, ECF No. 117; Def. Sur-Reply, ECF No. 130.)

Defendant filed his motion <u>in limine</u> on May 16, 2022, which seeks to have the Court: (1) admit evidence of Defendant's prior "good acts"; (2) preclude testimony by Defendant's former employees concerning their opinions about medical billing, coding, and Defendant's compensation; (3) preclude testimony by patients regarding their opinions about the success, failure, appropriateness, billing, or coding of their medical care, and Defendant's compensation; (4) preclude evidence or argument concerning Defendant's alleged fraud on healthcare costs and insurance premiums; (5) preclude evidence or argument concerning Defendants earnings, personal finances, and wealth; (6) preclude a recorded phone conversation between Defendant and a former

---

[2] Defendant was granted leave to file a sur-reply to the Government's motion <u>in limine</u> during the May 23, 2022 Pre-Trial Conference.

employee; (7) preclude recorded phone conversations between Defendant and insurance company representatives in which Defendant used "offensive or inappropriate language"; (8) preclude excerpts from medical billing textbooks found in Defendant's home; (9) preclude the Government from introducing handwritten notes and journals found in Defendant's office; (10) preclude the Government from referring to patients as "victims" of Defendant's alleged fraud; (11) preclude the Government from referring to a civil lawsuit filed against Defendant by Aetna, one of the alleged health insurance company victims in this case; (12) direct the Government to specify, with greater particularity, the exhibits it intends to introduce at trial; and (13) omit reference to the Government's forfeiture allegations in the Superseding Indictment unless or until Defendant is convicted. (Def. Mot. at 1.) The Government opposes this motion, except as to Defendant's fourth and thirteenth requests, which the Court deems moot. (Gov't Opp'n at 9, ECF No. 123 ("The government has no intention of arguing or presenting evidence on potential impact of defendant's fraud on health care costs or insurance premiums."); 16 ("The government agrees . . . that the Court should not advise or instruct the jury about the forfeiture allegation in the Superseding Indictment until and unless the defendant is convicted.").) Defendant submitted a reply. (Def. Reply, ECF No. 135.)

ANALYSIS

I.  Legal Standard

"A district court's inherent authority to manage the course of its trials encompasses the right to rule on motions in limine." Highland Cap. Mgmt., L.P. v. Schneider, 551 F. Supp. 2d 173, 176 (S.D.N.Y. 2008)(citing Luce v. United States, 469 U.S. 38, 41 n.4 (1984)).  "The purpose of a motion in limine is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence." United States v. Kuo Chen, No. 10-CR-671, 2011 WL 197585, at *1 (E.D.N.Y. Jan. 20, 2011) (citing Luce, 460 U.S. at 40 n.2).  In considering a motion in limine, a trial court should only exclude evidence when it is "clearly inadmissible on all potential grounds." Id. (citing Baxter Diagnostics, Inc. v. Novatek Med., Inc., No. 94-CV-5220, 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998)); see also United States v. Ceballo, No. 13-CR-308, 2014 WL 4980554, at *1 (E.D.N.Y. Oct. 6, 2014)("Only when evidence is 'clearly inadmissible on all potential grounds' should evidence be excluded on a motion in limine." (quoting United States v. Paredes, 176 F. Supp. 2d 192, 193 (S.D.N.Y. 2001))).  Moreover, a "[a] court considering a motion in limine may reserve judgment until trial so that the motion is placed in the appropriate factual context." See Ceballo, 2014 WL 4980554, at *1 (citing  Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Grp., 937 F. Supp. 276, 287 (S.D.N.Y. 1996)).  In its

discretion, the Court may also alter a prior in limine ruling at trial "when the case unfolds."  See Luce, 469 U.S. at 41-42 ("The [in limine] ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the [movant's] proffer.  Indeed even if nothing unexpected happens at trial, the district judge is free, in the exercise of sound judicial discretion, to alter a previous in limine ruling."); see also United States v. Ulbricht, 79 F. Supp. 3d 466, 478 (S.D.N.Y. 2015)("In limine rulings occur pre-trial, and that fact has significance.  The evidence at trial may come in differently than anticipated, altering the solidity of the proffered basis for a pre-trial ruling.  The Court therefore invites parties who believe that the factual record as developed at trial supports a revised ruling to bring such an application in a timely manner.").

II.  Discussion

    A.  The Government's Motion

        1.  Phone Recordings with Defendant Using "Abusive Language"

The Government seeks to introduce recordings of three phone calls in which Defendant used "abusive language" towards employees of Accent, who initiated these calls as a third-party vendor on behalf of Cigna.  (Gov't Mot. at 2-5; Gov't Reply at 2 & n.2.)  According to the Government, in the first call, an Accent

employee called Defendant to discuss a claim overpayment, and Defendant responded by stating: "I'm a gigolo; I like to f*** people.  If you like to f***, yes, please come on over."  (Mot. at 3.)  In the second call, an Accent employee called Defendant regarding claim billing, and in response, Defendant stated: "You know, as soon as I get a blow job from you, I will, I will give you all the information, okay."  (Id.)  And in the third call regarding a claim overpayment, Defendant responded by stating: "This is a sex place.  Would you like to have some sex tonight?" (Id.)  After Defendant made these sexually charged remarks, the Accent employees promptly ended each phone call.  (Id.)  The Government contends Defendant utilized vulgar language as a tactic to carry out his alleged fraudulent scheme, to avoid his billing practices from being questioned, to avoid his scheme from being detected, and to prevent attempts by the insurance companies to recoup overpayments.  (Id. at 3-5; Gov't Reply at 3.)  In particular, the Government submits that the calls demonstrate Defendant's modus operandi "in which he egregiously verbally abused employees from the Insurance Companies to induce them to agree to his demands or changed topics when they attempted to inquire about overpayment of claims."  (Id. at 5.)  As such, the Government argues that these recordings are direct evidence of the crimes for which Defendant is charged because they are inextricably intertwined with the evidence regarding the charged offenses,

7

necessary to complete the story of the crime on trial, and provide necessary background and context.  (Id. at 4-5.)  In addition, the Government intends to use these recordings to establish Defendant's identity and compare them to the voices on other phone calls related to the fraud and identity theft charges.  (Id.)

In opposition, Defendant argues that the Government does not provide a sufficient foundation for the calls because each recording is undated, and the transcripts and underlying audio files do not identify when these calls occurred.  (Def. Opp'n at 2-3.)  Defendant also notes that only the second recording identifies the underlying patient's name and nature of the overpayment at issue, i.e., that there is an overpayment due to the incorrect primary insurance provider being billed; the other two calls appear to involve unrelated, unidentifiable patient claims, and lack context that might connect to the Superseding Indictment.  (Id. at 3.)  Defendant then contends that the calls do not constitute direct evidence of the healthcare fraud scheme because they "provide no additional probative context regarding the reason for the refund request[s] or the status of the request[s,] [n]or do they suggest that there is any connection between the request[s] and the allegations at the core of the government's case."  (Id. at 4.)  To the extent the Government submits that the vulgar language utilized by Defendant demonstrates his modus operandi, Defendant contends that he is

"not on trial for being rude" or for using such "foul language," and rather than being a tactic to avoid detection, these calls would only increase scrutiny on him and the subject claims. (Id. at 4-5.)  Moreover, Defendant acknowledges that he is speaking on these calls as well as other calls the Government will seek to introduce at trial that do not involve outbursts, and Defendant argues that the Government should use those less-inflammatory alternatives to identify Defendant's voice in other recordings. (Id. at 6.)  Last, Defendant argues that even if the Court were to find these three calls to have some probative value, the calls should be excluded from evidence because they are highly prejudicial under Federal Rule of Evidence ("Rule") 403.  (Id. at 6-7.)

As a preliminary matter, the Court is unable to determine whether these recordings are clearly inadmissible solely based upon the questions of foundation raised by Defendant.  Defendant's objection towards lack of foundation is premature at this juncture, especially where, as here, the Government has indicated that it will lay a foundation through a records witness who will (a) testify that these calls were maintained by Cigna in the ordinary course of business and (b) provide context for the calls by linking them to specific patients and claims that the Government has identified as fraudulent.  (Gov't Reply at 2-3.)  The more critical issues are whether the calls are direct evidence of the

9

alleged health care fraud scheme, constitute "other acts" evidence pursuant to Rule 404(b), or unfairly prejudice Defendant pursuant to Rule 403.

It is well-established in the Second Circuit that "[e]vidence of uncharged criminal conduct is not evidence of 'other crimes, wrongs, or acts' under Rule 404(b) if that conduct": (1) "arose out of the same transaction or series of transactions as the charged offense"; (2) "if it is inextricably intertwined with the evidence regarding the charged offense"; or (3) "if it is necessary to complete the story of the crime on trial." United States v. Robinson, 702 F.3d 22, 37 (2d Cir. 2012)(quoting United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000)).  On the other hand, pursuant to Rule 404(b), evidence of crimes, wrongs, or other acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." FED. R. EVID. 404(b).

The parties do not dispute that Defendant's conduct in these phone recordings constitutes "other acts" which are not included within the Superseding Indictment. (See Gov't Mot. at 4.) Courts within the Second Circuit "typically 'employ a narrow construction' in considering whether other acts constitute direct evidence." United States v. Segui, No. 19-CR-0188, 2019 WL 8587291, at *6 (E.D.N.Y. Dec. 2, 2019)(quoting United States v.

10

Johnson, No. 16-CR-0281, 2019 WL 690338, at *3 (S.D.N.Y. Feb. 16, 2019)).  Therefore, "numerous courts in this circuit [have] found it necessary to conduct a Rule 404(b) analysis of uncharged [conduct] that merely provided context or was somehow relevant to the charged conduct."  United States v. Kassir, No. 04-CR-0356, 2009 WL 976821, at *2 (S.D.N.Y. Apr. 9, 2009); see also United States v. Herron, No. 10-CR-0615, 2014 WL 1894313, at *4 (E.D.N.Y. May 12, 2014)("[W]here it is not manifestly clear that the evidence in question is intrinsic proof of the charged crime, the proper course is to proceed under Rule 404(b)." (quoting United States v. Townsend, No. 06-CR-0034, 2007 WL 1288597, at *1 (S.D.N.Y. May 1, 2007), aff'd sub nom. United States v. Mercado, 573, F.3d 138 (2d Cir. 2009))).   Notwithstanding, whether uncharged conduct constitutes direct evidence or "other crimes" evidence under Rule 404(b), "the uncharged conduct must still survive scrutiny" under Rule 403's balancing test to be admissible.  United States v. Johnson, 469 F. Supp. 3d 193, 205 (S.D.N.Y. 2019).  Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of," inter alia, "unfair prejudice."  Id. (quoting FED. R. EVID. 403).  "The district court has wide discretion in making this determination."  Herron, 2014 WL 1894313, at *4.

Here, the Court does not view these calls to demonstrate that Defendant induced insurance companies to agree to his demands,

11

as the Government contends.   Although Defendant's comments
prompted the Accent representatives to hang-up the phone, there is
no indication that Defendant's remarks induced the Accent
representatives to do anything with respect to the processing of
any claims.   In addition, Defendant is not contesting his voice on
these calls and does not intend to contest his voice on others the
Government plans to introduce at trial, thereby eliminating any
probative value these calls would have towards establishing
Defendant's identity.   Rather, the Government's strongest argument
is that Defendant's comments were efforts to conceal fraudulent
conduct and attempts to avoid answering questions about certain
claims flagged for overpayment.   (Gov't Reply at 3-4.)   As such,
these calls appear to be circumstantial evidence rather than direct
evidence, and seemingly fall within the purview of Rule 404(b).

          Notwithstanding, the Court will reserve decision on the
admission of these calls (and their transcripts) until trial due
to the limited information presented by the Government as to the
foundation it expects to lay for these calls, as well as the
Court's concerns regarding the necessity or probative value of
these calls for a permissible purpose under Rule 404(b)(2), which
consequently affects the balancing test to be performed under
Rule 403.   Moreover, it is the Court's understanding that the
Government is in possession of a multitude of audio recordings,
which leads the Court to reasonably believe some of those calls

may involve Defendant in a similar context.  (See Def. Opp'n at 6;
see also infra Section II.B.6.)  This suggests there may be dangers
of cumulative evidence, or possibly alternative, less-inflammatory
phone calls, that could accomplish whatever goal the Government is
attempting to achieve here.

### 2.   Health Insurance Company Policies

Next, the Government moves to preclude Defendant from
arguing that (1) the insurance companies are at fault for not
identifying problems with his billing practices, (2) Defendant was
entitled to rely upon the companies' willingness to pay for claims
serves as a tacit endorsement that his billing was done correctly,
and (3) the insurance companies' clinical and payment policies are
exculpatory or increase/alter the Government's burden of proof.
(See Gov't Mot. at 5.)   As to the Government's first point,
Defendant does not intend to argue that the insurance companies
are at fault, therefore, the Government's motion is DENIED as moot
on this issue.  (See Def. Opp'n at 7.)   As to the Government's
second point, Defendant contends he should be permitted to argue
that the companies' continued payment of claims evinces a lack of
fraudulent intent because, when he submitted the claims on behalf
of his physician clients, Defendant provided the insurance
companies with the underlying medical records from his clients,
and he believed his billing was coded and submitted in good faith.
(Id. at 7-9.)   The Court disagrees.

13

A defendant charged with a fraudulent scheme may not assert the victim's negligent failure to discover the fraud as a defense.  United States v. Thomas, 377 F.3d 232, 243 (2d Cir. 2004).  In other words, a defendant may not advance a "blame the victim" defense.  See United States v. Ahmed, No. 14-CR-0277, 2016 WL 8732355, at *3 (E.D.N.Y. June 24, 2016) [hereinafter "Ahmed I"].  Defendant acknowledges various cases which exclude "victim negligence" arguments, but contends those cases are distinguishable because Defendant provided the insurance companies with the information necessary to determine the validity of the claims he submitted.  (See Def. Sur-Reply at 2-3.)  This is a distinction without a difference -- Defendant's argument is nothing more than a Trojan horse carrying an impermissible victim blaming defense.  In Ahmed I, the defendant did not contest the exclusion of arguments concerning Medicare's negligent reimbursement for certain claims, but rather, sought to introduce evidence of Medicare's payments as relevant to the question of whether he acted with the requisite intent.  Ahmed I, 2016 WL 8732355, at *3.  Like Defendant here, the defendant in Ahmed I sought to assert that he believed his billing practices were proper, in part, because Medicare continued to pay his claims without any notice or indication of its objection.  Id.  The Ahmed I court rejected the defendant's argument, finding the defendant to "essentially assert[] that Medicare either should

14

have stopped paying Defendant's claims or notified him of its concerns," which, in other words, is an assertion that "Medicare was negligent in handling his claims[,] [and] led him to believe his claims were proper," thus evidencing a lack of criminal intent. Id.

The Court finds Ahmed I to be directly on point and considers Defendant's argument to be "nothing more than a repackaged version" of an impermissible victim-blaming defense. Id. Moreover, the primary fact that Defendant relies upon to distinguish the instant case from others where such a defense was rejected -- the fact that the victim insurance companies here were provided with "all of the information that they needed to evaluate" the claims Defendant submitted -- cuts against Defendant's argument. Following Defendant's logic, because the insurance companies had all of the information required to corroborate the claims submitted by Defendant, the companies should have been able to discover a fraudulent scheme, did not discover such a scheme, and continued to pay Defendant's claims. The Court cannot envision a scenario which renders Defendant's argument as anything other than a defense that the insurance companies were negligent in failing to discover the alleged fraud. Accordingly, the Government's motion is GRANTED to the extent that Defendant is precluded from arguing at trial that the insurance companies'

payment of claims is relevant to whether he acted with the requisite intent.[3]

Next, as to the third prong of the Government's motion which concerns health insurance clinical and payment policies, Defendant contends such policies may demonstrate that his alleged misrepresentations were not material and that he lacked the fraudulent intent to harm the insurance companies. (Def. Opp'n at 11.) However, the Government's request for the preclusion of such information is premature at this time. Defendant has served subpoenas upon several insurance companies which contemplate the production of the clinical and payment policies referred to by the Government, but defense counsel has yet to obtain any responsive documentation from the companies. (Id. at 15-16.) The Court is unaware of the contents of those policies such that it cannot make an informed decision concerning their relevancy, if any. As such, the Government's motion to preclude the introduction of these policies is DENIED WITHOUT PREJUDICE and with leave to renew when the defense receives the pertinent policies.

---

[3]    The Court notes that in Ahmed I, the defendant was permitted to request that the court revisit the ruling which rejected the victim blaming defense if the defendant "can articulate a reason for admitting evidence of Medicare's negligence other than on the issue of [d]efendant's intent." Ahmed I, 2016 WL 8732355, at *4.

### 3.   Information Regarding Defendant's Background

Finally, the Government moves to exclude evidence of Defendant's background and personal life.  (Gov't Mot. at 9.)  In particular, the Government seeks to exclude evidence about his background, family and relationship status, and lack of a criminal record, unless he testifies.  (Id. at 9-10.)  Defendant contends that such a blanket prohibition on such evidence and arguments is unwarranted at this stage of the proceedings, and the Court agrees.  (Def. Opp'n at 16-17.)  This aspect of the Government's motion is a "preemptive weapon[] with which [it] endeavor[s] to strike in shotgun fashion at whole topics and sources of prospective evidence, out of context and before any specific objection against its proper backdrop is raised."  TVT Records v. Island Def Jam Music Grp., 250 F. Supp. 2d 341, 344 (S.D.N.Y. 2003).  Accordingly, the Government's motion to preclude Defendant from introducing details about his background and personal life is DENIED WITHOUT PREJUDICE and with leave to renew "if Defendant attempts to elicit personal information outside the scope of Federal Rules of Evidence 401 and 403."  See United States v. Kosinski, No. 16-CR-0148, 2017 WL 4953902, at *6 (D. Conn. Oct. 31, 2017).

### B.   Defendant's Motion

### 1.   Prior "Good Acts"

Defendant requests that the Court permit him to introduce evidence of prior "good acts," namely, evidence of his

legitimate billing practices.   (Def. Mot. at 2-3.)   Defendant's request is primarily based upon the fact that the Government has "repeatedly alleged that Mr. James has 'always' or 'continuously' engaged in fraudulent activity."   (Id. at 2.)   Put differently, the Government has represented "that its theory of the case is that the entirety of Mr. James's billing practice was fraudulent," and the defense draws the Court's attention to several conference transcripts where the Government has made such a representation. (See id.)   In response, the Government states that it "will not argue that the defendant 'always' engaged in fraudulent billing, or that every single claim or every single CPT code on a claim filed by the defendant was fraudulent."   (Gov't Opp'n at 4.) Rather, the Government will argue Defendant's fraudulent conduct took various forms and that he submitted over "105,122 claims tainted by the [six] specified forms of fraud" outlined in its Opposition,[4] and all of these claims are identified in its trial

---

[4] The six forms of fraud the Government identifies are:
1. Billing for services not rendered, whether by "upcoding," "unbundling," or other means;
2. The admission of non-emergent patients through the emergency room;
3. The falsification of medical records to justify fraudulent billing;
4. Defendant's and his employees' impersonation of patients and patients' relatives on telephone calls with the Insurance Companies;
5. The filing of falsified documents and forged signatures in the course of appealing insurance denials; and
6. The laundering of the fraudulent proceeds.
(See Gov't Opp'n at 3.)

chart.  (See id. at 4-5.)  Although the Government will not argue at trial that any claim outside these identified parameters was fraudulent, the Government has not backtracked from its prior position that Defendant's fraudulent conduct "was extensive." (Id. at 3-4.)

Generally, a defendant may not establish his innocence by offering proof that he was not engaging in criminal conduct on specific occasions.  See United States v. Dawkins, 999 F.3d 767, 792 (2d Cir. 2021)(citing United States v. Scarpa, 897 F.2d 63, 70 (2d Cir. 1990)); see also United States v. Nekritin, No. 10-CR-491, 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011) ("Evidence that a defendant charged with fraud engaged in other, non-fraudulent activity is generally irrelevant.").  However, evidence of a defendant's prior "good acts" may be relevant where it is alleged the defendant has "always" or "continually" committed "bad acts," or where such "good acts" "would undermine the underlying theory of a criminal prosecution."  United States v. Balboa, No. 12-CR-0196, 2013 WL 6196606, at *3 (S.D.N.Y. Nov. 27, 2013)(citing United States v. Damti, 109 F. App'x 454, 455-56 (2d Cir. 2004)).

Damti, a Second Circuit decision cited by both parties, is instructive.  Damti, 109 F. App'x at 455.  There, the trial court prevented the defendants from introducing "evidence of moves in which customers were satisfied and no fraud or extortion occurred."  Id.  The trial court concluded "that the Government's

case presumed that the defendants operated a business that was 'permeated with fraud' but expressed concern that the jury might construe that allegation as one where 'all customers were defrauded.'" Id. To assuage this concern, the trial court "instructed the Government not to use the phrase 'permeated with fraud' (or any similar term) in front of the jury." Id. On appeal, the Damti defendants argued that the district court abused its discretion by precluding evidence of their "good acts." Id. In affirming the district court's decision, the Second Circuit noted that the government abided by the district court's instruction, and did not argue to the jury that the defendants' criminal conduct was "ceaseless," that the defendants defrauded "all" of their customers, or that the defendants' business was "permeated with fraud." Id. at 456. Rather, the government argued to the jury that "ten specific moves were fraudulent and therefore representative of a substantial portion of the more than four-thousand moves performed by the defendants during the period relevant at trial." Id. In conclusion, the Second Circuit noted that "[e]ven if many or most of these moves were fraudulent, it follows that a substantial portion also presumably were legitimate. Evidence of 'good moves,' therefore, would not have been probative of the key issue during trial." Id.

Like the prosecution in Damti, the Government here contends that it "has identified claims related to nine patients

20

that are representative of certain methods the [D]efendant engaged in to carry out his fraudulent conduct." (See Gov't Opp'n at 4.) However, the Government's case-in-chief appears to be far more expansive than what was presented in Damti. Indeed, the Government readily admits that it "does not seek to limit its evidence to th[o]se nine patients" and "does not intend to introduce evidence outside the fraudulent claims identified in the chart." (Id.) But this chart, however, in its most recent iteration, is composed of 105,122 allegedly fraudulent claims related to 8,853 different patients. It necessarily follows that while the Government intends to introduce evidence pertaining to an unspecified number of claims regarding nine patients, at least, it intends to introduce evidence pertaining to 105,122 claims regarding more than 8,000 patients, at most. As such, the Court agrees with the defense that, at this juncture, the Government appears to have "identified as fraudulent nearly all of the claims that Mr. James billed during the relevant time" period (see Def. Reply at 2) -- despite the Government's unavailing attempts to recharacterize the scope of the alleged fraud as anything less than Defendant's entire practice. Evidence to show that not all of Defendant's billing practices were fraudulent may be relevant to disprove the Government's theory that Defendant's business was almost entirely fraudulent. See also United States v. Al Asai, No. 16-CR-0149, 2018 WL 5816769, at *3 (W.D. Ky. Nov. 6, 2018) (relying on Damti, and permitting

21

evidence of prior non-fraudulent activity in a case involving food stamp fraud to disprove the government's theory that the defendant was consistently engaged in fraudulent activity).

This conclusion is further supported by the fact that the Court is presently unaware of even a single non-fraudulent claim billed by Defendant, or more broadly, a non-fraudulent area of Defendant's billing practice.   (See Gov't Opp'n at 3 ("The defendant knows exactly what the government contends encompassed his fraudulent billing practices.  While the government has always maintained that the defendant's fraudulent conduct was extensive (and difficult to detect, as a result of the methods by which the defendant undertook his criminal conduct), the government identified the specific areas of the defendant's billing practice that it alleges was fraudulent. . . .  The government has also identified the most common fraudulent Current Procedural Terminology ('CPT') codes used by the defendant in submitting claims. . . .  Critically, the government identified the specific claims submitted by the defendant to the Insurance Companies that the government submits fall within the charged fraudulent conduct. . . .  [T]he government provided the defendant with a chart . . . [that] currently identifies 105,122 claims submitted by the defendant to the Insurance Companies . . . .").)

Notwithstanding, the defense has not proffered any specific "good acts" evidence it would present at trial, if

permitted to do so by the Court.  As such, while the Court will not preclude the defense from admitting "good acts" evidence at this time, the Court is not categorically endorsing the admittance of such evidence either, and will determine the admissibility of these "good acts" at trial.  See United States v. Fiumano, No. 14-CR-0518, 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016) (reserving "decision on whether any ['good acts'] evidence the Defendant seeks to introduce is, in fact, inadmissible 'good acts' evidence" because "[n]either the Government nor the Defendant identify the specific acts that should be precluded").

### 2.   Testimony by Defendant's Former Employees

Defendant moves to preclude the Government from eliciting testimony from his former employees concerning the accuracy or appropriateness of the medical billing or coding at issue in this case, the amount of money charged for the procedures at issue, or the amount of money Defendant was compensated.  (Def. Mot. at 3.)   In addition to arguing that such testimony is irrelevant, Defendant also contends that this testimony is an impermissible attempt by the Government to introduce expert opinions through lay witnesses.  (Id. at 5.)

"Whether a witness is testifying as an expert or non-expert depends on whether his testimony is based on personal perceptions of the matters in issue on the one hand or his specialized knowledge of issues relevant to the case on the other."

United States v. Johnson, No. 16-CR-0457, 2017 WL 11490479, at *2
(E.D.N.Y. Aug. 4, 2017).  A non-expert, or lay witness, may testify
to matters on which they have personal knowledge.  See FED. R. EVID.
602; see also Zhen v. Safety-Kleen Sys., Inc., No. 18-CV-6015,
2021 WL 4937888, at *1 (E.D.N.Y. May 27, 2021)("Lay witnesses may
give testimony on matters with which they have special familiarity
based on personal experience.").  A lay witness may also provide
opinion testimony which is: "(a) rationally based on the witness's
perception; (b) helpful to clearly understanding the witness's
testimony or to determining a fact in issue; and (c) not based on
scientific, technical, or other specialized knowledge with the
scope of Rule 702."  FED. R. EVID. 701.

        In  this  case,  the  Government  intends  to  utilize
Defendant's former employees to provide factual and/or lay opinion
testimony, and does not intend to call an expert witness at trial.
(Gov't Opp'n at 6 & n.6.)  According to the Government, several of
these former employees have coding experience "of their own, either
from before or after their time working for" Defendant.  (Id.
at 6.)  For  example,  the  Government  anticipates  the  former
employees  to  testify  regarding  their  thoughts  and  impressions
about  Defendant's  billing,  coding  and  business  practices;  their
views regarding "the appropriateness of the claims they submitted"
on Defendant's behalf; and the differences between Defendant's
coding practices and their education and/or work experience from

24

before or after their employment with Defendant.  (Id. at 5-7.)
The Government may also pose hypotheticals to these witnesses to
elicit testimony concerning "whether and why they disagreed with
a billing or coding decision made by the defendant."  (Id. at 7-8.)

          The Court rejects the Government's contention that this
anticipated testimony of Defendant's former employees solely
consists of lay testimony.  In essence, each of these topics
described by the Government, will, to an extent, call for the
respective witnesses to draw upon their collective experiences as
medical billers and coders, or opine whether Defendant's billing
and/or billing practices were "appropriate" or "correct."   Such
testimony crosses the line from lay to impermissible expert opinion
because it calls for each of these witnesses to draw upon
specialized experiences accumulated throughout the course of their
careers as medical billers/coders to render an opinion on
Defendant's billing.  See United States v. Rigas, 490 F.3d 208,
224 (2d Cir. 2007)(holding that a witness's testimony is
permissible lay opinion if it "resulted from a process of reasoning
familiar in everyday life"; however, if the testimony was "not a
product of [the witness's] investigation but rather reflected
[his] specialized knowledge, it was impermissible expert
testimony"); Bank of China v. NMB, LLC, 359 F.3d 171, 181-82 (2d
Cir. 2004)(finding testimony inappropriate where lay witness
provided, inter alia, opinion testimony that transactions at issue

did not comport with business community's understanding and that certain actions would be considered fraud in the industry); see also Zhen, 2021 WL 4937888, at *1 ("Mastroianni's background as a safety instructor for the U.S. postal service who has driven large trucks for 20 years is relevant to establishing a foundation for his testimony.  Mastroianni may not, however, testify that, in his opinion Meyer 'messed up' or was careless or was the proximate cause of the accident.  Such testimony would invade the province of the jury.").

As such, the proposed testimony exceeds the bounds of what has been previously held to be permissible lay opinion testimony.  For example, in Rigas, an accountant with personal knowledge of a company's books testified to the accounting impact of debt reclassifications, which the prosecution had already established to be fraudulent.  Rigas, 490 F.3d at 224.  The Second Circuit held that the accountant's testimony was lay opinion, and not impermissible expert testimony, "because it did not address what the appropriate accounting technique should have been, but was instead simply offered to show what the amount of the debt would have been had the fraud not occurred."  United States v. Cuti, 720 F.3d 453, 460 (2d Cir. 2013)(emphasis added)(citing Rigas, 490 F.3d at 225).

Then in Cuti, the Second Circuit considered a challenge to the testimony of two accountants, one of whom worked in-house

26

for the defendant's company, which concerned "how they had accounted for the proceeds from the fraudulent transactions; how they would have accounted for the transactions had they been aware of the full facts; and how the material information that was withheld from them led to misstatements in the company's financial statements." See Cuti, 720 F.3d at 456. The court held this testimony to have been properly admitted as factual testimony, or alternatively, as lay opinion. Id. at 459. In so ruling, the Cuti panel noted that when the accountants were asked to answer hypothetical questions, the hypotheticals were "limited by the factual foundation laid in earlier admitted testimony and exhibits, the factual nature of the hypotheticals, and the witnesses' reasoning, which was based on undisputed accounting rules." Id. at 458 ("The hypothetical questions utilized facts that had been independently established in the record. If the facts as the witnesses had understood them were *A* and the true facts were *B*, it was not inappropriate to ascertain, from the very witnesses responsible for their accounting, whether *B* would have affected that accounting under the same, undisputed accounting rules. And, since the applicable accounting rules were explained in detail, the reasoning process that the witnesses employed in answering the hypotheticals was straightforward and transparent to the jurors, who could readily discern whether the responses given were reliable."). As such, "[t]hese limitations left little room

27

for the witnesses to engage in speculation and ensured that their testimony fell near the fact end of the fact-opinion spectrum." Id.

Last, the parties in Ahmed I filed a second set of motions in in limine, which resulted in additional rulings that further support this Court's conclusion. See United States v. Ahmed, No. 14-CR-0277, 2016 WL 3647686, at *1 (E.D.N.Y. July 1, 2016) [hereinafter "Ahmed II"]. In Ahmed II, the prosecution intended to call a Medicare administrative contractor to testify about "the process for paying Medicare claims and the policies that determine which claims Medicare will reimburse, and at what rates." Id. at *12. This contractor was expected to rely "in some measure, on the applicable Medicare billing rules for the relevant surgical procedures . . . to educate the jury on the processing and payment of claims to Medicare for these surgical procedures," and to assist the jury in determining whether the defendant submitted claims that were false and fraudulent, and if so, whether such claims were submitted with the intent to defraud Medicare. Id. Critical here, "[t]he government [did] not expect the witness to apply the Medicare billing rules to Defendant's own conduct; as such, no improper legal opinions w[ould] be elicited." Id.

Accordingly, Defendant's motion is GRANTED to the extent that the Government may not elicit lay testimony from Defendant's

former employees concerning their views and opinions regarding the "correctness" or "accuracy" of Defendant's billing.  This ruling, however, does not preclude Defendant's former employees from testifying on more limited subjects or even answering hypotheticals that fall within the scope permitted by the Second Circuit in Cuti.

The remaining aspects of Defendant's motion concerning testimony by former employees, which relate to amounts charged for procedures and Defendant's compensation, are DENIED because the Government does not intend to elicit such testimony.  (See Gov't Opp'n at 5-6.)  The Government's stated intention contains one notable exception, namely, that it will elicit testimony from "at least one former employee" involved in making "impersonation calls to insurance companies" regarding amounts charged.  (Id. at 6 n.4.) These employees will testify that they participated in making impersonation calls because "they believed that the patients were genuinely being threatened with tens or hundreds of thousands of dollars in balance bills."  (Id.)  It does not appear this testimony runs afoul of the improper opinion evidence described by the Court above; however, to the extent the Government attempts to elicit such testimony, the Court will address its admissibility once it is placed in context.

3.   <u>Testimony by Patients</u>

Defendant also moves to exclude patients from testifying about: (1) the success or failure of the medical procedures they received; and (2) their opinions of the billing or coding in this case, including their opinions of the amounts their insurance companies were charged and the amounts Defendant was compensated. (Def. Mot. at 5.)  The Government "does not intend . . . to elicit testimony from the patient-witnesses regarding the defendant's compensation," mooting that portion of Defendant's motion, but opposes Defendant's challenges to the other aspects of the potential patient testimony.  (Gov't Opp'n at 8.)

The parties appear to agree on the scope of admissible testimony regarding the success or failure of the medical procedures received by patients.  The Government previews evidence of nearly 1,000 member appeals letters to insurance companies, which are claimed to be forged by Defendant, that contain statements such as "the results are amazing" and "I am almost pain free."  (<u>Id.</u>)  As such, the Government contends that Defendant put the success or failure of the procedures performed at issue because these letters were sent with the intention of inducing insurance companies to pay more money, were often successful, and contained false statements.  (<u>Id.</u>)  And Defendant concedes that the Government may introduce testimony about the success or failure of

30

medical treatment by patients to rebut the statements contained in the appeals letters.  (Def. Reply at 8-9.)

As to the anticipated testimony by patients regarding the appropriateness of billing and coding of their claims, the Government contends "patients are eminently qualified to testify regarding the medical conditions that resulted in the billed procedures, including offering their view on the complexity (or lack thereof) of their injuries, as well as describing the conversations they had with their physicians regarding the procedures." (Gov't Opp'n at 9.)  Further, the Government argues that the patients "are qualified to compare the procedures reported by the defendant to the Insurance Companies to their own experience of their injuries and symptoms, and to state whether the defendant's claims were consistent with the procedures they believed were being performed on them." (Id.)

The Court agrees with the Government that the patients may testify about their injuries and symptoms, and even describe procedures they underwent that are relevant to claims at issue. The Court will also allow the Government to utilize patients to indicate whether they were (or were not) charged for the procedures they underwent.  However, the patients may not opine on the "appropriateness" of the billing and coding submitted by Defendant for reasons which are substantially similar to those described by

31

the Court in the immediately preceding section.  (See supra
Section II.B.2.)

Last, Defendant seeks to exclude comments by patients
"characterizing (or reacting to) the amount that their insurance
companies were charged for a procedure" because such evidence "has
no bearing on whether those underlying claims were bundled or coded
appropriately, whether Mr. James lied to the insurance companies,
or whether such alleged false statements were material." (Def.
Mot. at 7.)  According to Defendant, this testimony would suggest
that the size of an insurance payment "corresponds to the
likelihood that a claim was fraudulent or miscoded," and such an
implication is inherently inflammatory.  (Id.)  The Government
states it will seek to introduce testimony where patients
complained of "the size of the payment received by the physician
who treated them."  (Gov't Opp'n at 9.)  The Government will also
show that another patient complained to an insurance company which
"led to the insurance company paying a significant additional
quantity of money for the patient's claim." (Id.)  The Government
sheds no additional light on this vague response in its attempt to
demonstrate the relevancy of this patient testimony, which is
claimed to "explain, among other things, the[] [patients']
actions, and the actions of the defendant." (Id.)
Notwithstanding, the defense concedes that "[t]here may be some
limited instances where a patient's testimony characterizing or

32

opining on the cost of a procedure may be relevant or admissible." (Def. Reply at 10.)  As such, the Court will reserve decision on this limited patient-testimony issue until trial so that the motion is placed in the appropriate factual context.

### 4.  Evidence Concerning Defendant's Finances

Defendant's next request is to preclude the Government from: (1) arguing or inferring that "the wealth, assets, or properties that [Defendant] accumulated over the years demonstrate or suggest that his business was fraudulent"; and (2) introducing any photographs of Defendant's homes or assets.  (Def. Mot. at 8.) Defendant concedes that "some evidence regarding the proceeds of Mr. James's business, and any money transfers he made in connection with those proceeds, is relevant to the single money laundering count in the Indictment"; however, Defendant contends the Government should be precluded "from offering any argument, evidence, or testimony that suggests that Mr. James's earnings as a biller, personal wealth, assets, or properties are relevant to, or support, the remaining counts of the Indictment."  (Id.) According to Defendant, his wealth and how he spends his money "would only serve to prejudice him by introducing a taint of wealth and class bias before the jury."  (Id.)  In response, the Government submits that Defendant's earnings are directly relevant to not only the money laundering charge, but the charges for fraud and identity theft as well.  (Gov't Opp'n at 9.)  The Government

33

"intends to argue that the defendant's greed was a significant driver for his decision to commit fraud and identity theft," and the "way the defendant accumulated and spent the proceeds of the fraud is therefore strong evidence of his motive." (Id.) Regarding Defendant's claims of class prejudice, the Government "has no intention of making an appeal to any form of class prejudice, and will agree to a limiting instruction on that matter." (Id. at 10.)

In support of his motion, Defendant cites to a previous decision by this Court, United States v. Hatfield, which involved charges of securities fraud. 685 F. Supp. 2d 320 (E.D.N.Y. 2010). There, the Court denied the government's request to introduce evidence concerning the defendant's "lavish" personal spending as direct evidence and as Rule 404(b) evidence. Id. at 326. To begin, the Court explained that evidence of a lavish lifestyle is not relevant to motive, but may be probative of a defendant's participation in criminal misconduct. Id. (citing United States v. Ewings, 936 F.2d 903, 906 (7th Cir. 1991)). The Court continued, noting that "there [wa]s no dispute concerning [the defendant's] 'participation' in profitable stock trades, nor his 'participation' in receiving sizeable compensation." Id. The pertinent issue was "not how [the defendant] acquired the money he used to fund his extravagant lifestyle. Instead, it [wa]s whether the stock trades and compensation methods he used to acquire this

34

money were legal." Id. As such, it was irrelevant if the defendant "spent his fortune on lavish parties, instead of donating it to starving Malawian orphans." Id. (citing In re Von Behren, 314 B.R. 169, 181 (C.D. Ill. Bankr. 2004)). The Court also highlighted that, even before the alleged illegal activities occurred, the defendant "was a very wealthy man," which rendered it "entirely speculative" that the funding for his lavish lifestyle "came from the alleged scheme or from his sizable pre-existing fortune." Id. (citing United States v. Law, 528 F.3d 888, 897 (D.C. Cir. 2008)).

Defendant asks the Court to analogize the instant case to Hatfield, and prevent the Government from introducing evidence of his wealth, particularly with respect to establishing motive. (See Def. Mot. at 9; see also Def. Reply at 11 ("[T]he government argues that evidence of Mr. James's wealth, earnings, and personal finances are relevant to demonstrating Mr. James's motive as to each of the counts alleged in the Indictment. But under such a framework, unfettered evidence of a defendant's assets and personal spending would become admissible in almost every fraud case. Here, the government is asking this Court to act inconsistently with how district courts in this circuit (as well as the Second Circuit itself) have treated similar evidence of earnings, personal finances, and wealth.").)

The Court agrees with Defendant that, similar to Hatfield, there is no dispute that Defendant "participated" in a

35

profitable medical billing business and received commissions.  And the pertinent inquiry is not how Defendant acquired his wealth, but whether the manner in which he acquired his wealth was legitimate.  See Hatfield, 685 F. Supp. 2d at 326.  But Hatfield did not purport to categorically forbid introduction of evidence of wealth to show motive, as such a per se rule would be untenable under Second Circuit caselaw.  See United States v. Quattrone, 441 F.3d 153, 187 (2d Cir. 2006) (rejecting the defendant's argument "that evidence of wealth is always irrelevant to motivation").  Rather, the Hatfield decision was fact specific, and a key distinction between Hatfield and this case is that the parties do not appear to dispute that Defendant's medical billing business was his sole source of income, which supported his "lavish" lifestyle as described by the Government.  The evidence may show that Defendant's funding for his personal spending came from a pre-existing, legitimate source of income, or, conversely from his business through which he carried out the alleged scheme.  If the latter, then the wealth evidence is relevant to Defendant's motive to commit the alleged offenses.  See United States v. Cardena, 842 F.3d 959, 983-84 (7th Cir. 2016)("[E]vidence of wealth is not probative of involvement in criminal activity in the absence of evidence that the wealth could not have been earned legitimately (for when a billionaire buys a multi-million dollar home, no inference can be drawn that the money came from criminal activity).

Instead, . . . to render the evidence relevant, the government
must present evidence 'that the income was not obtained through
legitimate means.'" (quoting United States v. Carrera, 259 F.3d
818, 829 (7th Cir. 2001))); United States v. Hope, 608 F. App'x
831, 838-39 (11th Cir. 2015)(affirming district court's admission
of "wealth evidence" where defendant was charged with healthcare
fraud, conspiracy to commit healthcare fraud, aggravated identity
theft, and money laundering, for reasons including "motive to
commit the offenses"); see also Quattrone, 441 F.3d at 187 ("The
government offered evidence of Quattrone's salary during 1999 and
2000 in order to argue that Quattrone's substantial salary
established a motive for him to obstruct the IPO allocation
investigations.   Quattrone contends that the evidence was
irrelevant and unduly prejudicial because it invited the jury to
engage in class-based bias against him.   To this end, Quattrone
asserts that evidence of wealth is always irrelevant to motivation.
In our view, the district court acted within the scope of its
discretion in finding the evidence relevant and consistent with
Rule 403."); United States v. Holmes, No. 18-CR-02581, 2021 WL
2044470, at *4 (N.D. Cal. May 22, 2021) ("Nonetheless, evidence of
an individual's lavish spending habits, without a connection to an
individual's participation in criminal activity, is irrelevant."
(citing Hatfield, 685 F. Supp. 2d at 326)).

As such, the Court finds evidence of wealth will be relevant to Defendant's motive to commit the fraud, identity theft, and money laundering charges here.  However, the Court will not permit the Government to introduce such evidence carte blanche, and cautions the Government to narrow down the "wealth evidence" described in the parties' papers.  For example, the Government will not be allowed to introduce "hundreds" of photographs of Defendant's properties and assets.  "While evidence of compensation, wealth, or lack thereof can unduly prejudice jury deliberations, that evidence may be admitted where other safeguards are employed such as limiting instructions or restrictions confining the government's references to that wealth."  Quattrone, 441 F.3d at 187.  The parties shall confer, and to the extent they are able to agree to one, propose a limiting instruction for the Court's consideration which can be discussed at a charge conference.

### 5.   Phone Recording of Defendant's Former Employee and a Health Insurance Company

Defendant next moves to preclude the Government from introducing a recording of a phone call between one of his former employees, Stephanie Brunner, and Optum, an alleged victim insurance company.  (Def. Mot. at 10.)  According to Defendant, this call took place after Brunner was no longer working for Defendant.  (Id.)  In the call, Brunner "alleges, among other

things, that: Mr. James was coaching doctors on how to send their patients through the emergency room to obtain out-of-network treatment that health insurance companies would reimburse; Mr. James would call health insurance companies portraying patients; and Mr. James would be rude to health insurance customer service representatives until they paid for the claims." (Id.) Defendant submits that this call constitutes hearsay under Rule 801(c), and is "presumably being introduced for purposes of proving the truth of the matters asserted in the call – i.e., that Mr. James committed a fraud by" conspiring with doctors, impersonating patients, and verbally abusing insurance company employees to induce them to pay claims. (Id. at 11.) The Government contends that this recording is not hearsay because Brunner will be called as a witness during trial about "what she did, what she observed, and what she heard during" her employment, and be available for cross-examination. (Id.) The Government also expects Brunner to testify that, "following her employment, she reported the defendant's fraudulent conduct to an insurance company," and "that report is documented in [this] audio recording." (Id.)

The Federal Rules of Evidence define hearsay as an out-of-court statement made by a declarant that is offered into evidence to prove the truth of the matter asserted. FED. R. EVID. 801(c). Hearsay is not admissible unless the Federal Rules of Evidence, other federal rules, or a federal statute provide

39

otherwise. FED. R. EVID. 802. The Rules also establish exclusions from hearsay. Pertinent here, Rule 801(d)(1)(B) provides:

> (1) A Declarant-Witness's Prior Statement. The declarant testifies and is subject to cross-examination about a prior statement, and the statement:
>
> . . .
>
> (B) is consistent with the declarant's testimony and is offered:
>
> (i) to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying; or
>
> (ii) to rehabilitate the declarant's credibility as a witness when attacked on another ground.

FED. R. EVID. 801(d)(1)(B).

With these principles in mind, the Court agrees with Defendant that, to the extent the Government intends to introduce this recording during its direct examination of Brunner, the recording is undoubtedly hearsay and is excluded. However, the recording may be admissible during the Government's redirect as evidence of a prior consistent statement pursuant to Rule 801(d)(1)(B). As such, the Court reserves ruling on the propriety of admitting the recording under Rule 801(d)(1)(B) until after Brunner testifies and is cross-examined by defense counsel.

6.   Other Phone Recordings with Defendant using "Offensive" Language

Defendant also moves to exclude other "inflammatory calls" where he used vulgar language with insurance representatives.  (Def. Mot. at 11-12.)  These calls are similar in nature to those which the Government sought to have admitted above.  (See supra Section II.A.1.)  With respect to this request, Defendant has identified eight Government exhibits,[5] which consist of seven different recordings -- one recording was duplicated. (See Def. Mot. at 12.)  Defendant summarizes each of these calls as follows:

- GX 8:  Defendant "[c]alls a representative 'incompetent' and ends the call with an expletive."

- GX 14 and GX 16 (duplicates): Defendant "[y]ells at and insults a representative, saying 'Go f*** yourself . . . you pathetic piece of s***.'"

- GX 15: Defendant "[i]nsults a representative by repeatedly using a pejorative term for an individual with an intellectual disability."

- GX 17: Defendant "[i]nsults representatives by calling them 'monkeys,' 'donkeys,' and a pejorative term for an individual with an intellectual disability."

- GX 21: Defendant "[a]ccuses a representative of being 'on medication.'"

- GX 32: Defendant "[c]alls a representative an 'idiot' and adds, 'You feed your family and your kids from the money that we pay, and you f*** us up.'"

---

[5] Government exhibits are identified as "GX."

41

- GX 36: Defendant "[c]alls representatives 'f***ing stupid people' and a 'bunch of morons.'"

(See id. at 12-13.) Defendant contends that the relevance of these calls is minimal, especially when compared to their prejudicial effect. In opposition, the Government reiterates its previous arguments regarding the sexually-charged recordings set forth above, and contends these additional calls are admissible as direct evidence. (See Gov't Opp'n at 12.) The Government also provides a more specific argument concerning the relevancy of this set of recordings than it did for the first. To wit, the Government argues that Defendant used this "abusive language" to: (1) "force representatives of Aetna and Cigna to reprocess his fraudulent claims," (2) "escalate claims or appeals to supervisors or other employees so that he could ensure the claims were paid to him," (3) "avoid detection when representatives questioned him on anything from a claim being reprocessed multiple times for higher and higher dollar amounts," and (4) "resist when he was informed that nothing further could be done at the time despite his and his employee's incessant calls." (Id.)

Notwithstanding, due to the similarities between this set of calls and those discussed above, the Court will also reserve decision on the admissibility of these calls until trial. The rulings the Court will issue regarding the first set of calls may impact the admissibility of these calls, and vice versa.

7.   Excerpts from Medical Billing Textbooks

Defendant also moves to preclude the Government from introducing excerpts from various billing textbooks that were found in Defendant's home and seized pursuant to a warrant.  (See Def. Mot. at 14; Gov't Opp'n at 13.)  Defendant's primary contention here relates to whether the Government will be able to present a sufficient foundation to introduce these books (or excerpts from the books).  However, the Government intends to "lay [a] proper foundation connecting [the billing textbooks] to the defendant and his work as a medical biller, such as the fact that the books were found in the main office room in which the defendant's employees worked."  (See Gov't Opp'n at 13.)  As such, the Court will not rule on the admissibility of these books until trial to allow the Government an opportunity to lay a sufficient foundation.  If a sufficient foundation is indeed established, nothing in this decision prevents Defendant from lodging further objections to the books.

8.   Handwritten Notes and Journals

Similar to the previous request, Defendant moves to exclude certain handwritten notes and documents that were seized from Defendant's office during the execution of a search warrant, primarily due to challenges regarding the Government's ability to establish a foundation for these documents.  (See Def. Mot. at 14-15.)  The Court's ruling regarding these notes and other documents

43

is the same as its ruling concerning the medical billing textbooks, and these issues shall be determined at trial.

### 9. References to Patients as "Victims"

Defendant contends that the Government should not be permitted to generally refer to patients as "victims," refer to patients as "victims" of any alleged financial fraud, or as "victims" of identity theft. (Def. Mot. at 16-17.) The Government acknowledges that it will not refer to patients as victims of any alleged financial fraud, but does intend to refer to patients as victims of identity theft as per the Superseding Indictment. (Gov't Opp'n at 14.)

As an initial matter, the Government is precluded from referring to "victims" in a generic sense because the alleged victims in this case differ based upon which Count of the Superseding Indictment the Government is referring to, i.e., whereas the insurance companies are the alleged victims of the fraud charges, the patients are the alleged victims of the identity theft charges. Consequently, using the term "victim" in a general, shorthand fashion, could be confusing to the jury. The Court will not, however, preclude the Government from referring to the patients identified in Counts Six, Seven, and Eight as victims, so long as they are properly qualified as patient victims. See United States v. Gasperini, No. 16-CR-441, 2017 WL 3140366, at *7 (E.D.N.Y. July 21, 2017), aff'd, 729 F. App'x 112 (2d Cir. 2018).

44

Further, the jury will be instructed that arguments by counsel do not constitute evidence, and that the Government referring to a patient as a "victim" is not evidence the patient is in fact victim or that Defendant committed a crime.

### 10.   References to Civil Lawsuit between Defendant and Aetna

Defendant asks the Court to preclude the Government from introducing or referring to a prior, pending civil lawsuit filed against Defendant by Aetna, one of the alleged insurance company victims here.   (Def. Mot. at 17.)   This lawsuit does not bring claims against Defendant "for miscoding or upcoding, but focuses exclusively on Mr. James's purported impersonation of patients." (Id. at 17 n.10.)   In response, the Government notes that this lawsuit was filed "five months before his arrest," and that it intends to introduce evidence that the lawsuit had "a direct effect upon the defendant's criminal conduct."   (Gov't Opp'n at 15.)   To wit, the Government claims that after the Aetna lawsuit was filed, "the defendant ceased impersonating patients and, instead, began enlisting patients themselves to lie to the Insurance Companies about being balance billed."   (Id.)   The Government will proffer multiple witnesses who will testify that, "after the lawsuit was filed, the defendant took measures to cover up the impersonation calls that lay at the heart of the suit."   (Id.)   In sum, the Government "intends to argue that the defendant's post-lawsuit

45

conduct is evidence of his consciousness of the illegality of his impersonations and billing practices." (Id.)

The Court does not agree with Defendant that "any reference to other proceedings would be unfairly prejudicial . . . because it would mislead the jury" and confuse the issues. (Def. Mot. at 17.) Any possible confusion could be cured with a limiting instruction that conveys (1) the pending lawsuit is unresolved, and (2) there has been no finding or admission of liability against Defendant based upon that lawsuit. The parties have indicated in their motion papers that they agree to an instruction that contains this language. (See Gov't Opp'n at 15; Def. Reply at 17.)

Moreover, the Court does not agree with Defendant that references to the Aetna lawsuit and Defendant's subsequent conduct would be contrary to Rule 407. (See Def. Reply at 17.) Rule 407 precludes the introduction of subsequent remedial measures, which are measures "taken that would have made an earlier injury or harm less likely to occur," to prove culpable conduct. FED. R. EVID. 407. The Court does not consider Defendant's conduct (as it is described by the Government) following the Aetna lawsuit to be "remedial" in nature to trigger Rule 407. Rather, Defendant continued to conduct potentially illicit activity of the nature he is charged with in the Superseding Indictment, but carried out such conduct in a

different manner.  Accordingly, Defendant's motion is DENIED and the Government is permitted to refer to the Aetna lawsuit.

    11.  <u>Remaining Issues</u>

         As a final matter, the Court will address two other requests raised by Defendant.  First, Defendant requests that the Government identify with more particularity the exhibits it intends to introduce at trial.  (<u>See</u> Def. Mot. at 18.)  This is a matter that the Court has discussed with the parties on multiple occasions since this motion was filed.  Therefore, this request is DENIED and the parties are expected to continue to meet and confer to resolve any outstanding issues regarding the identification of the Government's exhibits.  Defendant's second request is for the Government to produce its trial chart to the defense in Excel format.  (Def. Reply at 4-5.)  If the Government has not already done so, the Government is directed to turnover an Excel version of the trial chart <u>as soon as possible</u>.

<u>CONCLUSION</u>

         For the stated reasons, **IT IS HEREBY ORDERED** that the Government's motion <u>in limine</u> (ECF No. 110) is GRANTED IN PART to the extent that Defendant is precluded from arguing that the insurance companies' continued payment of claims evinces a lack of fraudulent intent.  The Court is RESERVING decision on the admissibility of the three recorded phone calls with Defendant utilizing sexually-charged language.  The Government's motion is

47

DENIED in all other respects, except that it may renew its requests to preclude the insurance companies' clinical and payment polices, and to preclude Defendant from introducing information about his background should the elicited background evidence exceed the scope of Rules 401 and 403.

Defendant's motion in limine (ECF No. 116) is GRANTED IN PART to the extent that Defendant is not precluded from presenting prior "good acts" evidence, the Government may not elicit lay witness testimony from Defendant's former employees or from patients concerning their opinions of the "accuracy" or "appropriateness" of Defendant's billing and coding, the Government is precluded from introducing the Brunner recording during its case-in-chief, and the Government is directed to produce its trial chart in Excel format.  The Court is RESERVING decision on several aspects of Defendant's motion until trial, namely, whether patients may testify as to the costs of procedures they underwent, whether the Brunner recording is admissible pursuant to Rule 801(d)(1)(B) on redirect, whether additional phone calls with Defendant using vulgar language are admissible, and whether the medical billing textbooks (including their excerpts) as well as the  handwritten notes and documents seized from Defendant's office are admissible.  The remaining aspects of Defendant's motion are DENIED.

**SO ORDERED.**


/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: June 10, 2022
       Central Islip, New York