UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------X
UNITED STATES OF AMERICA,

    -against-                                    <u>MEMORANDUM & ORDER</u>
                                        19-CR-0382(JS)

MATHEW JAMES,

               Defendant.
-------------------------------X
APPEARANCES
For United States:          Catherine M. Mirabile, Esq.
                            Antoinette N. Rangel, Esq.
                            United States Attorney's Office
                            Eastern District of New York
                            271 Cadman Plaza East
                            Brooklyn, New York 11201

                            Miriam G. Dauermann, Esq.
                            United States Department of Justice,
                            Criminal Division
                            271A Cadman Plaza East
                            Brooklyn, New York 11201

For Defendant:              Paul M. Krieger, Esq.
                            Georgia V. Kostopoulos, Esq.
                            Krieger Kim & Lewin LLP
                            500 Fifth Avenue, 34th Floor
                            New York, New York 10110

SEYBERT, District Judge:

        Mathew James ("Defendant") moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure ("Rule") 29.   (<u>See</u> Mot., ECF No. 219.)   For the following reasons, Defendant's Motion is DENIED.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

<u>BACKGROUND</u>[1]

The Court presumes familiarity with the record and summarizes the facts and evidence only as necessary for resolution of Defendant's Motion.

Defendant was charged by a nine-count Superseding Indictment (the "Indictment"), dated December 12, 2019, with conspiracy to commit health care fraud, health care fraud, wire fraud, aggravated identity theft, and conspiracy to commit money laundering. (Indictment, ECF No. 26.) Generally, the Government alleged that Defendant, through his ownership of a third-party medical billing company, submitted claims for payment to health insurance companies that falsely reflected the medical services provided to beneficiaries. (<u>Id.</u> ¶¶ 8-9.) Defendant was also alleged to have impersonated patients and their relatives to induce health insurance companies to pay claims. (<u>Id.</u> ¶¶ 17-21.)

Jury selection began on May 31, 2022, and trial commenced on June 13, 2022. At the close of the Government's case, on July 11, 2022, Defendant made an oral Rule 29 motion that the Court denied. (<u>See</u> Tr. at 2700-05.) Then, on July 13, 2022, the jury delivered its verdict, finding Defendant guilty on Counts One

---

[1] The facts are recited as relevant to the Court's analysis and are drawn from the Docket, the Indictment, pre-trial proceedings, and the Trial Transcript ("Tr."). Citations to "GX" refer to the Government's exhibits and citations to "DX" refer to Defendant's exhibits.

through Eight, the health care fraud, wire fraud, and aggravated identity theft counts.  (Jury Verdict, ECF No. 213.)  Defendant was found not guilty as to Count Nine, the money laundering charge. (Id.)

Following the jury's verdict, Defendant filed a post-trial motion for a judgment of acquittal pursuant to Rule 29, which the Government opposes.  (See Mot.; Opp'n, ECF No. 224.)  Defendant submitted a reply.  (See Reply, ECF No. 226.)

DISCUSSION

I.  Legal Standard

Pursuant to Rule 29(a), "[a]fter the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  FED. R. CRIM. P. 29(a).  "Under Rule 29, the standard is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Kenner, No. 13-CR-0607, 2019 WL 6498699, at *3 (E.D.N.Y. Dec. 3, 2019) (internal quotation marks and citations omitted); see also United States v. Mi Sun Cho, 713 F.3d 716, 720 (2d Cir. 2013) ("The question is 'not whether this [C]ourt believes that the evidence at trial established guilty beyond a reasonable doubt,' but rather, whether 'any rational trier of fact could have

3

found the essential elements of the crime beyond a reasonable doubt.'" (alteration and emphasis in original) (first quoting United States v. Brown, 937 F.2d 32, 35 (2d Cir. 1991); then quoting United States v. Persico, 645 F.3d 85, 105 (2d Cir. 2011))). "[V]iewing the evidence in the light most favorable to the government means drawing all inferences in the government's favor and deferring to the jury's assessments of the witnesses' credibility." Kenner, 2019 WL 6498699, at *3 (internal quotation marks and citation omitted).

## II. Analysis

Although trial in this case lasted several weeks, Defendant's opening brief in support of his Rule 29 motion is hardly two pages in length, lacks analysis, and does no more than set forth threadbare recitals of the standards applicable to Rule 29 motions. (See Mot. at 1-2.) This filing, though not particularly helpful to the Court, is permissible under Rule 29 which does not require specificity. See United States v. Schulte, 578 F. Supp. 3d 596, 611 (S.D.N.Y. 2021) (citing United States v. Gjurashaj, 706 F.2d 395, 399 (2d Cir. 1983)); see also id. at 611 n.9 ("In this respect, the Criminal Rules differ from the Civil Rules. [Civil] Rule 50(a)(2) . . . requires that a motion for a directed verdict in a civil action shall state the specific grounds therefor. [Criminal] Rule 29 contains no such language."). Because "the very nature of such motions is to question the

sufficiency of the evidence to support a conviction," when a defendant's motion for acquittal lacks specificity, "it is incumbent upon the government to review its proof as to the facts required to establish each element of each offense alleged." Gjurashaj, 706 F.2d at 399 (citing United States v. Jones, 174 F.2d 746, 748 (7th Cir. 1949)).

In its opposition, the Government conducted a thorough review of the trial record to demonstrate the sufficiency of the evidence as to Counts One through Eight. Defendant submitted a detailed reply which vigorously disputes the Government's characterization of the evidence. The Court will begin its analysis with Count Two, the substantive health care fraud charge, before turning to the remaining Counts in sequential order.

A.   Count Two: Health Care Fraud

To establish health care fraud, the Government must prove: (1) either (a) a scheme or artifice to defraud, or (b) a scheme or artifice to obtain money or property by means of materially false or fraudulent pretenses, representations, or promises, in connection with the delivery of or payment for health care benefits, items or services; (2) that Defendant knowingly and willfully executed or attempted to execute that scheme, with the intent to defraud; and (3) the target of the scheme was a health care benefit program. See 18 U.S.C. § 1347. Here, the parties do

5

not dispute the third element, i.e., that the victim insurance companies qualified as health care benefit programs.[2]

The Government asserts the evidence at trial demonstrated that Defendant knowingly committed the charged scheme to defraud insurance companies in several ways: (1) by falsifying claims forms; (2) by impersonating patients and their family members; (3) by billing for procedures not performed; and (4) by staging emergency room visits.  The Government also argues that, as part of the scheme, Defendant took several steps to conceal his illegal conduct.  Though it was not necessary for the Government to prove Defendant committed the charged fraud in each of these ways, see United States v. Mermelstein, 487 F. Supp. 2d 242, 254 (E.D.N.Y. 2007) ("Courts, however, have repeatedly held that an indictment brought under the health care fraud, bank fraud, or major fraud statutes may properly charge, in a single count, a pattern of executions, or submissions of fraudulent claims, as part of a single, overarching continuing scheme."), Defendant's challenges to the sufficiency of the evidence fail.

   1.   Falsified Insurance Claim Forms

The Government's evidence focused on two ways in which Defendant falsified insurance claim forms as part of his billing

_____

[2] The victim insurance companies identified in the Indictment are Aetna, Cigna, Emblem Health, Optum/United Health Care, Anthem Health/Blue Cross Blue Shield, and/or HealthFirst.

practice:[3] "upcoding" and "unbundling".  Upcoding involves billing for "a higher level of service" than what was actually performed." (Tr. at 1868.)  Unbundling involves billing for multiple services that would be included in the primary procedure." (Id. at 1871.)

Defendant submits the Government's evidence regarding upcoding and unbundling is insufficient to support a conviction as to Count Two for several reasons: (1) Defendant's coding was done in good faith because he provided the insurance companies with corresponding medical records for the claims he submitted (see Reply at 6-9); (2) Defendant did not direct his employees to code inaccurately or to utilize the most complex code possible (id. at 9-12); (3) patients provided "improper coding-related testimony" (id. at 13-14); (4) the Government failed to introduce expert testimony, testimony by any of the alleged doctor co-conspirators, and evidence of the victim insurance companies' policies concerning billing and coding rules (id. at 14-17); (5) the Government ignored Defendant's "indisputably proper coding" (id. at 14, 16-17); and, (6) Defendant did not utilize "Modifier 59" to defraud insurance companies (id. at 18-21).

First, Defendant argues his coding was done in good faith because he provided the insurance companies with corresponding

---

[3] At trial, insurance claims forms were also referred to as "Forms 1500" or "HCFA Forms."

medical records for the claims he submitted.  (See Reply at 6-9.) According to Defendant, "the insurance companies were well aware – or at least as aware as [him] – of exactly how each claim was coded," and how the underlying medical records described each patient's treatment.  (Id. at 6-7.)  The Court readily rejects this argument because it is a repackaged version of an impermissible victim-blaming defense that, at the motion in limine stage, Defendant was precluded from advancing at trial.[4] See United States v. James, 607 F. Supp. 3d 246, 255 (E.D.N.Y. 2022) ("A defendant charged with a fraudulent scheme may not assert the victim's negligent failure to discover the fraud as a defense. . . .  [T]he primary fact that Defendant relies upon to distinguish the instant case from others where such a defense was rejected -- the fact that the victim insurance companies here were provided with 'all of the information that they needed to evaluate' the claims Defendant submitted -- cuts against Defendant's argument.  Following Defendant's logic, because the insurance companies had all of the information required to corroborate the claims submitted by Defendant, the companies should have been able to discover a fraudulent scheme, did not discover such a scheme, and continued to pay Defendant's claims.  The Court cannot envision

---

[4] The Court also notes that the insurance companies' auto-adjudication systems for processing claims do not typically require medical records for claims to be paid.  (See, e.g., Tr. at 707-08.)

a scenario which renders Defendant's argument as anything other than a defense that the insurance companies were negligent in failing to discover the alleged fraud." (first citing United States v. Thomas, 377 F.3d 232, 243 (2d Cir. 2004); then citing United States v. Ahmed, No. 14-CR-0277, 2016 WL 8732355, at *3 (E.D.N.Y. June 24, 2016)).  This good faith defense, which was previously unavailable to Defendant at the in limine stage and at trial, remains unavailable to him post-trial and is an insufficient basis to warrant relief under Rule 29.[5]

        Second, Defendant submits that "no rational juror could have agreed with the [G]overnment's argument" that Defendant directed his employees to code inaccurately or to utilize the most complex codes.  (Reply at 9-10.)  In his Reply, Defendant highlights two examples of claims where he told employees to select "a potentially lower-paying code," e.g., (1) "[w]hen an operative report did not include a description of debridement . . . [and he]  . . . told an employee not to add it" (Reply at 12 (citing DX 141)), and (2) when he told an employee to use the doctor's codes in the operative report even though the "doctor only coded for a

---

[5] To the extent Defendant raises a good faith defense based upon the notion that mistakes are common in coding and billing (see Reply at 8 n.7), that argument is also rejected.  See United States v. Chalhoub, No. 16-CR-0023, 2018 WL 3651584, at *2 (E.D. Ky. Aug. 1, 2018) ("[T]hough a simple mistake would not result in a fraud conviction, that is not the government's case here."), aff'd, 946 F.3d 897 (6th Cir. 2020).

simple debridement" (id. (citing DX 139)).  According to Defendant, "these communications [by Defendant to his employees] provided unequivocal reasonable doubt that Mr. James was intentionally coding claims in a fraudulent manner." (Id.)  The Court disagrees.

The Government introduced evidence that showed Defendant instructed his employees to upcode claims, such as those involving debridement.  For example, Sarina Martinelli ("Martinelli"), one of Defendant's employees, testified that Defendant taught her how to do her job and "[t]o code on the complex side." (Tr. at 1161.) She recalled Defendant directing her to utilize certain codes, particularly CPT code 11011, which is a code specifically pertaining to debridement at the site of an open fracture (see id. at 495-97), any time the word "debridement" was utilized in an operative report (id. at 1161). (See id. at 1306 ("Q: No matter what type of debridement was listed in the operative report, your testimony is that was the only debridement code you were instructed to use[,] right? A: Most times, yes. . . . Q: So 90 percent of the time? A: Yeah."); see also id. at 1305 ("[I]f [the operative report] said debridement then we would use one code.").) Martinelli's testimony was corroborated by notations she made in a notebook during her employment with Defendant, which indicated they "would bill open [fracture] by default" if an operative report didn't specify whether a fracture was open or closed." (Id. at 1262-63 (citing GX 428).)  This testimony was further corroborated

by a second employee, Christie Cutrone ("Cutrone"), who also recounted Defendant's coding instructions specifically as to CPT code 11011, and was told "to use that code if the medical records said 'debridement'." (Id. at 1334-35.)

Even considering the two communication examples Defendant offered, the Court finds a reasonable juror could still find that Defendant instructed his employees to upcode based upon the testimony by Martinelli and Cutrone; therefore, he is guilty of health care fraud. See United States v. Fishbein, No. 21-CR-0296, 2023 WL 5035179, at *6 (S.D.N.Y. Aug. 8, 2023) ("At bottom, 'a jury may bring to its analysis of intent on individual counts all the circumstantial evidence it has received on the scheme and the purpose of the scheme in which the defendant allegedly participated.").

Third, Defendant argues that patients provided improper coding-related testimony because patients discussed the medical care they received, which the Government contrasted with the procedures coded by Defendant in the claims forms. Defendant focuses on the testimony by Denise Baker ("Baker"), the patient who is also the victim of Count Six, that shattered a glass in her hand. Baker testified that she received stitches in the emergency room in April 2018, but that the hand surgeon who tended to her did not remove anything from her hand. (Tr. 1044-46.) Although Baker testified that no foreign bodies were removed from her hand,

11

Defendant points to the surgeon's operative report which indicates the surgeon found "a very small sliver of foreign matter, most likely consistent with a very small shard of glass." (Reply at 13-14 (citing GX 921 at 4).) As an initial matter, Defendant is attempting to re-litigate issues that were previously presented to the Court in the parties' motions in limine and upon which the Court ruled. With respect to the scope of anticipated testimony by patients, the Court set the following parameters:

> [P]atients may testify about their injuries and symptoms, and even describe procedures they underwent that are relevant to claims at issue. The Court will also allow the Government to utilize patients to indicate whether they were (or were not) charged for the procedures they underwent. However, the patients may not opine on the "appropriateness" of the billing and coding submitted by Defendant . . . .

James, 607 F. Supp. 3d at 262. The Government did not elicit testimony that ran afoul of this ruling. Nevertheless, Defendant's arguments with respect to Baker's testimony are based upon credibility determinations that were within the province of the jury and should not be side aside by the Court on a Rule 29 motion. The inconsistency Defendant highlights regarding Baker's belief of the extent of her injury is mitigated by a fact that Defendant cites to in his reply: "Baker also admitted that, as he wrote in her operative report, [the surgeon] warned her that while 'there was no foreign body seen on the x-ray, sometimes very small pieces

12

of glass cannot be seen.'" (Reply at 14 (first citing GX 921 at 4; then citing Tr. at 1100).) As such, it was reasonable for the jury to credit Baker's testimony over the language in the operative report. Further, in the operative report, the surgeon utilized CPT code 20520 for a simple foreign body removal; however, Defendant submitted the claim for the procedure utilizing CPT code 20525 for a deep or complicated removal of a foreign body. Whether there was a foreign body or not, Baker's medical documentation indicates that, at most, "a small sliver" of a glass shard that was undetectable on an x-ray was removed from her hand. A reasonable juror could certainly find that submitting an upcoded claim for "a deep or complicated removal of a foreign body" was fraudulent.

Fourth, Defendant argues the Government failed to introduce expert testimony, testimony by any of the alleged doctor co-conspirators, and evidence of the victim insurance companies' policies concerning billing and coding rules. The Court rejects this argument because the Government is entitled to prove its case by whichever means it chooses, and Defendant has cited no authority to the contrary to indicate that the Government was required to introduce evidence of this sort here. See United States v. Mack, No. 20-CR-0376, 2021 WL 4851391, at *4 (2d Cir. Oct. 19, 2021) ("[T]he prosecution is entitled to prove its case by evidence of its own choice[.]" (quoting Old Chief v. United States, 519 U.S.

172, 186 (1997))).  Thus, the Government's evidence is sufficient to sustain Defendant's convictions, and Defendant's attempt here to create holes in the record is unpersuasive.

Fifth, Defendant argues the Government ignored evidence of his proper coding.  Yet, Defendant has not identified any grounds which require the Government to introduce evidence of Defendant's "good acts."  From pre-trial to trial, and now even post-trial, the Government has consistently maintained its position that Defendant employed "a large-scale fraudulent scheme" that "caused well over $600 million in losses to [the] insurance company victims."  (Opp'n at 3.)  In light of this, the Court "[did] not preclude the defense from admitting 'good acts' evidence" at trial.  See James, 607 F. Supp. 3d at 258 (citing United States v. Fiumano, No. 14-CR-0518, 2016 WL 1629356, at *7 (S.D.N.Y. Apr. 25, 2016)).  Moreover, even if Defendant may have submitted legitimate codes at times as part of his billing practice, the extensive trial evidence is sufficient such that a reasonable juror could find Defendant guilty of health care fraud.

Sixth, Defendant argues he did not utilize Modifier 59 to defraud insurance companies.  His argument is unavailing.

The Government introduced evidence that insurance companies employ "auto-adjudication" systems to evaluate insurance claims.  (Tr. at 707-08, 1859.)  When reviewing claims, the auto-adjudication systems can apply "claim edits" to "codes that may be

included in other codes." (Id. at 1870-71.) Put differently, these edits may be applied where codes should be "bundled" together instead of "unbundled."[6] (Id. at 1870.) This is because unbundled codes are not permitted since they result in the insurance companies paying higher reimbursements than if the codes were bundled. (See id.)[7] There is, however, a mechanism to bypass the claim edits that bundle claims: One includes a code for "Modifier 59" which "unbundle" the codes so that each of the procedures coded are "separate and distinct" from the primary procedure, thereby allowing each procedure coded to be paid separately by the insurance company. (Id. at 1871; see id. at 530-40.) Utilization of Modifier 59 to unbundle codes that would otherwise be bundled as part of the auto-adjudication process is well-known in the medical billing community. (Id. at 1872.) Defendant directed his employees to affix Modifier 59 "on all of the procedure codes."

---

[6] The Government offered a useful analogy at trial to describe unbundling to the jury, which the Court repeats here. Consider unbundling "like a McDonald's combo meal. You order number one and it costs $5.99. Well, imagine when the cashier rings you up, he charges you separately for each item: $4.00 for the Big Mac, $3.00 for the fries, and $2.00 for the drink, and instead of paying $5.99 for the meal you wanted, you end up paying $9.00." (See Tr. at 18.)

[7] In light of testimony that higher reimbursements are issued by insurance companies for claims that are upcoded and unbundled (id. at 1869-70), the Court also rejects Defendant's argument that his coding practices did not have a material impact on claim reimbursement (see Reply at 17).

(Id. at 1164; see also id. at 1334 ("Usually [Modifier 59] would go after the codes coming after the first code . . . .").)

Despite admitting he "regular[ly] use[d] . . . [M]odifier 59," Defendant argues "there is . . . no evidence that [he] understood that he was committing a crime by" doing so. (Reply at 20.)  According to Defendant, "[c]ommon sense dictates that if [he] actually understood that his use of [M]odifier 59 was a fraud each and every time he used it, he would not have used it consistently, openly, and transparently." (Id.)  He also attempts to further mitigate the appearance of fraudulent intent by shifting the blame for the codes he submitted that contained Modifier 59 by stating his "doctor clients, who were ultimately responsible for the HCFA forms he submitted, knew that [he] was consistently using Modifier 59 and either approved of his using it or did not tell him to stop." (Id.)  None of these arguments, separately or together, are sufficient to warrant relief under Rule 29.  While Modifier 59 may be properly utilized under certain circumstances, it is reasonable for a juror to conclude that Defendant's pervasive and open use of Modifier 59 in his medical billing business is demonstrative of his intent to defraud.  This is especially true in light of the sufficient evidence at trial which shows, inter alia, that Defendant's employees knew claims that they submitted were being denied by insurance companies because of Modifier 59. (See id. at 18-19 (citing Tr. at 1439, 1447)).  Notwithstanding,

16

Defendant, by his own admission, continued to affix Modifier 59 to claims as a routine part of his business.   The fact that some claims with Modifier 59 were rejected does not mean there was insufficient evidence to prove beyond a reasonable doubt Defendant defrauded health insurance companies by unbundling claims.

      2.   Impersonating Patients and Family Members

     As part of its case-in-chief, the Government introduced evidence that Defendant and his employees posed as patients and their family members to insurance companies, unbeknownst to the patients and their family members, to induce payments for claims that had been denied in whole or in part.  Defendant and his female employees would impersonate patients and their family members in two ways: (1) by making phone calls to insurance companies (the "Impersonation Calls"); and (2) by sending appeal letters to insurance companies (the "Appeals Letters").  In the Impersonation Calls and Appeals Letters, Defendant and his employees, acting as patients and their family members, would claim that they were being "balance-billed" for procedures for which insurance companies were not willing to pay.  However, not only were Defendant and his employees faking their identities to the insurance companies, the patients and family members were not, in actuality, being balance billed.  Defendant, who admits to the impersonations by himself and his employees, however "misguided and problematic" it may be, argues that a reasonable juror could not conclude that his

17

impersonation of patients was material to insurance companies. (Reply at 30.)  The Court disagrees.

Defendant unpersuasively argues that the impersonations "were not so pervasive that they taint every dollar he collected in the six years that he was a medical biller."  (Id. at 31-32.) In essence, Defendant appears to argue that because the Impersonation Calls and Appeals Letters were not the most prevalent method by which he ensured insurance claims were paid, such conduct was not material to his billing practice.  Whether the Impersonation Calls and Appeals Letters were a material component of the success of Defendant's billing practice as opposed to containing material misstatements for purposes of inducing payments for claims are entirely separate issues.  Further, the Court notes that phone numbers Defendant purchased collectively made more than 18,000 calls to Aetna, Cigna, and Blue Cross Blue Shield between April 30, 2014 through February 27, 2019. (See Tr. at 2225.)

Next, Defendant argues that the Government's "impersonation case fails" because "the evidence showed that, regardless of whether a patient called the insurance company claiming to have received a bill from the doctor, the insurance company should have and often did go directly to the provider, the doctor, and pay that doctor" either the entire amount charged by the doctor or a negotiated amount.  (Id. at 32.)  In other words,

18

Defendant believes the evidence "showed that the insurance companies did not need to get a call from a patient in order to pay an out of network doctor a larger portion of that doctor's invoice." (Id.)  It is unclear to the Court how this evidence is relevant to the issue at hand.  The fact that a patient, on occasion, did not need to initiate contact with the insurance company to obtain a larger reimbursement does not have any bearing on the fact that, as demonstrated at trial, Defendant did just that through the Impersonation Calls and Appeals Letters.  Nor does it have any bearing on whether the Impersonation Calls and Appeals Letters contained materially false statements.

Defendant's billing and coding practice primarily assisted surgeons submit out-of-network claims to insurance companies.  Unlike in-network providers who have contracts with insurance companies that specify the amounts to be paid for certain services, out-of-network providers do not have such contracts or any limits upon the amounts for which they can bill insurance companies.  (See Tr. at 712-13.)  Thus, while an insured's plan may provide out-of-network coverage that is commensurate with what may be paid to an in-network provider, the out-of-network provider can still seek reimbursement from the patient for the difference between the amount billed to the insurance company and what was actually paid through the plan.  (See id. at 716.)  This is balance billing.  Though patients are generally responsible for paying a

19

balance bill (id. at 1874), under certain circumstances, the insurance companies would pay them.  For example, where a patient is balance billed for an emergency procedure, i.e., a situation the patient could not control, the insurance company would either pay the balance bill or attempt to negotiate with the provider to settle the bill.  (Id. at 730-31.)  Further, representatives from both Cigna and Aetna testified at trial that their respective insurance companies would not know that a patient is being balance billed unless the patient advised that they received a bill.  (Id. at 731-33, 1882-83.)

As highlighted by the Government, the Impersonation Calls and Appeals Letters led the insurance companies to believe that balance bills had been sent to patients for "emergency surgeries."[8]  (Opp'n at 15.)  Defendant's employees never sent nor saw anyone send, including Defendant himself, a balance bill to a patient.  (See Tr. at 1314, 1343-34, 1362-63, 1574, 2024-25.)  Defendant also told his employees and the doctor-clients that the patients would not be responsible for the balance bills that were generated for purposes of making the Impersonation Calls and Appeals Letters.  (See id. at 365; see also id. at 1572-73 (citing GX 1032).)  Thus, the Court concludes that a reasonable juror could

---

[8] As set forth in more detail below, the evidence at trial also indicated that Defendant and his doctor-clients/co-conspirators "staged" non-emergent procedures as emergency surgeries.

find that the false statements made in the Impersonation Calls and Appeals Letters, especially those which indicated the patients were balance billed, were material such that Defendant committed health care fraud beyond a reasonable doubt.

### 3.  Billing for Procedures Not Performed

Next, the Government submits that there was evidence at trial that showed Defendant "billed for medical procedures that were more complex or entirely different from what was performed." (Opp'n at 26.)  At trial, evidence was presented concerning the claim Defendant submitted regarding treatment Susan Breidenbach ("S. Breidenbach") received.  S. Breidenbach testified that she sustained a cut to her finger while using a rotary cutter on fabric, and that she went to the emergency room and was treated with eleven stitches by Dr. Urman Desai, one of Defendant's clients.  (Tr. at 121-25.)  S. Breidenbach's husband, Fritz Breidenbach ("F. Breidenbach"), sent an e-mail to Dr. Desai which stated his wife received eleven stitches and that their insurance company was billed $153,250.  (GX 1187; GX 1190.)  Dr. Desai forwarded that e-mail to Defendant.  (See GX 1186.)  After receiving the forwarded message by F. Breidenbach, Defendant created an invoice for Dr. Desai that contained a list of procedures, which pertain to hand reconstructive surgery that, at trial, S. Breidenbach testified Dr. Desai did not perform.  (See Tr. at 136-37; GX 124; GX 1189.)  The Court notes that

S. Breidenbach's medical records and operative report, which were prepared by Dr. Desai, are consistent with the procedures listed in the invoice generated by Defendant.  (See GX 949.)  Though Defendant's billing may have been supported by the patients' medical records at times, as set forth below, there was also evidence at trial that showed Defendant and his doctor-clients conspired to manipulate or falsify operative reports.  With this in mind as well as the other evidence at trial, a reasonable juror could conclude that Defendant knew the insurance claim he submitted for Dr. Desai involved more complex or different procedures than what was actually performed on S. Breidenbach.

4.   <u>Unnecessary Emergency Room Visits</u>

The Government also argues the evidence showed that Defendant and his doctor-clients staged emergency room visits for non-emergent and elective procedures, and billed them as emergency procedures.  (See Opp'n at 10-11, 28-29.)  The evidence cited by the Government on this issue, particularly that pertaining to Deja Guzman ("Guzman"), a patient of Dr. Amir Tahernia, is more aptly discussed in relation to Count One, the conspiracy charge.  (See infra at 28-30.)  As discussed below, a reasonable juror could find Defendant guilty as to Count One and Count Two based on this evidence.

5.  <u>Concealment</u>

Last, the Government posits that Defendant's fraudulent intent was evidenced by: (1) his purchase of hundreds of phone numbers from Compu-Phone; (2) his destruction of evidence; and (3) his use of a fake name, John Andrews.  (<u>See</u> Opp'n at 29-31.) With respect to the Compu-Phone phone numbers, the evidence at trial showed that Defendant obtained new, anonymous, non-sequential phone numbers every few months for area codes across the country.  (<u>See</u> Tr. at 512-18.)  Defendant's employee, Eileen Nash ("Nash"), testified: these numbers were utilized for Impersonation Calls; they used phone numbers with area codes that corresponded with the impersonated patients' locations; and, they told insurance companies to use these numbers as call-back numbers so the patients would not be contacted.  (<u>Id.</u> at 327-31.)  Notably, Defendant does not address the Compu-Phone phone numbers in his Reply.  The Court finds that a reasonable juror could find that the manner in which Defendant (and his employees) utilized these numbers are indicative of fraudulent intent, particularly with respect to the impersonation component of Defendant's operation.

Further, the Government presented evidence that Defendant destroyed evidence, particularly, "every single one of the text messages he had exchanged with Nash," and that he instructed Nash to "get rid of" her work computer after the FBI searched Defendant's office.  (Opp'n at 16-17, 30-31.)  In

23

addition, the Government also showed that Defendant used the name
John Andrews – after being sued civilly by Aetna – to communicate
with at least one patient, Samuel Brenner ("Brenner"), and
instructed Brenner to call his insurance company and state that he
was being balanced billed.  (Id. at 31 (citing Tr. at 1127, 1130).)
Defendant does not challenge that this evidence was introduced at
trial. (See Reply at 35-26.)  Despite Defendant's contention that
this evidence is not demonstrative of intent to defraud (see id.),
based upon the totality of circumstances, a reasonable juror could
infer such intent.

     Accordingly, Defendant's Rule 29 motion as to Count Two
is DENIED in its entirety.

    B.   <u>Count One: Conspiracy to Commit Health Care Fraud</u>

     Count One charged Defendant with conspiracy to commit
health care fraud.   To convict Defendant on this Count, the
Government was required to prove: (1) two or more persons entered
into the unlawful agreement charged in the Indictment; (2)
Defendant knowingly and intentionally became a member of the
conspiracy; and (3) the object of the conspiracy was to commit
health care fraud.  <u>See</u> 18 U.S.C. § 1349; <u>see also</u> 18 U.S.C. §
1347.  The Government submits that the evidence showed Defendant
conspired to commit health care fraud with his doctor-clients as
well as his employees. (Opp'n at 32.)

1.  <u>Defendant's Doctor-Clients as Co-Conspirators</u>

At trial, the Government elicited evidence such that a reasonable juror could find Defendant participated in the charged conspiracy, with the requisite intent to do so, with his doctor-clients.  The evidence showed that Defendant and the doctors accomplished this in two ways: (1) by manipulating and falsifying operative reports; and (2) by staging non-emergent elective procedures as emergency surgeries.

Regarding the operative reports, Defendant argues "there was no evidence at trial that [he] controlled what these physicians put in their operative reports."  (Reply at 21.)  While the evidence may not have shown Defendant himself physically made any changes to operative reports, the evidence did show operative reports were altered after communications were exchanged between Defendant and his doctor-clients, and these alterations provided support for Defendant to bill for more complex procedures or procedures that were not performed.  For example, the Government introduced evidence showing Dr. Christine Blaine modified her operative report for a patient named Suzanne Crowley after Defendant sent Dr. Blaine a text message stating: "Please give me a call when you get a chance.  Have to discuss the operative report on Suzanne Crowley."  (Tr. at 575 (quoting GX 704).)  Another message from Defendant to Dr. Blaine stated: " Take out from the op report that she came into the office; instead, consulted in the

ER.   Number  two  procedure,  add  exploration  of  the  wound,
debridement  of  the  skin  and  muscle,  complex  closure,  wounds  of
length.   Also,  please  dictate  an  ER  consultation  note."   (Id. at
576 (quoting GX 704).)   The  initial  operative  report  (GX  913)
reflected that the procedure Dr. Blaine performed on Crowley was
the removal of a ruptured breast implant.   (Tr. at 573.)   In that
report, Dr. Blaine indicated: Crowley presented in her office
postoperatively  for  an  incision  inspection;  Crowley's  incision
contained a small opening, one centimeter in length, with a visible
breast implant; and, Crowley was sent to the emergency room to be
admitted for the removal of the implant.   (Id.)  However, following
Dr. Crowley's communications with Defendant, the second operative
report   (GX   914),   indicated   the   procedure   performed   was
"exploration of the wound, debridement of skin and muscle, complex
closure measuring six centimeters, and then removal of intact right
mammary implant."   (Tr. at 574.)   It also stated Crowley did not
present to Dr. Blaine at her office, but rather, at the emergency
room.   (Id.)   The changes Dr. Blaine made to the operative report,
which mirror Defendant's suggestions, included, inter alia, the
unbundling of the procedure performed and expanding the wound size.
(See id. at 577.)   Based upon this evidence, a reasonable juror
could find Defendant was guilty of conspiracy to commit health
care fraud, and even substantive health care fraud.

As another illustrative example, a reasonable juror could find that Defendant conspired with Dr. Mark Schoemann to manipulate an operative report to commit health care fraud. In the initial report (GX 1093), Dr. Schoemann indicated that an intermediate wound closure was performed for a three-centimeter laceration above an eyelid. (See Tr. at 563.) There was no indication of debridement. Dr. Schoemann e-mailed this report to Defendant at 4:16 p.m. on April 2, 2018. (See id. at 2201.) After a four-minute phone call with Defendant shortly after the initial report was sent by Dr. Schoemann (see Tr. at 2202), Dr. Schoemann sent Defendant another e-mail at 5:21 p.m. with the subject line "new and improved op note" (id.; GX 2323). In this second operative report, Dr. Schoemann indicated that he performed a complex wound repair and a debridement at the site of an open fracture. (See Tr. at 564-65.) Then in the claim form, Defendant utilized Modifier 59, presumably to unbundle the complex wound repair and debridement codes. (Id. at 566-57.)

A reasonable juror could also find Defendant guilty of Count One by conspiring with his doctor-clients to have patients treated in the emergency room for non-emergent and elective procedures. One of Defendant's employees, Stephanie Brunner ("Brunner"), testified that several times per week, she overhead Defendant on the phone either coaching patients to go into the emergency room for their procedures or coaching doctors on how to

27

speak to their patients to get them into the emergency room for their procedures. (Id. at 2031-32.) As part of her job, she billed for emergency room visits "every day". (Id. at 2016.) Though Defendant argues Brunner's testimony is not credible (see Reply at 10 n.8), the proper avenue to have challenged her testimony would have been through cross-examination -- not in a post-trial motion -- and the Court notes that Defendant chose not to cross-examine Brunner at trial (see Tr. at 203-08). See James, 607 F. Supp. 3d at 264-64 (noting that a recording consisting of a prior consistent statement by Brunner may be admissible on re-direct).

Although there are others (see, e.g., Tr. at 1699-1712, 1873, 2288-89, 2294-98; GX 919; GX 955; 957 (pertaining to Dr. Charlotte Rhee's treatment of Victoria Motley)), one primary example of this tactic to stage emergency room visits, as highlighted by the Government, pertains to Dr. Tahernia's treatment of Guzman. Guzman testified that she initially approached Dr. Tahernia in 2015 about surgery to treat a skin disease she suffers from, Hidradentitis Suppurative ("H.S."). (Tr. at 240-42.) She ultimately underwent the procedure on September 20, 2017. (Id. at 244.) Prior to the surgery, Guzman received a letter from Dr. Tahernia on August 17, 2017 to give to her employer so that she could "get off from work" after her surgery. (Id. at 245-46 (citing GX 110).) Also prior to the

28

surgery by a few days, Guzman flew from her home in Florida to
Dr. Tahernia's practice in Beverly Hills for an initial
consult/pre-operative meeting.  (Id. at 246-47.)  Dr. Tahernia
and his staff told Guzman to check-in for her surgery at Olympia
Medical Center through the emergency room.  (Id. at 247.)  She
had a second surgery a "couple" of days after the first.  (Id.
at 250.)  Guzman testified that she began receiving text messages
from Dr. Tahernia because he was having "difficulty getting paid
on [her] insurance claim" and asked her to sign forms about an
appeal.  (Id. at 251-56.)  Guzman contacted her insurance company
and was told there was nothing she needed to submit.  (Id. at
256-57.)  Her insurance covered her surgery and she testified
that she never received a bill from Dr. Tahernia.  (Id. at 255.)
Notwithstanding, Dr. Tahernia sent Defendant an e-mail telling
him to "fix" the denial of the claim for Guzman's procedure. (GX
1212.)  Thereafter, Defendant submitted an Appeals Letter with
Guzman's forged signature to United.  (Tr. at 259 (citing GX
800-D).)  In the Appeals Letter, Defendant, posing as Guzman,
indicated that she "was admitted to the emergency room at Olympia
Medical Center on September 19th of 2017 for high fever due to
the severe infection, open wound, and had to undergo emergency
surgery."  (Id.)  However, Guzman testified: her surgery was
pre-planned (not an emergency); she did not have a severe
infection or fever; and, she did not have an open wound.  (Id.

29

at 260-61.)   In the Appeals Letter, Defendant also indicated
that Guzman was treated by the "on-call" surgeon, in this case,
Dr. Taheinia; but, Guzman testified this was false because Dr.
Tahernia knew she was checking-in for her surgery.  (Id. at 261-
62.)  Guzman was only one of the patients about whom Dr. Tahernia
and Defendant exchanged text messages.  Several other patients
who had H.S., the same condition as Guzman, were also sent
to the emergency room for their pre-planned surgeries.  (See
Opp'n at 10-11 (citing GX 754).)

It is not necessary for the Government to prove the
charged conspiracy by direct evidence.  In fact, "[i]t is well
established 'that the [G]overnment is entitled to prove its case
solely through circumstantial evidence." United States v. Flores,
945 F.3d 687, 710 (2d Cir. 2019) (quoting United States v.
Rodriguez, 392 F.3d 539, 544 (2d Cir. 2004)).  Especially where,
as here, "the offense at issue is conspiracy, 'deference to the
jury's findings is especially important . . . because a conspiracy
by its very nature is a secretive operation, and it is a rare case
where all aspects of a conspiracy can be laid bare in court.'"
Id. (quoting United States v. Rojas, 617 F.3d 669, 674 (2d Cir.
2010)).  In light of this standard, and the overwhelming evidence
at trial pertaining to communications between Defendant and other
doctor-clients (see Opp'n at 34 (citing GX 714; GX 749; GX 751; GX
752; GX 754; GX 756; GX 762; GX 778; GX 779; GX 1125 to GX 1135)),

a reasonable juror could find Defendant guilty of conspiring to commit health care fraud with his doctor-clients.

### 2. Defendant's Employees as Co-Conspirators

The Government also submits that sufficient evidence exists to find Defendant guilty of conspiring to commit health care fraud with his employees, particularly with respect to the Impersonation Calls. (Opp'n at 34.) Employees Nash and Dolores Persky both testified they made Impersonation Calls because Defendant asked them to, and that they knew they were making false statements to insurance companies. (See Tr. at 309-15, 837-42.) Based upon this, a reasonable juror could find Defendant guilty of conspiring to commit health care fraud with his employees.

Accordingly, Defendant's Motion as to Count One is DENIED.

### C. Counts Three, Four, and Five: Wire Fraud

To establish wire fraud, the Government must prove: (1) the existence of a scheme to defraud; (2) that Defendant knowingly and willfully participated in the scheme to defraud with specific intent to defraud; and (3) Defendant used or caused the use of interstate wires. (Tr. at 2985-87); see also 18 U.S.C. § 1343; United States v. Dinome, 86 F.3d 277, 283 (2d Cir. 1996).

Count Three pertained to the e-mail from Dr. Tahernia to Defendant, dated January 16, 2018, in which Dr. Tahernia told Defendant to "fix" the denial of the claim related to Guzman's surgery.  (GX 1212.)  Dr. Tahernia sent this e-mail to Defendant after the claim for Guzman's surgery was denied, which prompted Defendant to generate a forged Appeals Letter that contained false information about the nature of Guzman's surgery.  (See supra at 29-30.)  Thus, it was reasonable for a jury to find Defendant guilty of wire fraud as to Count Three.

Count Four pertained to an e-mail from Dr. Schoemann to Defendant, dated April 10, 2018, in which Dr. Schoemann attached medical records related to Baker.  (GX 1209.)  The evidence at trial showed that Dr. Schoemann's operative report indicated the procedure performed was a simple foreign body removal but Defendant submitted an upcoded claim for a deep complicated removal of a foreign body.  Given Baker's testimony that a foreign body was not removed from her hand during her procedure, the Court has already determined a reasonable juror could find Defendant guilty of health care fraud based on his submission of this claim.  (See supra at 11-13.)  The Court reaches that same conclusion with respect to Count Four.

The last wire fraud charge, Count Five, pertained to an e-mail from office staff for Dr. Candido Fuentes to Defendant, attaching an explanation of benefits and a copy of the electronic

funds transfer from Aetna for payment related to Defendant's billing claim for Dr. Fuentes' treatment of Sheila Sperber ("S. Sperber"). (GX 1224.) S. Sperber's father, Andrew Sperber ("A. Sperber"), testified that that she sustained a small cut, approximately a quarter of an inch long above her right eye; S. Sperber fell on a step at dance class and cut herself. (Tr. at 190-91.) At the emergency room, Dr. Fuentes, a plastic surgeon, placed stitches on the cut. (Id. at 191.) The stitches took approximately 20-25 minutes to insert. (Id.) Although S. Sperber only received stitches for a small cut, S. Sperber' s hospital admission records indicated, inter alia, that Dr. Fuentes performed a debridement and "complex plastic surgical repair of 2.6-centimeter laceration of right eyelid." (Tr. at 196; GX 906.) According to the records, Dr. Fuentes made an incision that "carried down through the dermis and subcutaneous tissue until the level the tissue was excised was a part of the orbicularis oculi muscle." (Id. at 197.). A. Sperber confirmed that Dr. Fuentes did not perform a complex plastic surgical repair in the brief time he was in the emergency room with his daughter, nor did Dr. Fuentes inform him that such a procedure would be performed. (Id. at 196-97.) However, Defendant billed a claim for Dr. Fuentes to Aetna in an amount that exceeded $40,000, and an explanation of benefits letter dated March 22, 2018 indicated that Aetna paid only $712.86. (GX 904.) Then on April 3, 2018, in one of his

Impersonation Calls, Defendant posed as A. Sperber and indicated to the insurance company that he was being balance billed and threatened with collections. (GX 6.) Defendant also posed as A. Sperber in an Appeals Letter, reiterating the claims relayed during the related Impersonation Call. (GX 433.) Thereafter, a subsequent explanation of benefits letter indicates that Aetna agreed to pay the more than $40,000 claim, and the wire charged here included the fund transfer stub. (GX 905; GX 1224.) As such, it is reasonable for a jury to conclude that Defendant, who posed as A. Sperber when making an Impersonation Call and who submitted an Appeals Letter, is guilty of the wire fraud charged in Count Five.

Accordingly, Defendant's motion is DENIED as to Counts Three, Four, and Five

D.   Counts Six, Seven, and Eight: Aggravated Identity Theft

To establish Defendant's guilt as to aggravated identity theft, the Government is required to prove three elements: (1) Defendant knowingly used, transferred or possessed a "means of identification"[9] of another person; (2) Defendant used the means of identification during and in relation to the offense of

---

[9] The term "means of identification" means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including, for example, any name, Social Security Number, date of birth, official state or government issued driver's license or identification number, or insurance identification number. See, e.g., 18 U.S.C. § 1028(d)(7).

conspiracy to commit health care fraud or health care fraud; and (3) Defendant acted without lawful authority.

Count Six charged Defendant with aggravated identity theft with respect to Baker and her husband. At trial, the Government introduced recordings in which Defendant impersonated Baker's husband, who was the policyholder for her insurance. (GX 4; GX 5.) During these Impersonation Calls, Defendant utilized Baker's and her husband's names and dates of birth, and Defendant did so without their consent. This is sufficient for a reasonable jury to find Defendant guilty of aggravated identity theft.

Count Seven charged Defendant with aggravated identity theft with respect to A. Sperber and his daughter, S. Sperber. Defendant impersonated A. Sperber in an Impersonation Call and in an Appeals Letter, utilized A. Sperber's name and date of birth, and utilized personal information identifying S. Sperber, all without the consent of the Sperbers. (GX 6; GX 7.) This, too, is sufficient for a reasonable jury to find Defendant guilty of aggravated identity theft.

Count Eight charged Defendant with aggravated identity theft with respect to Marcus Smart ("Smart"). Smart, a professional basketball player, injured his hand in January 2018 while punching a picture frame in a hotel room.

(Tr. at 984.)   Smart went to the emergency room at Cedars-Sinai Hospital, where the doctors removed glass from the palm of his right hand.   (Id.)   After the glass was removed, "the doctor told [him] that he doesn't understand how the glass sat perfectly between [his] tendons, . . . didn't tear any tendon, and [that] every tendon in [his] hand was in contact."   (Id.) Yet, the medical records pertaining to Smart's treatment at Cedars-Sinai -- which were prepared by Dr. Desai, Defendant's same doctor-client who treated S. Breidenbach -- indicated, inter alia, Smart sustained a partial tendon laceration and that a repair of same was performed.   (Id. at 986-87 (citing GX 916).) At variance with the medical records, Smart testified he never received a bill regarding the treatment he received in January 2018. (Id. at 991.)   Further, the Government introduced several recordings of Impersonation Calls where Defendant posed as Smart, without his consent, claiming to be balance billed in an amount exceeding $104,000.   (See Tr. at 989-99; GX 35; GX 36; GX 37; GX 38; GX 39.)   Based upon this evidence, a reasonable juror could conclude Defendant committed aggravated identity theft as charged in Count Eight.

Accordingly, Defendant's Motion is DENIED as to Counts Six, Seven, and Eight.

## CONCLUSION

Thus, for the stated reasons, **IT IS HEREBY ORDERED** that Defendant's Motion for a Judgment of Acquittal (ECF No. 219) is DENIED.

**SO ORDERED.**

_/s/_ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated: October 12, 2023
       Central Islip, New York