

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

CMM/MGD/ATR
F. #2018R02072

*610 Federal Plaza*
*Central Islip, New York 11722*

January 16, 2024

By ECF

The Honorable Joanna Seybert
Senior United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

Re:     United States v. Mathew James
        Criminal Docket No. 19-382 (JS)

Dear Judge Seybert:

The government writes in connection with the sentencing of defendant Mathew James, which is scheduled for January 23, 2024.

I.     Preliminary Statement[1]

For approximately seven years, the defendant—who is college-educated, holding both a Bachelor of Science and a nursing degree—used his education and skills to conceive, oversee and lead a complex fraudulent-billing scheme that targeted numerous private insurance companies nationwide. The defendant's scheme resulted in countless victim insurance companies being billed a collective $700 million plus in fraudulent claims and thousands of patient's identities stolen and abused by the defendant. As the U.S. Probation Department ("Probation") so aptly stated: "the defendant was convicted of carrying out an audacious scheme in which he used insurance companies to steal hundreds of millions of dollars, and his aggressive opportunism as an entrepreneur morphed into outright greed." (See Probation Sentence Recommendation at 3.)

---

[1] Because the Court presided over the instant matter for more than four years, including trial and post-trial motion, the government will not repeat the facts adduced at trial, and instead respectfully refers the Court to the factual statements set forth in the Government's Response in Opposition to Defendant's Post-Trial Motion for Judgment of Acquittal, dated November 14, 2022, and the Court's Memorandum and Order, dated October 12, 2023 ("Rule 29 Order"). See ECF Dkt Nos. 224 and 240.

Indeed, the defendant went to great lengths to execute his fraud. He lied to insurance companies. He "upcoded"—that is, he submitted falsified claim forms that reflected more serious (and therefore more expensive) procedures than had actually occurred. And he "unbundled" claims that resulted in higher reimbursements by allowing his claims to fool the victim insurance companies' automated systems. He created fake documents. He instructed co-conspirators to falsify medical records. He directed co-conspirators and patients to use the emergency room for elective and pre-planned procedures. He stole people's identities and impersonated patients and their family members. He forged people's signatures. He used hundreds of rotating, untraceable telephone numbers to conceal his conduct. He destroyed evidence. He assumed an alias, and continued to commit his fraudulent conduct while on pretrial release.

The defendant's fraudulent conduct—which amounted to one of the largest healthcare fraud cases in this country—in the end, caused the insurance companies to pay hundreds of millions of dollars on false claims. The defendant's conduct obviously harmed the insurance industry directly, but more importantly, it hurt insurance holders indirectly. Insurance companies do not absorb fraud losses. Instead, they pass them along in the form of higher premiums to their customers.

All objective metrics—the scope of the defendant's fraud, the enormity of the losses he caused, the brazenness of his criminal behavior, his attempts to obstruct justice and the need to send a strong deterrent message—point to the imposition of a significant sentence. For the reasons set forth below, after a careful consideration of the Section 3553(a) factors, the government respectfully submits that a fair and just sentence is a sentence of 25 years' imprisonment.

II.     The Presentence Investigation Report

A.     The United States Sentencing Guidelines Calculation

On February 9, 2023, Probation issued the PSR; on October 16, 2023 and January 3, 2024, it issued its first and second Addenda, respectively. Probation concluded that the defendant's advisory Guidelines offense level was 43, and he was a Criminal History Category I, resulting in a range of imprisonment of life. (PSR ¶ 106.) Taking into consideration the statutory maximum terms of imprisonment on each count (240 months on each of Counts 1 through 5, and 24 months on each of Counts 6 through 8), the effective guideline imprisonment term is 1,272 months (i.e, 106 years). (Id.)

The offense level for Counts One, Two, Three, Four and Five was calculated using a base offense level of seven (U.S.S.G. § 2B1.1(a)(1)), adding 28 levels because the defendant intended to cause more than $250 million in losses (U.S.S.G. § 2B1.1(b)(1)(O)), adding four levels because the defendant was an organizer/leader (U.S.S.G. § 3B1.1(a)), adding two levels because the defendant abused a position of trust (U.S.S.G. § 3B1.3)), and adding two levels because the defendant obstructed justice (U.S.S.G. § 3C1.1). (See PSR ¶¶ 37-43.)

Counts Six, Seven and Eight charge aggravated identity theft, in violation of 18 U.S.C. § 1028A. These counts carry a mandatory two-year term of incarceration, to be imposed consecutively to all other counts. (U.S.S.G. § 2B1.6; see PSR ¶ 44.)

2

While the government agrees that Probation's loss calculation is one method of determining a loss amount for purposes of the Guidelines, the government submits that such calculation is conservative and that government has proven, by a preponderance of the evidence, an intended loss of over $756 million, resulting in a 30-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(P).  In addition, while not included in Probation's Guidelines calculation, the government submits that the defendant is also subject to a two-level enhancement for sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C).

By letter dated November 13, 2023, the defendant raised several objections to the PSR.  (See Defendant's November 13, 2023 Objections (the "Objections").)  Specifically, he objects to:  (i) the loss amount (id. at 11-12); (ii) the four-level role enhancement for being an organizer/leader, pursuant to § 3B1.1 (id. at 9-10); (iii) the two-level enhancement for abuse of trust, pursuant to § 3B1.3 (id. at 10-11); (iv) the two-level enhancement for obstruction of justice, pursuant to § 3C1.1 (id. at 9); and (v) because the defendant objects to the four-level role enhancement, he claims he is entitled to a two-level reduction because he has zero criminal history points (id. at 10).  For the reasons set forth below, those arguments lack merit.

A chart detailing the differences between Probation's, the government's and the defendant's Guidelines calculations with respect to Counts One through Five is detailed below.

| | **Probation** | **Government** | **Defendant** |
|---|---|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | 7 | 7 | 7 |
| Plus: Loss Amount (U.S.S.G. § 2B1.1(b)(1)) | 28 | 28 or 30 | Objects to Loss Over $250 Million |
| Plus: Sophisticated Means (U.S.S.G. § 2B1.1(b)(10)(C)) | 0 | 2 | None Provided |
| Plus: Role Adjustment (U.S.S.G. § 3B1.1(a)) | 4 | 4 | 0 |
| Plus: Abuse of Trust (U.S.S.G. § 3B1.3) | 2 | 2 | 0 |
| Plus: Obstruction of Justice (U.S.S.G. § 3C1.1) | 2 | 2 | 0 |
| Less: Zero-Point Offender Adjustment (U.S.S.G. § 4C1.1) | <u>0</u> | <u>0</u> | <u>-2</u> |
| ***Adjusted Offense Level*** | 43 | 45 or 47 | None Provided |
| ***Guidelines Range*** | Life | Life | None Provided |

B.    The Defendant's Factual Objections to the PSR Are Wholly Without Merit

Before discussing the merits of the defendant's objections to Probation's Guidelines calculation, the government first will address the defendant's objections to (i) certain facts contained in the PSR (Objections at 2-8); and (ii) that acquitted conduct should be excluded (id. at 11).  The defendant's objections are without merit and should be rejected.

The defendant attempts in his objections to the PSR (and, presumably in his sentencing memorandum)[2] to relitigate the trial and to reframe the trial testimony as though the jury's verdict were something other than to convict the defendant for his participation in a large-scale, egregious healthcare fraud scheme in which he personally benefited over $63 million.  These objections amount to a total denial of the crimes for which he was convicted—a position that the defendant unabashedly still promotes.  (See, e.g., Objections at 2 (defendant claims that because he was released from detention following a pretrial detention hearing he did not engage in fraud post-arrest); 3, 5-7 (defendant claims he did not "use the most expensive "CPT codes," that he did not submit claims for procedures more complex or totally different than those actually performed, that he did not work with his doctor-clients to manipulate operative reports, and that he did not use (or sometimes properly used) Modifier 59); and 3-4 (defendant asserts that the evidence at trial did not establish that he made "thousands" of impersonation calls (the "Impersonation Calls"), that he directed multiple female employees to make Impersonation Calls, or that he sought to hire employees who could be "molded" to participate in the fraud)).  The jury already considered and rejected these specious arguments.  The Court did as well in its comprehensive order denying the defendant's post-trial motion.  (See Rule 29 Order.)  While the government refers the Court to those arguments already rejected in the Rule 29 Order, the government will nevertheless address the defendant's factual objections.

1.    Paragraphs 12, 26, 33

The defendant argues that the PSR's references to his post-arrest fraudulent activity should be struck, asserting that there is no evidence that he continued conducting his fraudulent billing practices after his arrest.  (Objections at 2.)  In doing so, the defendant relies on the Court's December 2019 determination that his bond should not be revoked, which was predicated on questions as to (a) whether the claims for Sam Brenner, the relevant patient, were fraudulent, and (b) whether the defendant, after his arrest, had initiated contact with Brenner regarding the claims.  (Id.)  The defendant's reliance on the Court's prior ruling is misplaced, as the determination was made prior to the trial and both the circumstances and evidence are now significantly more developed.  In particular, the trial evidence proved that the defendant (using the alias "John Andrews") both contacted Brenner and directed Brenner to appeal his claims.  Further, it was the defendant who provided Brenner with the fraudulent balance bill itself for Brenner to present to the insurance company as a basis to appeal the claim.

_____

[2] Because the government's and defendant's sentencing memoranda are due to be filed on the same day, the government anticipates that the defendant will, similarly, object to the factual background underlying his convictions.

At trial, Brenner testified about his facial laceration and the treatment provided to him by Dr. Urmen Desai, and the jury saw the corresponding bill submitted by the defendant that was significantly different from Brenner's description of his injury and treatment. (Compare T. 1120-21 with GX 1197.)[3] The trial evidence also established the criminal nature of the relationship between the defendant and Dr. Desai: among other evidence, it was Dr. Desai who treated Susan Breidenbach, whose claim for stitches was substantially inflated by the defendant, with Dr. Desai's knowledge, to hand reconstructive surgery. (T. 120-128; GX 1187, 1189, 1193.) The evidence at trial further established that the defendant trained his doctor-clients, including, but not limited to, Dr. Desai, to falsify their own operative reports to justify the highest possible billing codes. Accordingly, although at the December 2019 bond hearing defense counsel argued that the defendant had accurately coded Brenner's operative report and therefore did not commit fraud, (Objections Ex. C at 14-15), the trial evidence makes clear that the Brenner claim was completely fraudulent at the defendant's behest.

In the Rule 29 Order, the Court agreed with the government regarding the fraudulent nature of the Brenner communications. In particular, the Court held that the government had shown at trial that the defendant "used the name John Andrews – after being sued civilly by Aetna – to communicate with [Brenner], and instructed Brenner to call his insurance company and state that he was being balance[] billed," and that this evidence was sufficient for a "reasonable juror to infer [fraudulent] intent." (Rule 29 Order at 24.)

Finally, the trial evidence showed that the defendant pursued the fraudulent Brenner claims long after his arrest: in October 2019, four months after his July 2019 arrest, the defendant emailed Brenner and insisted that Brenner pursue the fraudulent bill by falsely informing the insurance company that the provider was threatening collections. (GX 1203, 1207.) The PSR's references to the defendant's post-arrest fraudulent activity are supported by the trial record and should remain.

2. Paragraph 13

The defendant argues that the trial evidence did not establish that he changed his company name for the purpose of concealment. (Objections at 3.) But the evidence at trial established that the defendant had a regular practice of encouraging his co-conspirator doctors to create new medical practices for themselves so that the fraudulent payments would be more difficult for insurance companies to recoup. (See, e.g., T. 1175-76, 1562-63; GX 1136, 1137, 1138, 1139, 1140, 1151, 1286; see also GX 428.)

The evidence also showed that the defendant took multiple other measures to conceal his fraud, including using untraceable phone numbers to make the Impersonation Calls and directing Eileen Nash and Dolores Persky in various ways to avoid detection by insurance companies. (See Rule 29 Order at 23-24.) The government argued in summation, and Probation and the Court are entitled to infer, that the defendant changed the name of his billing company multiple times, for no apparent legitimate reason, for the same reason he instructed his co-conspirator doctors to change theirs: because he wanted to conceal his criminal activity.

---

[3] "T." refers to the transcript of the trial in this matter; "GX" refers to government exhibit.

3.    Paragraph 15

The defendant argues that the PSR's statement that the amount of money paid by a plan to an out-of-network provider should be deleted as being "of limited relevance," as well as uncorroborated.  Multiple witnesses testified to the fact that the amount of money an insurance company paid a health care professional was normally determined by the relevant health plan – including payments to out-of-network providers.  For example, Aetna employee Garrett Shohan testified that his insurance company determined the appropriate payment to an out-of-network provider based on the provisions of the patient's insurance plan.  (T. 1865; see also T. 1858.)  If the out of network provider disputed the payment, there were options to negotiate a higher payment.  (See T. 1874-76.)  The role of the plan in determining out-of-network reimbursements is relevant, among other reasons, because the purpose of the Impersonation Calls was to force the insurance companies to pay the amount over and drastically above what the plans paid to the out-of-network provider.  The means by which the original out-of-network payment was calculated is therefore relevant to sentencing.  The challenged sentence should remain in the PSR.

4.    Paragraph 19

The defendant asserts that the evidence at trial does not support the PSR's determination that the defendant (a) knowingly and intentionally submitted claims completely different from the procedures performed by his co-conspirator physicians, (b) used the most expensive CPT codes for the claims he submitted, and (c) conspired with his clients to stage emergency room visits.  (Objections at 3.)  The evidence on each of these points was reviewed by the Court in the Rule 29 Order and the Court determined that the jury was entitled to find, as it did, that the defendant committed the actions stated by Probation.  (See Rule 29 Order at 25.)  The defendant's attempts to relitigate the jury's findings, which the Court upheld in the Rule 29 Order, should be flatly rejected.

5.    Paragraph 20

The defendant asserts that the evidence at trial does not support the PSR's determination that the defendant (a) made "thousands" of impersonation calls knowing that the requests for additional payments were false, (b) directed at least five female employees to make impersonation calls, and (c) sought to hire employees who could be "molded" to participate in his fraud.  (Objections at 3-4.)  Again, the defendant is attempting to relitigate the evidence as proved at trial.

With respect to (a), the evidence showed that the defendant's Compu-Phone lines – the lines he purchased to use for the Impersonation Calls – were used to call insurance companies nearly 20,000 times.  (GX 2325.)  His female impersonation employees also testified that they made hundreds of calls each.  (See T. 349-350, 840; GX 101.)  Moreover, the defendant's demands for additional payments were based on an entirely false premise: that the doctor was balance billing the patient and would otherwise turn the patient's account over to collections.  The language used by Probation is accurate and consistent with the trial evidence.

With respect to (b), the female impersonation employees proved at trial were Dolores Persky, Eileen Nash, and Christie Cutrone.  The government also disclosed to the

defendant prior to trial that there were two other female impersonation callers, Ciara Nagy and Kathleen Green, both of whom were interviewed by the government and admitted to their conduct. Accordingly, there is no error in the PSR as to item (b).

With respect to (c), the evidence at trial showed that the defendant deliberately sought out employees who had minimal billing experience.  He generally employed younger women who had taken, at most, medical billing classes lasting weeks, and who had minimal or no experience in a medical billing context.  (See T. 1151, 1317-18, 1473-74, 2005-07.)

      6.     Paragraph 22

The defendant argues that the PSR is incorrect in stating that he submitted claims for procedures more complex or totally different than those actually performed and did so in part by working with his doctor-clients to manipulate operative reports.  (Objections at 5.)  He provides two examples that he alleges were not supported by the trial evidence: Susan Breidenbach's eleven stitches, for which the defendant billed $153,000 for hand reconstructive surgery, and Victoria Motley, who received a tummy tuck but for whom the defendant billed for a hernia repair.  For the reasons that follow, the objection to Paragraph 22 should be rejected.

The defendant is again attempting to relitigate the jury verdict and the Court's Rule 29 Order.  At trial, the government proved that the defendant had a regular practice of directing his doctor-clients to falsify their operative reports.  One of the doctors with whom the defendant had such an arrangement was Dr. Desai, the doctor who treated Breidenbach.  The trial evidence also showed that the defendant was aware that Breidenbach's specific claim was false (GX 1188 (email describing Breidenbach's treatment as "11 stitches")), and he continued to pursue it by sending falsified invoices to Dr. Desai for forwarding to the Breidenbachs.  (GX 1189 (invoice describing "repair extensor tendo[n]," "repair nail bed," etc.).)

As for Motley, the defendant claims that she was "confronted" with an operative report and other paperwork that stated she had received hernia surgery, and that her statement that she had been seeking tummy tuck surgery was "fabricated."  (Objections at 5.)  Clearly the jury did not agree that Motley had "fabricated" her testimony.  The defendant ignores the substantial evidence, including, but not limited to, Motley's testimony, that she had intended from the beginning to have a cosmetic tummy tuck.  (See T. 1873, 2288-89, 2294-98, GX 957.)  The defendant also ignores the fact that Motley was directed to go through the emergency room for her pre-planned surgery, adding another level to the fraudulent nature of the defendant's claims for her.  (See T. 1698, GX 134.)  Moreover, the government proved that the defendant sent Dr. Rhee, a plastic surgeon, a draft operative report for a hernia repair (GX 1143), and that the defendant corresponded with other plastic surgeons about the need to make tummy tucks appear to be emergency hernia repairs so that they would be covered by insurance.  (See, e.g., T. 2310, 2297-98; GX 706 p. 38.)

These instances are only two of many examples of the defendant working with doctor-clients to falsify their operative reports.  (See, e.g., T. 2303, 2305, 2307-08; GX 706, 716, 749, 766, 944, 945, 1101.)  As another example, the defendant directed one doctor-client to increase the size of a wound, (see GX 1112), and another to report additional procedures (see GX 704a).  The defendant explained his reasoning: with the larger wound size the defendant requested,

he could bill additional, more lucrative codes.  (GX 1101.)  The Court acknowledged the weight of this evidence in the Rule 29 Order: the Court reviewed the evidence elicited at trial and found that "[t]he evidence showed that Defendant and the doctors accomplished [the conspiracy] in two ways: (1) by manipulating and falsifying operative reports; and (2) by staging non-emergent elective procedures as emergency surgeries."  (Rule 29 Order at 25.)  The Court went on to state that "the evidence [showed] operative reports were altered after communications were exchanged between Defendant and his doctor-clients, and these alterations provided support for Defendant to bill for more complex procedures or procedures that were not performed."  (Id.)  The defendant's objection to Paragraph 22 of the PSR should be rejected.

7.    <u>Paragraph 23</u>

The defendant objects to Paragraph 23 of the PSR on three grounds that he (a) did not "use the most expensive CPT codes," (b) "regularly communicated with his physician-clients to confirm details of the treatment and the coding," and (c) sometimes did not use (or sometimes properly used) Modifier 59.  (Objections at 6-7.)  Each of these objections fails.

Part (a) of the defendant's objection misrepresents the trial record.  The record is clear that the defendant consistently directed his employees to use the most complex possible CPT code.  (See, e.g., T. 1161, 1527-30, 2012-13.)  The example highlighted at trial was the word "debridement": although there were multiple debridement codes, the defendant instructed his employees that whenever they saw the word in an operative report, they were to code the highest complexity code (specifically, 11011).  (See Rule 29 Order at 9-11.)

Regarding part (b), as proven at trial, the defendant's "regular[] communicat[ion]" with his doctor-clients was not meant to ensure accurate coding, but to ensure that the doctor-clients would draft their operative reports to reflect more extensive procedures than they had actually performed, so that he could justify the more expensive CPT codes he planned to bill.  (See Rule 29 Order at 25.)  Moreover, the fact that the defendant sometimes – although not always – correctly coded the claims based on the operative reports simply reflects, as the trial evidence showed, that he had trained his repeat doctor-clients well on how to falsify their operative reports.  (See Rule 29 Order at 21-22; T. 153-58, 2204-23.)  Nor does the testimony from his employees that he did not make up CPT codes justify the objection – the gravamen of the criminal conduct is that the defendant misused and upcoded existing codes, not that he made up codes or used completely unrelated codes.

Part (c) of the objection likewise fails.  The defendant asserts (without citation) that there were instances in which Modifier 59 was not used, was used properly, or was irrelevant to the insurance company's claim evaluation.  The trial evidence showed that nearly all of the claims fraudulently included Modifier 59 (see, e.g., T. 1164, 1334, 1871-72, GX 401), and the Court determined in the Rule 29 Order that the defendant's use of the modifier was "routine," and was "pervasive and open" in a manner "demonstrative of his intent to defraud."  (Rule 29 Order at 16-17.)  The objections to Paragraph 23 are inconsistent with the trial evidence and the Rule 29 Order and should be denied.

8.    Paragraph 24

The defendant objects to Paragraph 24's statement that he worked with his doctor-clients to fraudulently send patients through the emergency room for their pre-planned surgeries. (Objections at 7.)  This objection has been addressed above and was squarely rejected by the Court in the Rule 29 Order.  (Rule 29 Order at 25.)  The objection should be denied.

9.    Paragraph 26

The defendant objects to Paragraph 26's statement that he called Compu-Phone and demanded to know how he had been "found."  (Objections at 7-8.)  The PSR directly quotes the trial testimony of Rachel Lemmer, the Compu-Phone employee, which reads as follows:

> Q.    And what did the defendant say when he called you about shutting down his accounts?
>
> A.    He called saying I don't know how they found me.  I need to cancel my account.  Close my account.  They found me.

(T. 527.)  The defendant called Lemmer back several days later "to try to figure out how his calls would have been traced."  (Id.)  The PSR accurately reflects the trial testimony and the defendant's objection to Paragraph 26 should be rejected.

10.    Additional Offense Conduct

a.    GAP Procedures

The defendant requests that the PSR be amended to include the fact that he billed for so-called "GAP procedures," which were out of network claims authorized by insurance companies.  (Objections at 8.)  As the testimony of patient Heather Quinlivan made clear, the defendant's fraud extended to GAP procedures as well: he made Impersonation Calls demanding that the insurance companies pay the difference between the amount pre-authorized by the GAP authorization and the amount he wanted to bill for the procedures, falsely claiming that the patient was being balance billed.  (See, e.g., T. 63, 74.)

Of note, the defendant's knowledge and understanding of the GAP authorization procedures makes even more clear the reason for the fraudulent emergency room visits: To the extent the PSR is amended to include the GAP procedures, the amendment should include the fact that the defendant's billing for GAP procedures was fraudulent as well, and that his desire to avoid the GAP authorization process – and thereby avoid the risk of having the procedure denied in advance – was one driver of the emergency room aspect of the fraud.

b.    Patient Harm

The defendant requests that the PSR include the fact that no witnesses claimed that their credit was harmed or that they were held responsible for a medical bill.  This was, of course, the motivating impetus behind the Impersonation Calls as part of the fraud and, with it, the aggravated identity theft: that the defendant lied to the insurance companies about the existence of

a balance bill.  (T. 1572-74, 2024; GX 782; <u>see also</u> GX 1024, 1032.).  The fact the defendant seeks to include is probative of the fraud, not a mitigating factor for sentencing.  Further, while the patients may not have experienced financial harm, several patients testified about the emotional toll the defendant's fraud had on them.  (<u>See, e.g.</u>, T. 81, 270-71, 998.) The defendant's request should be denied.

c.    <u>Acquitted Conduct</u>

The defendant also objects to paragraph 29 of the PSR, which recounts the evidence presented at trial regarding the defendant's conspiracy to engage in money laundering.  (<u>See</u> Objections at 11; PSR ¶ 29.)  The defendant is wrong and, as paragraph 29 correctly states, "the Court may, in its discretion, consider the defendant's money laundering conduct as the basis for an upward departure pursuant to USSG § 2K2.21."  (PSR ¶ 29.)

Acquitted conduct, particularly crimes related to the offense of conviction, can and should be considered by a court at sentencing.  <u>See, e.g.</u>, <u>United States v. Gotti</u>, 767 Fed. App'x 173, 174-75 (2d Cir. 2019) ("[A] district court may consider acquitted conduct at sentencing") (citing <u>United States v. Vaughn</u>, 430 F.3d 518, 527 (2d Cir. 2005) (holding that "district courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct") (internal citations omitted))); <u>see also</u> 18 U.S.C. § 3661 (expressly providing that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence").  The defendant's attempt to preclude the Court's consideration of such facts runs afoul of well-settled law.

C.    <u>Loss Amount</u>

1.    <u>Applicable Law</u>

Under U.S.S.G. § 2B1.1(b)(1), a defendant receives an upward adjustment in offense level based upon the amount of loss.  There are two ways to calculate loss:  actual loss and intended loss.  "[L]oss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, App. Note 3(A).

For Guidelines purposes, "actual loss" refers to the reasonably foreseeable pecuniary harm that resulted from the offense.  U.S.S.G. § 2B1.1, note 3(A).  Under "relevant conduct" principles, the amount of loss attributable to a particular defendant is determined under Guidelines Section 1B1.3(a) and includes the loss from:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance

10

of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense.

U.S.S.G. § 1B1.3, App. Note 2; see also United States v. Greenfield, 44 F.3d 1141, 1149 (2d Cir. 1995) (concluding that, under § 1B1.3(a)(1)(B), a co-conspirator shall be held accountable at "sentencing for 'all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity'").

Intended loss, on the other hand, requires determining the intended harm.  See United States v. Lacey, 699 F.3d 710, 719 (2d Cir. 2012) (intended loss encompasses a defendant's reasonable expectation of loss); United States v. Carboni, 204 F.3d 39, 47 (2d Cir. 2000) ("intended loss must include both the amount the victim actually lost and any additional amount that the perpetrator intended the victim to lose").

The commentary to § 2B1.1(b)(1) provides in relevant part that "[t]he court need only make a reasonable estimate of the loss."  See U.S.S.G. § 2B1.1(b)(1), App. Note 3(C).  The commentary further provides that

[t]he estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following: . . . (iv) the approximate number of victims multiplied by the average loss to each victim[; and] . . . (vi) more general factors, such as the scope and duration of the offense and revenues generated by similar operations.

Id.; see also United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009) (district court "need not establish the loss with precision but rather need only make a reasonable estimate of the loss, given the available information"); United States v. Bryant, 128 F.3d 74, 75 (2d Cir 1997) (the "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision").

2.    Discussion

As a result of the defendant's fraudulent scheme, the victim insurance companies unquestionably suffered substantial losses and there are collateral consequences for insurance holders.  The government has established, by a preponderance of the evidence, that, conservatively speaking, the total loss amount exceeds $250 million and that this Court should, at a minimum, apply U.S.S.G. § 2B1.1(b)(1)(O).

Probation calculated the loss in this matter to be $528,183,741.83.  (PSR ¶ 27.) Probation's estimate is based on the following:  The defendant personally obtained $63,382,049.02 through his billing businesses during the dates set forth in Counts One and Two of the Superseding Indictment.   Accepting the government's position that "that money was secured through the defendant's involvement in his fraudulent schemes" and that the defendant received 10% to 12% of the monies paid on claims from his doctor-clients, using the percentage in the range of 10% to

12% that is most conservative (12%), Probation determined the loss to be $528,183,741.83. (Id.) Based on this loss amount, Probation calculated an actual loss amount of more than $250 million (and less than $550 million) and, thus, applied a 28-level increase, pursuant to § 2B1.1(b)(1)(O).

The government submits that the loss in this matter can be calculated in several different ways and, depending on the method of calculation, the loss amount is either more than $250 million with a 28-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(O) or more than $550 million with a 30-level increase pursuant to U.S.S.G. § 2B1.1(b)(1)(P).

First, the government agrees that Probation's method of calculating loss is viable and based on evidence established at trial. As established at trial, the defendant's medical billing companies were permeated with fraud. Nearly every claim submitted to the insurance companies contained false information. (See, e.g. T. 709-11, 1161-62, 1164-65, 1264-64, 1334-36, 1525-30, 1533-36, 1548, 1658-59, 1855, 1861, 1868-70, 2012-13 (falsified claim forms – upcoding and unbundling); T. 153-58, 1520-22, 2204-23, GXs 704a, 713, 714, 944, 945, 1093, 1094, 1101, 1112 (falsified operative reports); T. 1699-1712, 1873, 2288-89, 2294-98, GX 706, 919, 955, 957 (falsely billing cosmetic procedures as medical necessary procedures); T. 52-53, 242-50, 262, 1701-04, 1706, 1699-1701, 1708, 2013, 2031-33, GX 109, 110, 751, 754, 756, 762, 932, 933, 934, 955, 956 (unnecessary emergency room visits); T. 76-69, 199-201, 209-13, 308. 310-12, 314, 349-50, 835, 840, 903-08, 915-18, 989-97, 1070-73, 1346, 1352, 1354, 2024-25, GX 101 (impersonations); T. 1314, 1343-44, 1362-63, 1574, 2024-25 (every one of the defendant's employees testified that she had never sent or seen anybody else, including the defendant, send a bill to a patient).) Indeed, the defendant's entire business model was built on fraud. The defendant used redacted, fraudulent claims as examples of his billing to lure in more doctor-clients with the promise of higher payouts. The more fraudulent claims the defendant churned out, the more referrals and doctor-clients he received, allowing him to expand his fraudulent scheme more and more every year. Bank records introduced at trial showed that, during the relevant period, the defendant earned approximately $63,382,049.02 from his medical billing companies. (T. 2607; GX 2353.) Further, testimony at trial established that the defendant took anywhere from a 10% to 15% commission on the monies paid on claims from his doctor-clients. (T. 2033, 2647-48; GX 2358.) Using these figures, the Court can calculate the actual loss to the collective victim insurance companies:

| The Defendant's Bank Accounts | | | |
|---|---|---|---|
| Earned | 10% | 12.5% | 15% |
| $63,382,049.02 | $633,820,490.20 | $507,056,392.16 | $422,546,993.47 |

Thus, the most conservative view of the loss calculation (15%) reveals a loss of over $422 million to the collective victim insurance companies, resulting in a 28-level increase under § 2B1.1(b)(1)(O). The least conservative view of the loss calculation (10%) reveals a loss of over $633 million, resulting in a 30-level increase under § 2B1.1(b)(1)(P).

The government also undertook a second method for determining the loss calculation in this case. Specifically, the government calculated loss amounts based on the defendant's impersonations, his fraudulent use of Modifier 59 and the total claim amounts submitted to the insurance companies based on Explanation of Benefits ("EOBs"). Using this method, the loss calculations similarly establish either a 28-level or a 30-level increase.

With respect to the impersonations, the Federal Bureau of Investigation ("FBI") identified patients impersonated by the defendant or one of his employees. This information was sourced from (i) Cigna call recordings, (ii) Aetna call recordings, (iii) Eileen Nash's spreadsheet, (iv) appeals packets found in the defendant's office; (v) appeals letters that were located on the defendant's computer in the scanned folder, (vi) Word documents of appeals letters that were located on the defendant's computer in his shared folder, (vii) physical copies of appeals letters found in the defendant's office that had forged signatures, (viii) excel spreadsheets labeled "Dolores Persky Lists," (ix) emails between the defendant and Persky with instructions from the defendant regarding impersonations, (x) text messages between the defendant and Persky regarding patients to impersonate, and (xi) Dropbox files between the defendant and Ciara Nagy, another impersonation caller who did not testify at trial, regarding patients to impersonate. From these sources, the FBI not only identified the patient(s) but also the provider(s) and the date(s) of service.

Once the FBI identified the people the defendant or his employees impersonated, the FBI then identified the billing documents related to each patient from (i) the EOBs on defendant's computer, (ii) the Lytech data on the defendant's computer and/or (iii) the subpoena returns from the victim insurance companies.

The FBI compiled this information into an excel spreadsheet, and reviewed and removed any duplicate information. (See FBI Impersonation Spreadsheet attached hereto as Exhibit A.)[4] The FBI then calculated the claim amounts billed for each of the impersonated patients as well as the amounts paid by the insurance companies on those claims.[5] The results are as follows:

| Impersonations | |
|---|---|
| Billed | Paid |
| $313,734,707.80 | $127,373,512.51 |

The FBI then cataloged the total EOBs submitted by the defendant's medical billing companies to various insurance companies that were located on the defendant's computer.[6] The FBI identified and removed any duplicate information, and compared this list against the list of impersonated patients and, so as to not duplicate the loss amounts related to the impersonations, removed the EOBs related to the impersonated patients: leaving a total list of EOBs minus the

---

[4] Because Exhibit A contains personal identifying information, it is being filed under seal.

[5] On occasion, the FBI was unable to identify the amount billed or paid on a claim with respect to a particular patient. In that circumstance, no amount was included in the loss calculation for that patient, despite evidence that the patient was impersonated and further underscoring the conservative loss calculations by the government.

[6] Communications with the defendant's employees show that the defendant only saved EOBs that paid out $10,000 or more. (See GX 428 at 4.)

impersonations.  (See FBI EOB Spreadsheet attached hereto as Exhibit B.)[7]  The FBI then calculated the claim amounts billed for the EOBs and the amounts paid by the insurance companies on those claims.  The results are as follows:

| Total EOBs (Minus Impersonations) | |
| --- | --- |
| Billed | Paid |
| $442,825,679.14 | $305,610,269.25 |

Using the total EOBs (minus impersonations), the FBI identified those claims using Modifier 59.[8]  The FBI then calculated the claim amounts billed using Modifier 59 and the amounts paid by the insurance companies on those claims.  The results are as follows:

| Modifier 59 | |
| --- | --- |
| Billed | Paid |
| $307,878,800.46 | $215,449,450.42 |

From this information, the FBI made two additional calculations:  (i) the total amount billed and paid based on the Total EOBs and the impersonations; and (ii) the total amount billed and paid based on only the impersonations plus the EOBs with Modifier 59.  The results are as follows:

| Totals (Impersonations + Total EOBs) | |
| --- | --- |
| Billed | Paid |
| $756,560,386.94 | $432,983,781.76 |

and, the more conservative loss calculation:

| Impersonations + Modifier 59 | |
| --- | --- |
| Billed | Paid |
| $621,613,508.26 | $342,822,962.93 |

Using the more conservative loss calculation of just the impersonations plus the EOB claims that contained Modifier 59, the intended loss amount is more than $621 million, resulting in a 30-level enhancement under § 2B1.1(b)(1)(P), and an actual loss amount of more than $342 million, resulting in a 28-level enhancement under § 2B1.1(b)(1)(O).

The government submits that the intended loss of more $621 million and the actual loss of more than $342 million based on just the impersonations and the defendant's use of Modifier 59 is a conservative estimate for a number of reasons.  Modifier 59 and the impersonations were both vital to the defendant's fraud scheme.  The defendant used, and taught his staff to use, Modifier 59 on all procedure-related claim lines.  (See, e.g., T. 1164, 1334, 1336,

---

[7] Because Exhibit B contains personal identifying information, it is being filed under seal.

[8] This information is obtained by sorting columns G, H and I in the EOB Spreadsheet for Modifier 59.

1529-30, 1870; GX 1019.)  The defendant used Modifier 59 to bypass the auto-adjudication system to just get *something* paid on each claim line.  Once something was paid, regardless of the amount, the defendant then made his impersonation calls, with material misrepresentations, to attempt to collect the balance.

This loss amount is conservative to the true amount of the defendants crime because: (i) the FBI only used the EOBs found on the defendant's computer and the defendant only saved EOBs valued over $10,000, and that also assumes that every EOB over $10,000 was actually saved and not forgotten about; (ii) not all EOBs provided the modifiers for each CPT code; based on the defendant's billing practice and history, it is extremely likely that at least some of these codes had Modifier 59 attached to them, but if the FBI could not find the data to back it up, this information was not included in the calculation; (iii) for those EOBs that the FBI could not determine the CPT codes used ($562,779.27 of paid claims), that amount is not included in the loss calculation, even though it is very likely that at least some of those claims had Modifier 59 affixed to them; and (iv) the government was unable to obtain recorded calls from multiple victim insurance companies, meaning that defendant likely impersonated more than the patients the FBI was able to identify.

Thus, the government submits that under any of these methods of calculating loss, the defendant is subject to either a 28-level or a 30-level increase under § 2B1.1(b)(1).

The defendant objects to Probation's loss calculation and urges Probation and, presumably, the Court to "not adopt the government's drastically overstated loss amount as the government has not met its burden of proving a $528,183,741.83 loss amount by a preponderance of the evidence." (Objections at 11.)  Specifically, the defendant claims that the government's loss amount is "speculative, inconsistent with positions the government has taken throughout the pendency of this case, and . . . dramatically overstates the seriousness of the offense with which [the defendant] (and none of the alleged 140 doctor co-conspirators, none of whom testified at trial) was convicted." (Id. at 12.)  Significantly, the defendant utterly fails to proffer an alternative loss calculation, asserting instead to "reserve" his calculation for his sentencing submission. (Id. at 12).

In any event, the defendant is wrong.  As an initial matter, it is irrelevant whether the defendant's co-conspirators testified at trial, were charged or convicted.  In reality, the defendant asks this Court, in short, to effectively declare that he is innocent and ignore the loss he inflicted on the victim insurance companies and their policyholders.  But this Court already denied the defendant's Rule 29 motion.  And the jury concluded the defendant was guilty.  The defendant's continued attempt to disclaim responsibility for his large-scale fraud scheme—and place that responsibility on his doctor-clients—should not be entertained.

Moreover, the defendant's claim that the government's loss calculation is "speculative" is at odds with the law in the Second Circuit, which has repeatedly made clear that "a district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information." United States v. Binday, 804 F.3d 558, 595 (2d Cir. 2015) (abrogated on other grounds); see Uddin, 551 F.3d at 180.  The Binday Court also stated:

Notably, the defendants have not offered an alternative calculation for actual loss, nor is one readily apparent.  Indeed, the alternative for which defendants seem to argue is zero, because the actual losses cannot currently be determined.  To be sure, it is not defendants' obligation to establish loss amount.  Yet unless we conclude, which we hesitate to do, that actual loss caused by frauds of this nature are categorically outside the reach of the loss Guideline even where there has clearly been some loss, the absence of a better alternative weighs in favor of concluding that the method used here is a reasonable one.

Binday, 804 F.3d at 597.

The intended harm of the defendant's fraud was the money the defendant sought to obtain from the insurance companies as a result of the defendant's overwhelming fraudulent claims.  The amount paid by the insurance companies on the defendant's fraudulent claims thus constitute the intended loss.  Testimony about every single claim is not required to establish that every claim was fraudulent.  The abundant evidence presented at trial already shows that nearly every claim submitted by the defendant involved deceit.  Having carried its burden beyond a reasonable doubt at trial, the government has also carried its burden by a preponderance of evidence that the more than $756 million billed to the insurance companies on the defendant's medical claims is a reasonable estimate of the amount of intended loss for purposes of sentencing.

Nevertheless, as discussed above, the government has also offered alternative conservative loss calculations, focusing only on the impersonations and the defendant's prolific, fraudulent use of Modifier 59.  The government has not overstated the loss to the victim insurance companies or the seriousness of the defendant's audacious fraud (which, as discussed below, amounts to one of the largest healthcare fraud convictions in the country), and its loss calculations are entirely consistent with positions the government has taken through the pendency of this case, including trial.

Accordingly, the 28-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(O) is appropriate and should be applied.[9]

---

[9] There is, arguably, yet another method of calculating loss.  If one considers the gain (i.e., the approximately $63 million that the defendant earned through his fraudulent billing practices) to be the loss amount, as opposed to the total amount billed to or paid by the insurance companies—which the Court should not do—the defendant would be subject to a 22-level enhancement pursuant to § 2B1.1(b)(1)(L), resulting in a total offense level of 39 (including all the other enhancements set forth in the PSR, as well as the enhancement for sophisticated means) and an advisory guidelines range of 262 to 327 months' imprisonment.  Such a calculation would, however, drastically understate the defendant's culpability and the scope of his fraud since he was the mastermind of the whole scheme.

D.     A Two-Level Enhancement for Sophisticated Means is Warranted

While not included in Probation's calculation, the government submits that to a two-level adjustment for sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C) is, likewise, appropriate.

1.     Applicable Law

The Sentencing Guidelines provide that where "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, increase by 2 levels." U.S.S.G. § 2B1.1(b)(10)(C). Application Note 9(B) defines "[s]ophisticated means" to be especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."

The Second Circuit has recognized that the enhancement "targets conduct that is more complex, demonstrates greater intricacy, or demonstrates greater planning than a routine [criminal offense of the same variety]." United States v. Lewis, 93 F.3d 1075, 1080 (2d Cir. 1996). The creation and use of false documentation is often an element of "sophisticated means." See, e.g., United States v. Amico, 416 F.3d 163, 169 (2d Cir. 2005) (creation of false bank documents, appraisals and blueprints); United States v. Regensberg, 381 Fed. App'x 60, 62 (2d Cir. 2010) (creation of fake loan documents and fraudulent earnings statements). The commission of an offense across multiple jurisdictions may also be an indication that the offense involved sophisticated means. The commentary provides the example of a telemarketing operation that locates its main office in one jurisdiction but conducts operations in another. See U.S.S.G. § 2B1.1, App. Note 9(B).

The Second Circuit has also recognized that "even if each step in [a] scheme was not elaborate," the sophisticated means enhancement nevertheless applies where "the total scheme was sophisticated in the way all the steps were linked together so that [the defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way." United States v. Jackson, 346 F.3d 22, 25 (2d Cir. 2003).

2.     Discussion

The defendant's offense conduct involved the kind of complexity, intricacy and sophistication that warrants an enhancement under § 2B1.1(b)(10)(C). In particular, the defendant's fraudulent scheme involved, among other things:

- sophisticated knowledge of the coding system and the auto-adjudication system;
- the falsification of insurance claim forms so that they reflected more serious (and therefore more expensive) procedures than actually occurred (i.e., upcoding);
- the use of Modifier 59 to unbundle claims that resulted in higher reimbursements but also allowed the defendant's claims to bypass the victim insurance companies' precautions against fraud;

- coordination with doctor-clients to falsify operative reports;
- falsely billing cosmetic procedures as medically necessary procedures;
- unnecessary emergency room visits;
- impersonations of patients and patient family members;
- the hiring and training of several employees to upcode or impersonate patients;
- the use of hundreds of rotating, untraceable telephone numbers;
- the creation of several billing entities and bank accounts;
- the destruction of evidence; and
- the defendant's use of an alias.

Indeed, the defendant's impersonations, use of multiple company names and bank accounts, use of doctored records and knowledge of how to bypass the insurance companies' auto-adjudication process to avoid detection, use of untraceable telephone numbers and an alias are hallmarks of sophisticated means to commit and conceal an offense. The defendant also used his deep understanding of coding as well as the auto-adjudication system to structure a fraudulent scheme that was undetectable for years and enabled him to steal hundreds of millions of dollars.

The totality of the defendant's healthcare fraud scheme carried out over an extended period of time required an intricate web of lies and several employees all created and working at the defendant's direction supports the sophisticated means adjustment. Accordingly, the government submits that the defendant is subject to a two-level enhancement for sophisticated means, pursuant to § 2B1.1(b)(10)(C).

E.    An Organizer/Leadership Role Enhancement is Warranted

The defendant objects to the four-level role enhancement for being an organizer and leader of the instant offense, which involved five or more participants, pursuant to U.S.S.G. § 3B1.1(a). (See Objections at 9-10.)[10] He claims that, while he "ran a medical billing business

---

[10] In his letter to Probation, other than stating that he was not a "leader, organizer, manager or supervisor," the defendant makes no argument or reference whatsoever about the applicability of the other aggravating role enhancements. As discussed herein, the defendant is subject to the four-level aggravating role enhancement for being an organizer and leader of the criminal scheme. However, to the extent that the Court finds that the defendant was not an organizer or leader of five or more participants (which the government contends the trial evidence proves he was), he unquestionably satisfies one of the other two aggravating role enhancements set forth in § 3B1.1.

Section 3B1.1(b) provides for a three-level enhancement if "the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." This enhancement is appropriate where the defendant "played a crucial role in the planning, coordination, and implementation of a criminal scheme." See United States v. Paccione, 202 F.3d 662, 624 (2d Cir. 2000). A defendant may be considered a manager or supervisor if he exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants. See United States v. Al-Sadawi, 432 F.3d 419, 426 (2d Cir. 2005); United

out of the basement of his home," he was not the organizer, leader, manager or supervisor of any of the criminal activity for which he was convicted.  Consistent with his utter failure to take any responsibility for his own conduct, the defendant places blame on his doctor-clients.  (Id.)  He further claims that, regardless of his role, the government failed to prove the criminal activity involved five or more knowing participants or that his criminal activity was extensive.  (Id. at 10.)  Contrary to the defendant's claims, the evidence supporting his role as a leader or organizer and the extent of, and number of participants in, his criminal activity was overwhelming.

     1.    <u>Applicable Law</u>

     Section 3B1.1(a) provides for a four-level enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  The Guidelines define "participant" as a person "criminally responsible for the commission of the offense," regardless of whether the person has been charged or convicted.  U.S.S.G. § 3B1.1, App. Note 1.  "For a defendant to qualify for the enhancement on the five-or-more ground, the government must show four people other than the defendant who were criminally responsible for the offense."  <u>United States v. Archer</u>, 671 F.3d 149, 165 (2d Cir. 2011) (internal quotation marks and citation omitted); <u>see also</u> <u>United States v. Norman</u>, 776 F.3d 67, 82 (2d Cir. 2015) (citing <u>Paccione</u>, 202 F.3d at 625).  However, because the enhancement also applies for the organizer or leader of criminal activity that "was otherwise extensive," "[a] defendant may be subject to a four-level enhancement even if the defendant managed only one other participant."  <u>United States v. Mi Sun Cho</u>, 713 F.3d 716, 722 (2d Cir. 2013) (per curiam).  In considering whether a scheme is "otherwise extensive" under § 3B1.1(a), "all persons involved during the course of the entire offense are to be considered."  U.S.S.G. § 3B1.1, App. Note 3.

     To determine whether as defendant is an "organizer or leader," as opposed to a "manager or supervisor," "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."  U.S.S.G. § 3B1.1, App. Note 4; <u>see also</u> <u>United States v. Katsman</u>, 551 Fed. App'x 601, 603 (2d Cir. 2014) (summary order).

     2.    <u>Discussion</u>

     Here, the defendant unquestionably played a leadership role in defrauding the victim insurance companies.  He was indisputably an organizer or leader of a criminal activity that involved five or more participants.  In addition, his criminal activity was "otherwise extensive" regardless of the number of participants.  The criminal activity spanned years, involved multiple

---

States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002).  Under § 3B1.1(b), a defendant need only manage or supervise one other person, so long as the criminal activity itself involved at least five participants.  See United States v. Payne, 63 F.3d 1200, 1212 (2d Cir. 1995).

     Section 1B1.1(c) provides for a two-level enhancement if "the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b). . . ."

employees, impersonations, aliases and the submission of hundreds of thousands of fabricated claims to numerous victim insurance companies, all leading to the theft of hundreds of millions of dollars.

In particular, the evidence showed that the defendant was the sole owner and operator of his medical billing companies.  He managed the day-to-day affairs and directed and controlled all aspects of his companies.  He hired and fired employees.  (T. 308, 836, 1151, 1317, 1473-74, 2007-08.)  He trained employees on how to review an operative report, identify key terms and procedures and translate that information into CPT coding on the insurance claim form.  (T. 1512-18, 1520, 2012, 1161.)  He reviewed every insurance claim form that his employees drafted and approved every line of every claim that went to insurance companies.  (T. 1165, 1524-25, 1532-33, 2015.)

Significantly, he personally managed and supervised several employee participants in the criminal activity—including, but not limited to, Jennifer Flanagan, Christie Cutrone, Sarina Martinelli, Stephanie Brunner, Dolores Persky and Eileen Nash—each over whom he exerted control and authority and who he trusted to carry out his criminal directives.  The defendant trained and directed his employees to, among other things, falsify insurance claim forms (including, but not limited to, upcoding and unbundling) and bill for procedures not performed.  At his direction and under his close supervision, the office employees, among other tasks, reviewed the doctor-clients' operative reports, translated the information in the reports into the most complex and lucrative CPT codes and upcoded wherever possible; drafted Forms 1500 using the CPT codes for modifiers to bypass the auto-adjudication system; called insurance companies to follow up on the status of claims that he was attempting to appeal; and logged the claims into the company's claim tracking system when they were paid by the insurance companies.  (See T. 1161, 1323, 1511-20, 2012.)  Flanagan, Martinelli, Cutrone and Brunner each testified about the defendant's training and directives.  (See also Rule 29 Order at 10 (highlighting in particular the defendant's control and authority over Martinelli).)

Further, in addition to making his own impersonation calls, the defendant hired several female employees[11] who impersonated patients or patients' family members that he, as a male, was unable to impersonate.  (T. 310-11, 837-38.)  Both Persky and Nash testified that the defendant hired them solely to impersonate female patients, provided them with the patients' personal identifying information and instructed them to make the false statements to the insurance companies.  (T. 309-10, 317, 319, 837, 839.)  Persky and Nash together made hundreds, if not thousands, of impersonation calls at the defendant's direction.  (See T. 349-50, 840; GX 101.)

Similarly, while Cutrone had other responsibilities, she, too, impersonated patients at the defendant's direction.  For example, when the defendant was impersonating a female patient's parent or spouse, insurance companies would request to speak to the patient to obtain authorization to speak to the defendant.  (See, e.g., T. 1390; GX 41.)  In such cases, the defendant

---

[11] The defendant also employed Ciara Nagy, who, among other things, made impersonation calls for him.  While the government has already identified four other "participants" for purposes of the four-level aggravating role enhancement, to the extent necessary, the government is prepared to establish Nagy as yet another participant.

walked down the hall to Cutrone's desk and directed her to impersonate the female patient, providing authorization to the defendant to continue the conversation.  (T. 1390-94; GX 20, 41, 453.)  After Cutrone, impersonating the patient, authorized the insurance company representative to speak to her "father" or "spouse," the defendant would continue with the impersonation call.  (See, e.g., GX 41.)  This, too, happened hundreds of times.  (T. 1376.)

Further, the evidence overwhelming established that the defendant's fraudulent scheme did not begin and end with the defendant and his own employees.  Although he now attempts to downplay his role, the defendant also instructed numerous doctor-clients (well in excess of five doctors) on what to include in operative reports to intentionally deceive the victim insurance companies into paying out significantly greater reimbursements.  For example, the defendant directed his co-conspirator doctors to falsify and manipulate their operative reports and to stage non-emergent elective procedures as emergency surgeries, all of which allowed him to bill for more complex procedures or procedures that were not performed.  (See Rule 29 Order at 25; see, e.g., T. 2303, 2305, 2307-08; GX 706, 716, 749, 766, 944, 945, 1101.)

The defendant's summary claim that the doctors were more culpable than him is inapposite.  (See Objections at 9-10.)  The Guidelines expressly provide that "[i]n distinguishing an organization role from one of mere management or supervision, titles such as 'kingpin' or 'boss' are not controlling" and that "there can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  U.S.S.G. § 3B1.1, App. Note 4.  Whether the defendant exercised control over the doctors is not the question.  The question posed by the Guidelines is whether the defendant organized or led the organization.  And on that question, the record fully supports application of the enhancement.

Fraud touched every aspect of the defendant's medical billing companies and the defendant oversaw all of it.  He qualifies as an organizer/leader.  Accordingly, Probation correctly applied the four-level aggravating role enhancement.

F.     The Defendant Abused a Position of Trust

The defendant contends that Probation erred in applying the two-level enhancement, pursuant to U.S.S.G § 3B1.3, on the grounds that he did not hold a position of trust with any of the victim insurance companies.  (See Objections at 10-11.)  Again, the defendant is wrong and the enhancement should be applied.

1.     Applicable Law

Under § 3B1.3 of the Guidelines, a two-level enhancement is appropriate "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."  U.S.S.G. § 3B1.3.

A position of "public or private trust" refers to positions in which an individual has "professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference).   Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature."  U.S.S.G. § 3B1.3, App. Note 1.  In addition, for the enhancement to

apply, the position of trust must have contributed in some significant way to facilitating the commission or concealment of the offense.  U.S.S.G. § 3B1.3.

Section 3B1.3's abuse-of-trust enhancement involves a two-prong analysis: (1) whether the defendant occupied a position of trust from the victim's perspective; and (2) whether that abuse of trust significantly facilitated the commission or concealment of the offense.  United States v. Huggins, 844 F.3d 118, 124 (2d Cir. 2016).

As the Second Circuit has explained, whether the defendant occupied a position of trust turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong.  United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (per curiam) (internal quotations and citations omitted); United States v. Castagnet, 936 F.2d 57, 61-62 (2d Cir. 1991) (indicia of having the freedom to commit a difficult-to-detect wrong includes "[i]f one party is able to take criminal advantage of the relationship without fear of ready or quick notice by the second party, the second party has clearly placed a level of trust in the first").  "In other words . . . the defendant's position must involve discretionary authority."  United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001).  Moreover, it does not require "a legally defined duty such as fiduciary duty."  United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003) (citations and quotations omitted).

"[W]hether a position is one of 'trust' . . . is to be viewed from the perspective of the offense victims and is a question of law for the court, subject to de novo review on appeal."  United States v. Wright, 160 F.3d 905, 910 (2d Cir. 1998).  Whether a defendant abused a position of trust in a manner that "significantly facilitated the commission or concealment of the offense" is a question of fact, reviewed for clear error.  United States v. Hussey, 254 F.3d 428, 431 (2d Cir. 2001) (internal citations and quotations omitted).

2.    Discussion

As Probation correctly concluded, the defendant abused a position of trust and the two-level enhancement applies.

The defendant was a third-party medical biller and, as such, he was trusted to submit accurate and truthful claims on behalf of his doctor-clients to the insurance companies. The victim insurance companies, acting on behalf of their insureds, trusted the defendant to submit accurate medical claims.  Insurance companies paid medical claims in deference to the defendant's unsupervised professional judgment in completing the medical billing forms on behalf of his doctor-clients.

Medical billers, like the defendant, have a relationship of trust "characterized by professional . . . discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)" that is "subject to significantly less supervision" than others.  U.S.S.G. § 3B1.3, App. Note 1.  Insurance companies relied upon the expertise and representations of the defendant.  There is simply no question that, as a medical biller, the defendant had the freedom, discretion, and lack of supervision that provided him "the freedom to commit a difficult-to-detect wrong."  Allen, 201 F.3d at 166.

The discretion entrusted to those who receive payments from the insurance companies derives from their ability to bill the insurance companies with virtually no oversight. To receive reimbursement from the victim insurance companies, the defendant submits (on behalf

22

of the provider) a health insurance claim form (Form 1500), or an electronic substitute, to the insurance company.  The form asks for information about the recipient and about the services, including the dates of service.  Once the form is complete, the physician then signs the form and it is submitted for payment.  By signing the form, the physician certifies that "the services shown on this form were medically indicated and necessary for the health of this patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision."

And the defendant unquestionably abused that trust and, from its inception, the defendant's scheme was designed to be difficult to detect.  He conspired with his doctor-clients to falsify operative reports so that the doctors would justify the codes that the defendant wanted to bill by including certain medical procedures in their medical reports.  Indeed, on multiple occasions, a doctor-client sent the defendant an operative report, to which the defendant responded by instructing the doctor-client to change the contents to support higher-paying CPT codes.  (See PSR ¶ 24; compare, e.g., GX 713 with 714; GX 944 with 945; GX 1093 with 1094.)  He falsely billed cosmetic procedures as medically necessary procedures.  (See PSR ¶ 22.)  He carried out his fraud scheme by having his co-conspirator doctor-clients send patients to the emergency room to check in for pre-planned surgeries.  (PSR ¶ 24; see Tr. 2013, 2031-33; GX 751, 754, 756.)  He made impersonation calls when insurance companies at times balked at paying the fraudulently inflated claims.  And he undertook great efforts to conceal his conduct, including, but not limited to, using hundreds of rotating, untraceable telephone numbers and aliases.

Moreover, the defendant used his training and knowledge of the medical billing field to bypass the auto-adjudication systems set up by insurance companies to detect and re-bundle codes that should be bundled together.  As proven at trial, the defendant's use of Modifier 59 to bypass the auto-adjudication systems not only resulted in higher reimbursements but also allowed his claims to bypass the victim insurance companies' precautions against fraud.  (See T. 530, 540-41, 707-08, 1856-59, 1871-72.)

While the government has not identified a court decision specifically involving a medical biller, it is well-established that medical care providers who submit false bills to insurers abuse the trust that the insurers place in the providers.  See, e.g., United States v. Ntshona, 156 F.3d 318, 321 (2d Cir. 1998) (upholding enhancement where physician defrauded Medicare by signing false claims); United States v. Hodge, 259 F.3d 549, 556 (6th Cir. 2001) (abuse of trust applied where physician abused discretion in submitting bills to private and public insurers); United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000) (insurers entrust physicians with considerable discretion in exercising their professional responsibilities, and they expect physicians to ensure the integrity of their claims); United States v. Sherman, 160 F.3d 967, 969-71 (3d Cir. 1998) (upholding abuse of trust enhancement based on defendant physician's position of trust with respect to defrauded insurance company); United States v. Iloani, 143 F.3d 921, 922-23 (5th Cir. 1998) (upholding enhancement based on defendant chiropractor's position of trust with respect to insurance companies); United States v. Rutgard, 116 F.3d 1270, 1293 (9th Cir. 1997) (affirming application of a § 3B1.1 sentencing enhancement to a doctor who submitted false claims to Medicare because "the government as insurer depends upon the honesty of the doctor and is easily taken advantage of if the doctor is not honest").  The defendant's medical billing company is no different from these medical care providers who have been found to abuse a position of trust when

submitting false bills to insurers—particularly, as is the case here, the defendant conspired with his doctor-clients to submit false bills to insurers.

It is beyond dispute that the defendant used his position of trust to facilitate his crimes.  Accordingly, the Court should find that the defendant abused a position of trust under § 3B1.3.

G.    The Two-Level Enhancement Pursuant to § 3C1.1 Is Appropriate

The defendant contends that Probation erred in applying the two-level obstruction of justice enhancement, pursuant to U.S.S.G § 3C1.1.  (See Objections at 9.)  Again, the defendant is wrong and the enhancement should be applied.

1.    Applicable Law

Section 3C1.1 provides that a defendant's offense level should be increased by two levels

> [i]f . . . the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation . . . of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct . . . .

U.S.S.G. § 3C1.1.

Section 3C1.1 requires that a district court find that a defendant acted with the "specific intent to obstruct justice, i.e., . . . the defendant consciously acted with the purpose of obstructing justice."  United States v. Woodward, 239 F.3d 159, 162-63 (2d Cir. 2001) (internal quotation marks and citations omitted).  The facts necessary to support an obstruction of justice enhancement must be proven by a preponderance of the evidence.  See United States v. Khedr, 343 F.3d 96, 102 (2d Cir. 2003).

This adjustment applies if the defendant's obstructive conduct took place "during the course of the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (b) related to either (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case . . . ."  U.S.S.G. § 3C1.1, App. Note 1.  The Application Note further specifically provides that "[o]bstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  Id.

In addition, "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence") is among the types of conduct to which the adjustment for obstruction of justice is meant to apply.  U.S.S.G. § 3C1.1, App. Note 4(D).  It is well settled that

"the obstruction of justice enhancement . . . is mandatory once its factual predicates have been established."  United States v. Friedman, 998 F.2d 53, 58 (2d Cir. 1993).

### 2.   Discussion

The defendant destroyed evidence and is subject to the two-level enhancement for the obstruction of justice.

In March 2019, the defendant was sued civilly for his impersonation calls by Aetna, one of the victims in this matter.  (PSR ¶ 26; see T. 1400.)  After the defendant became aware of the Aetna lawsuit, he destroyed evidence in an attempt to prevent his conduct from being traced back to him.  The defendant called Compu-Phone demanding to know how Aetna had "found" him and insisted that Compu-Phone immediately cancel his account.  (PSR ¶ 26; T. 527-28; GX 1502.)  The defendant also met with Nash, his impersonation caller at the time, and demanded that she "get rid of" the computer she used for her work with him.[12]  (PSR ¶ 26; T. 396.)  At some point prior to his arrest in July 2019, the defendant deleted his text messages with Nash, which Nash testified included messages regarding the impersonation calls she made at his behest.  (T. 340; see T. 1682-83.)  And, at some point between April 2019 and October 2019, the defendant deleted all of his emails with Nash, which Nash likewise testified pertained to the impersonation calls.  (PSR ¶¶ 26, 31; T. 340; see T. 2340-42; see also, e.g., GX 1258, 1260, 1261, 1262, 1263, 1264, 1265.)  The defendant's deletion was confirmed by the two productions of the defendant's email account provided by Google.  One production from Google contained emails with Nash and the other did not.

While the government's investigation was ongoing during this period of time, even if the defendant was unaware of the criminal investigation, his conduct still satisfies the obstruction of justice enhancement.  As noted above, obstructive conduct can predate the relevant criminal investigation.  See U.S.S.G. § 3C1.1, App. Note 1.  Here, the defendant's conduct "was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  Id.  Accordingly, a two-level increase for obstructing justice is appropriate under § 3C1.1.

### H.   The Defendant Is Not Entitled to the Zero-Point Offender Adjustment

The defendant claims that because he has no criminal history and should not receive a role adjustment, he is entitled to a two-level reduction under the zero-point offender amendment to Guidelines.  (Objections at 10.)  The defendant is wrong.  As discussed above, the defendant was a organizer/leader and, thus, must receive the four-level role enhancement under § 3B1.1(a).  Because the defendant received an aggravating role adjustment, he is disqualified from receiving the zero-point offender adjustment under § 4C1.1.  See § 4C1.1(a)(10).

---

[12]  Nash refused to destroy her computer despite the defendant's insistence, because "[t]hat would be tampering with evidence and I wasn't Nixon."  (T. 397.)

1.      Applicable Law

The Zero Point Offender Amendment "created a new Chapter Four guideline at § 4C1.1 . . . to provide a decrease of two levels from the offense level [otherwise] determined for defendants who did not receive any criminal history points . . . and whose instant offense did not involve specified aggravating factors." See U.S.S.G. § 1B1.10, App. Note 7. Among other requirements, a defendant only qualifies if "(10) the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." The Zero-Point Offender Amendment can only apply when the defendant has not done any of the things listed. See U.S.S.G. § 4C1.1(a); see also United States v. Gordon, No. 19-CR-7, 2023 WL 8601494, at *3 (D. Me. Dec. 12, 2023); United States v. Mahee, No. 21-CR-494, 2023 WL 8452433, at *2-3 (N.D. Ga Dec. 6, 2023).

2.      Discussion

As outlined above, in order to be eligible for relief under § 4C1.1, a defendant must meet all of the requirements. Among the enumerated factors rendering the defendant ineligible for relief, subsection (10) provides that the defendant must not have "receive[d] an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." Because the defendant receives an aggravating role adjustment under § 3B1.1, he is disqualified from receiving a two-level reduction under this section. See Gordon, 2023 WL 8601494, at *3 (concluding that the defendant was not eligible for relief solely on the ground that he received an aggravating role adjustment under § 3B1.1); United States v. Vladimirov, No. 20-CR-54, 2023 WL 8529076, at *1 (S.D.W.V. Dec. 8, 2023) (same); Mahee, 2023 WL 8452433, at *2-3 (same); United States v. Williams, No. 04-CR-20065, 2023 WL 8082074 (S.D. Fla. Nov. 21, 2023) (same).

Accordingly, the defendant's request for a two-level reduction under the Zero-Point Offender Amendment should be denied.

III.   The 3553(a) Factors

Although important, the advisory Guidelines are merely one step in the process of fashioning an appropriate sentence. The Court must also consider the factors listed in 18 U.S.C. § 3553(a) in determining the defendant's sentence. Gall v. United States, 552 S. Ct. 586, 596 (2007). That section directs courts to impose a sentence that is "sufficient, but not greater than necessary" to comply with the need for the sentence imposed:

(A)     to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Here, the extremely serious nature of the offense, the need for deterrence, the history and characteristics of the defendant, the need to promote respect for the law and to provide just punishment warrants a sentence of 300 months' imprisonment.

A.    The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

Section 3553(a) requires the Court to consider "the nature and circumstances of the offense" and to impose a sentence that "reflect[s] the seriousness of the offense." 18 U.S.C. §§ 3553(a)(1) and (a)(2)(A). Consideration of those factors makes clear that a significant sentence is appropriate.

The seriousness of the offense speaks for itself: the defendant stole hundreds of millions of dollars as part of his fraudulent scheme. Worse still is that the defendant himself profited over $63 million. (PSR ¶ 27). His extreme greed fueled his motivation to commit such a massive and wide-ranging fraud to support his lifestyle of luxury, purchasing multiple opulent mansions, installing a heated driveway in one of his properties, purchasing a red Ferrari, and leasing multiple high-end vehicles. But loss does not end the inquiry. Indeed, all the other objective metrics demand a significant sentence.

First, the defendant's role in the fraud demands a sentence of 300 months' imprisonment. He was the mastermind behind the fraud. He started the fraud. He hired unsophisticated employees to help him carry out his fraud. And he repeatedly lied to insurance companies by impersonating patients and directing his employees to do the same. In fact, he specifically hired young and inexperienced female employees so he could "mold" them to his ways, i.e., directing them to bill the most lucrative codes to make him the most money possible. He paid his employees slightly better than minimum wage while he flagrantly made millions. The defendant also hired two employees, Dolores Persky and Eileen Nash, whose entire jobs were to impersonate female patients. As set forth above, he was the person who created and ran the entire fraudulent scheme.

Second, the length of the fraud further warrants a substantial sentence. The defendant committed the fraud over the course of seven years. The defendant did not have a one-time lapse in judgment. He made a daily decision to lie and steal from insurance companies and impersonate hundreds, if not thousands of patients himself and to run a business that was permeated with fraud.

Third, the defendant told countless lies during his fraudulent scheme. During the Impersonation Calls the defendant lied to insurance companies about his identity when he used the personal identifying information of patients and their loved ones. The defendant and his employees (at the defendant's sole direction) stole the identities of thousands of victims – from a Long Island firefighter to an NBA Celtics superstar. But the lies did not stop there: beyond using these stolen identities, the defendant also lied about what was happening to the patients. He

27

completely fabricated stories about emergency surgeries, the severity of procedures, patients being balanced billed and sent into collections. He and his employees, pretending to be patients, feigned desperation and financial turmoil so that insurance companies would pay out exorbitantly high rates for overstated procedures.

But the Impersonation Calls were only some of the defendant's lies. He lied to the insurance companies by coaching doctors to include certain descriptions on operative reports that would support more lucrative codes even though he could not have possibly known the information he was instructing the doctors to change in the medical records, and sometimes when he well knew the procedures did not happen. As shown at trial, the defendant would dictate to his corrupt doctor-clients the wound size even though he was not in the operating or emergency room. Or the defendant would instruct doctors to change procedures all together, like when he instructed Dr. Christine Blaine to change an operative report from a breast revision to an initial breast reconstruction because the latter was a far more complicated, and thus expensive surgery. (T. 572-78; GX 704, 913, 914.)

The defendant told his lies with no shame or remorse. He spoke beratingly to the customer service agents for the insurance companies when they did not follow his demands or when they pushed back on the lies he told. The defendant even went to so far as to use extremely vulgar language like asking for oral sex or telling the customer service agents he would like to "fuck people." (See, e.g., ECF Dkt. No. 110 (Government's Motions in Limine at 2-3 and GXs 46, 47 and 48).) The defendant used this type of abusive and sexually-charged language as a tactic to avoid detection so that he could steal millions.

Fourth, the deceitful tactics that the defendant used to carry out the fraud further warrants a significant punishment. He created fake documents. He forged people's signatures. He stole people's identities. He repeatedly lied to insurance companies. He hired two employees to impersonate patients day in and day out. He instructed those employees to hang up if they were connected to the same customer service representative as a previous call under another name or if an attorney came on the line. He assumed a fake name and persona to continue his fraud after the civil lawsuit by Aetna was filed even though he knew he had been caught. He purchased hundreds of phone numbers from Compu-Phone and strategically changed those numbers every few months to avoid detection. He requested that the Compu-Phone numbers come from different area codes so it would look like the patients were actually calling their insurance companies. He demanded his accounts with Compu-Phone be closed when he realized the insurance companies were on to him. He deleted all of Nash's texts and emails to cover his tracks. He asked her to destroy her laptop which contained all the records of her patient impersonations. And, he created dozens of companies to move his money around to launder his proceeds and conceal his fraud.

And last but certainly not least, the defendant did not simply cause gross financial harm to his insurance company victims, he also caused intangible consequences to the patients with whose private medical information he was entrusted. He caused harm to the patients he impersonated and destroyed the integrity of their medical records that he helped falsify. Indeed, victims explained to the government how the defendant's conduct impacted them. Boston Celtics player Marcus Smart testified about the damage to his reputation as a role model and how listening to the defendant impersonate him impacted his playing because his mother did not raise someone

who would treat others as the defendant did.  (Tr. 998).  Quinlivan testified about the emotional toll that the circumstances around her surgery have taken on her and cried on the witness stand demonstrating how deeply she was affected by the defendant's lies.  (T. 80-81).  Patient Deja Guzman testified about how the defendant's conduct has negatively impacted her so much so that she tries to block it all out because it was a "trauma" for her.  (Tr. 271).  Guzman said she "never felt more vulnerable and taken advantage of."  (Tr. 270).  While a financial crime may not be the physical equivalent of violent crime, it certainly can and in the instant case, actually did impact the patients he impersonated.  The Court heard the testimony from these patients giving the Court a glimpse into the effect that the defendant's conduct had on them.

B.    The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The next factor that the Court must consider is the "history and characteristics of the defendant."  18 U.S.C. § 3553(a)(1).  This factor weighs in favor of the imposition of a significant term of imprisonment.

The defendant's positive upbringing warrants a significant sentence.  As the defendant explained, he experienced a close-knit middle-income family.  The defendant, unlike so many defendants that appear for sentencing, was raised by two loving parents in a home devoid of physical or verbal abuse.  The defendant had every opportunity to lead a productive, law-abiding life: he had a positive upbringing and a supportive, loving family.  Despite all of this, he chose to defraud insurance companies and steal people's identities to impersonate them.  And he should be punished accordingly.  What makes the defendant's criminal conduct so appalling is that he learned work ethic from his parents, and he witnessed first-hand how hard his parents had to work to make ends meet to provide for him and his siblings.  His mother even took a job in Germany when he and his brother stayed back in India with his father so she could support them better financially.  By the defendant's own admission, he said his parents "emphasized the importance of working hard."  But instead of following his parents' path, he chose a different path, an easier and more lucrative path.  A path where he stole hundreds of millions of dollars to support his lavish lifestyle.

Worse still, the defendant is highly educated and trained in medical billing which also counsels in favor of a significant sentence.  The defendant holds a nursing degree and an experienced coder.  Instead of using his education and specialized skills for good, he used it for nefarious purposes: to make him rich beyond comprehension to satisfy his unbridled greed.

Moreover, the defendant's lack of criminal history does not militate against imposition of a significant sentence.  In fact, the advisory Guidelines range already reflects the defendant's lack of criminal history, placing him in the lowest possible criminal history category.  Given that the Guidelines already have accounted for this factor, and hence mitigated his sentence based on it, no further variance should be granted based on his lack of criminal history.  Again, the defendant was committing fraud for nearly a decade.  All his lack of criminal history proves is that this was the first time that he got caught doing so.

C.    The Need to Promote Respect for the Law and
       to Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))

The next factor that the Court must consider is "the need for the sentence imposed to promote respect for the law, and to provide for just punishment for the offense."  18 U.S.C.

§ 3553(a)(2)(A).  A sentence below 300 months' imprisonment will not promote respect for the law or provide just punishment.  Cases of this scale require significant custodial sentences.  These sentences are among the best ways in which to communicate to the public that they will be protected from, and that the guilty will be punished for, healthcare fraud.

Similarly, for a defendant to commit a crime of this magnitude, a sentence below 300 months' imprisonment would serve to erode respect for the law.  Cases do not get much bigger and financial crimes do not get much more brazen than the defendant's crimes.  If the defendant walks away with a non-incarceratory sentence, a message would be sent that these white-collar crimes are unworthy of significant punishment.

D.      The Need to Afford Adequate Deterrence to Criminal Conduct
        (18 U.S.C. § 3553(a)(2)(B))

Section 3553(a)(2)(B) further requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." Id.  This factor has two components: general and specific deterrence.  Both factors point to the need for the imposition of a significant sentence here.  As mentioned in the previous section, the Court has a responsibility to send clear, unambiguous messages that financial crimes will be punished.  If that message is muted, criminals will quickly learn that a multi-hundred-million-dollar fraud scheme does not merit significant prison sentences.  That message will have a disastrous effect upon our community.

Given the massive amount of money the defendant stole, those who are afforded the opportunity to participate in a fraud where they receive millions of dollars will not be deterred if the defendant is not punished severely.  That is particularly so because frauds like the defendant's take years to uncover and only was discovered because it was so egregious.  Here, it took the unwavering dedication of the FBI and the victim insurance companies who spent thousands of hours pouring over records and interviewing people to uncover sufficient evidence to prosecute and convict the defendant.  In fact, it took years to investigate and arrest the defendant.  This demonstrates how difficult and time-consuming investigating and prosecuting financial crimes actually are.  Thus, the sentencing court's obligation to "afford adequate deterrence" for these kinds of offenses requires substantial sentences.

White collar criminals are among the most responsive to the general deterrence of a significant sentence.  Unlike many of the criminals who pass through this Court, white collar criminals or those considering committing financial crimes are generally well-educated, have access to and are more acutely aware of information about white collar sentences.  A significant sentence for the defendant can help protect the public by providing strong general deterrence to the next person considering participating in fraud.

There is a greater need for general deterrence for fraud schemes than other crimes, because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." See, e.g., United States v. Martin, 455 F.3d 1227, 1300 (11th Cir. 2006) (quoting Stephanos Bibas, White–Collar Plea Bargaining and Sentencing After Booker, 47 WM. & MARY L. REV. 721, 724 (2005)) (internal quotation marks omitted)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those

offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. OF POLITICAL ECON. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence.").

Moreover, although he does not have any criminal convictions, the defendant poses a recidivist risk. Even after the defendant was sued civilly by Aetna, he continued to perpetrate his fraud – but this time taking on a fake name, using a new approach to stealing from the insurance companies by forcing the patients themselves to perpetrate his lies like he did with Samuel Brenner. Thus, specific deterrence counsels toward a significant sentence in this case. See 18 U.S.C. § 3553(a)(2)(C). A prison sentence of 300 months' imprisonment is therefore necessary not only to deter would-be fraudsters in general, but also to specifically deter the defendant from committing further crimes.

E.   The Kinds of Sentences Available and the Sentencing Range
     (18 U.S.C. §§ 3553(a)(3), (4) & (5))

It is no accident that the Guidelines counsel toward life. The Guidelines serve as the reservoir for the collective sentencing wisdom of the entire nation of federal jurists. That wisdom, looking at the enormous scope of the instant crimes, counsels toward a very long custodial sentence. Ultimately, each sentence must be imposed according to the discretion of the Court, as exercised within the confines of the law. However, these factors also suggest that the Court should consider the sentences that other judges would impose under similar facts. The government provides some such examples below, all of which support the government's requested sentence of 300 months' imprisonment.

F.   The Need to Avoid Unwarranted Sentencing Disparities Among Defendants
     With Similar Records With Similar Conduct (18 U.S.C. § 3553(a)(6))

Section 3553(a)(6) requires the Court to consider the "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. The government submits that it would be instructive to discuss some of the health care fraud sentences recently imposed in this district who received sentences of incarceration whose crimes were less serious and loss amounts pale in comparison to the defendant's. From these cases, it is clear that the defendant deserves a significant custodial sentence.

- United States v. Drivas, 10-CR-770 (2013) (Gershon, J.): Gustave Drivas, a medical doctor, was convicted following a jury trial of health care fraud conspiracy and health care fraud for his role in a Medicare fraud scheme. Drivas stole more than $77 million dollars by billing Medicare for services that were medically unnecessary and never provided. The district court sentenced Drivas to 151 months' imprisonment and ordered to pay over $50 million dollars in restitution. Drivas's co-defendants Irina Shelikhova, the ringleader of the fraud who was not even a licensed medical professional, was sentenced to 15 years' imprisonment, and Yuri Khandrius, an unlicensed individual who masqueraded as Dr. Drivas so that Dr. Drivas did not have to come to the clinic to treat patients, was sentenced to 8 years' imprisonment.

31

- United States v. Mohammed, 18-CR-509 (2022) (Vitaliano, J.): Aleah Mohammed, the non-pharmacist former owner/operator of several Queens pharmacies, pleaded guilty to mail fraud, health care fraud and conspiracy to commit health care fraud and was sentenced to 78 months' imprisonment. As part of the scheme, Mohammed submitted claims for prescription drugs to Medicare and Medicaid for drugs that were not dispensed, not prescribed as claimed, not medically necessary, and in some instances were submitted after the pharmacy was no longer licensed in New York. Some of Mohammed's misconduct continued while she was on pretrial release, and she was subsequently charged with additional crimes stemming from her post-indictment conduct. Mohammed was responsible for approximately $6.5 million in fraudulent billings.

- United States v. Pikus, 16-CR-329 (2020) (Donnelly, J.): Aleksandr Pikus was convicted after a jury trial of one count of conspiracy to commit money laundering, two counts of money laundering, one count of conspiracy to pay and receive health care kickbacks and one count of conspiracy to defraud the United States by obstructing the IRS. Pikus, who did not hold any professional licenses, stole millions of dollars from Medicare and Medicare programs in a multi-million-dollar health care kickback, money laundering, and tax fraud scheme. The district court sentenced Pikus to 156 months' imprisonment and was ordered to pay over $39 million in restitution. Pikus's conviction was ultimately vacated by the Second Circuit on separate Speedy Trial grounds.

There have also been significant sentences of incarceration for health care fraud cases with similar complexity, loss amounts, and duration to the defendant's case in districts across the country.

- United States v. Adkins, 16-CR-00022 (E.D.K.Y., 2017): Alfred Adkins, a clinical psychologist, was convicted after a jury trial of mail fraud, wire fraud, and making false statements to the Social Security Administration. Adkins stole $550,000,000 as part of his fraudulent scheme. The district court sentenced him to 300 months' imprisonment and ordered to pay over $93 million in restitution.

- United States v. Esformes, 16-CR-20549 (S.D.F.L., 2019): Philip Esformes, an owner and operator of a skilled nursing facilities, was convicted after a jury trial of health care fraud, illegal kickbacks, and money laundering. Esformes stole a billion dollars as part of his fraudulent scheme. The district court sentenced him to 240 months' imprisonment. Esformes's sentence was commuted by President Trump.

- United States v. Mesquias, 18-CR-00008 (S.D.T.X., 2020): Rodney Mesquias, a corporate executive, was convicted after a jury trial of conspiracy to commit health care fraud, conspiracy to commit money laundering, obstruction of justice, and six counts of health care fraud. Mesquias engaged in falsely telling thousands of patients with long-term incurable diseases, such as Alzheimer's disease and dementia, that they had less than six months to live and subsequently enrolled them in hospice programs creating false and fraudulent claims for these services. Mesquias stole $150 million as

part of his scheme. The district court sentenced Mesquias to 240 months' imprisonment and ordered him to pay $120 million in restitution.

- <u>United States v. Patel</u>, 19-CR-80181 (S.D.F.L., 2023): Minal Patel, owner of LabSolutions LCC, was convicted after a jury trial for his scheme to defraud Medicare by submitting over $463 million in genetic and other laboratory tests that his patients did not need and that were procured through the payment of kickbacks and bribes. Like James, Patel had a base offense level of 43. Patel stole $494,000,000 as part of his scheme and like the defendant, also purchased a red Ferrari. The district court sentenced him to 324 months' imprisonment and ordered to forfeit over $187 million.

- <u>United States v. Rashid</u>, 17-CR-20465 (E.D.M.I., 2021): Mashiyat Rashid, the chief executive officer of a Michigan and Ohio-based group of pain clinics and other medical providers pleaded guilty to one count of conspiracy to commit health care fraud and wire fraud, and one count of money laundering. Rashid stole $150 million as part of his scheme. Despite cooperating with the government, Rashid was sentenced to 15 years' imprisonment and ordered to pay $51 million in restitution.

- <u>United States v. Trotter</u>, 14-CR-20273 (E.D.M.I., 2017): Johnny Trotter, a medical doctor, was convicted after a jury trial for conspiracy to commit health care fraud, wire fraud, and three counts of health care fraud. Trotter's fraudulent scheme involved billing Medicare for nerve block injections that were never provided to patients. Trotter stole $26 million as part of his scheme. The district court sentenced him to 180 months' imprisonment. Trotter's co-defendant Elaine Lovett, the owner of a medical billing company who participated in the scheme, was sentenced to 120 months imprisonment and over $9 million in restitution.

- <u>United States v. Walters</u>, 19-CR-51 (S.D.M.S., 2021): Wade Ashley Walters, a businessman pleaded guilty to one count of conspiracy to commit health care fraud and one count of conspiracy to commit money laundering. Walters participated in a multi-million-dollar scheme to defraud TRICARE, a health care benefit program serving U.S. military veterans and their family members, as well as private health care benefit programs. Walters was sentenced to 18 years' imprisonment and ordered to pay over $287 million in restitution.

- <u>See also</u> <u>United States v. Earnest Gibson III</u> (S.D.T.X., 2015) (loss amount $158,000,000, sentenced to 540 months' imprisonment); <u>United States v. v. Earnest Gibson IV</u> (S.D.T.X, 2015) (loss amount $158,000,000, sentenced to 240 months' imprisonment); <u>United States v. McInnis</u> (S.D.T.X., 2021) (loss amount $153,111,986, sentenced to 180 months' imprisonment); <u>United States v. Francisco Patino</u> (E.D.M.I., 2023) (loss amount $120,000,000, sentenced to 198 months' imprisonment).

These cases illustrate that rampant health care fraud, carried out over a significant period of time with exorbitant loss amounts, warrant a substantial sentence of incarceration.

Because, as set forth above, the government's recommendation falls squarely within the range of sentences imposed by district courts in similar cases, the Court should impose a sentence of 300 months' imprisonment.

* * *

The law and the Guidelines make clear that there is no carve-out for white-collar criminals.  See 28 U.S.C. § 994(d) (requiring the Guidelines to be "entirely neutral as to the . . . socioeconomic status of offenders); U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic status is "not relevant in the determination of a sentence").  Courts across the country have agreed with this assessment.  See United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); see also United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."); United States v. Bistline, 665 F.3d 758, 760 (6th Cir. 2012) ("[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.") (internal citations omitted).[13]

IV.    The Defendant Owes Restitution and Forfeiture

It is well established that restitution and forfeiture are separate, mandatory obligations of a defendant at sentencing.  See United States v. Torres, 703 F.3d 194, 203 (2d Cir. 2012) (upholding an order of forfeiture and restitution because each serves a different purpose: forfeiture is meant to interfere with criminal activity and provide an economic deterrence o crime, while restitution is meant to compensate victims); United States v. Kalish, 626 F.3d 165, 169 (2d Cir. 2010) (there was "no infirmity in the District Court's imposition of both a forfeiture remedy and a restitution remedy.  These remedies are authorized by separate statutes, and their

---

[13] As a white-collar criminal, the defendant is already potentially receiving special treatment under the First Step Act.  In particular, the offense of conviction and the defendant's lack of criminal history make him eligible to acquire credit that could effectively halve the Court's sentence.  See 18 U.S.C. § 3632(d)(4).  In relevant part, the First Step Act "provide[s] incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs."  18 U.S.C. § 3632(d).  Although the statute excludes from participation in this program numerous federal offenses, the defendant's crimes are not included.  See id. § 3632(4)(D).  For qualifying defendants, these incentives and rewards include, inter alia, the accrual of up to 15 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities.  See id. § 3632(d)(4)(A)(i)-(ii).  In other words, the defendant would be eligible to earn 15 days per month of credit toward "prerelease custody or supervised release."  Id. § 3236(d)(4)(C).  Thus, even if Your Honor sentenced the defendant to 300 months incarceration, given good time credit, the defendant may serve only approximately 150 months.  Respectfully, the government submits this information to the Court for its awareness.

simultaneous imposition offends no constitutional provision.").  The defendant is liable for both obligations as a result of his crimes.

A.      The Court Should Order Restitution

The Mandatory Victims Restitution Act ("MVRA") provides for mandatory restitution to victims of certain crimes, including conspiracy to commit healthcare fraud, healthcare fraud and wire fraud.  See 18 U.S.C. § 3663A(c).  "The primary and overarching goal of the MVRA is to make victims of crime whole, to fully compensate the victims for their losses and to repot these victims to their original state of well-being."  United States v. Quarshi, 634 F.3d 699, 703 (2d Cir. 2011) (internal quotation marks and citation omitted); see also United States v. Pescatore, 637 F.3d 128, 138 (2d Cir. 2011) (full amount of restitution must be ordered without regard to defendant's economic circumstances).

To that end, the MVRA requires defendants convicted of covered offenses to "reimburse the victim for lost income and . . . other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  18 U.S.C. § 3663A(b)(4).  A victim's attorneys' fees are among the types of "other expenses" that may be included in such a restitution order where they are "necessary" and "incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense."  United States v. Amato, 540 F.3d 153, 161 (2d Cir. 2008) (quoting 18 U.S.C. § 3663A(b)(4)).  The statutory terms "investigation," "prosecution," and "proceedings" refer to government investigations and criminal proceedings (not private investigations victims may choose to conduct on their own).  See Lagos v. United States, 138 S. Ct. 1684, 1690 (2018).

"Generally, this Circuit takes a broad view of what expenses are 'necessary.'" United States v. Maynard, 743 F.3d 374, 381 (2d Cir. 2014).  A district court has "broad discretion to determine restitution" and must make a "reasonable estimate" of the actual loss "based on the evidence before it."  United States v. Milstein, 481 F.3d 132, 137 (2d Cir. 2007).

Here, the government submits that this Court should order restitution to the victim insurance companies in the amount of $342,822,962.93.[14]  This figure represents the actual loss incurred by the collectively victim insurance companies as a result of the defendant's Impersonation Calls and his prolific, fraudulent use of Modifier 59.  To the extent the Court orders restitution in this amount, the government will submit a Proposed Order of Restitution, outlining

---

[14] Aetna, one of the victim insurance companies, has submitted a Victim Impact Statement and requested "a claim for restitution in an amount of *at least* $50,000,000."  (See Aetna's Victim Impact Statement attached hereto as Exhibit C (emphasis added).)  Cigna, another victim insurance company, has also submitted a Victim Impact Statement seeking restitution in the amount of $33,640,157.  (See Cigna's Victim Impact Statement attached hereto as Exhibit D.)  As Exhibits C and D are victim impact statements, they are being filed under seal.  The government submits that, as neither Aetna nor Cigna have access to the full scope of evidence underlying the defendant's egregious fraud, their respective victim impact statements and requests for restitution severely underestimate the actual loss incurred by each insurance company.

the amounts due to the victim insurance companies based on the figures set forth in the FBI spreadsheets (Exhibits A and B.)  See 18 U.S.C. § 3664(d)(5).

### B.  The Court Should Order Forfeiture

In accordance with Rule 32.2, the government previously provided notice to the defendant of its intent to seek forfeiture in the event of his conviction. Fed. R. 32.2(a); ECF Dkt Nos. 15, 26.  In this regard, the applicable statutory provision mandates the forfeiture of all property constituting or derived from proceeds traceable to the crimes of conviction.  18 U.S.C. §§ 982(a)(7) and (b)(1) and 21 U.S.C. § 853(p).  Moreover, under established Second Circuit precedent, the forfeiture may take the form of a money judgment.  See United States v. Awad, 598 F.3d 76, 79 (2d Cir. 2010).

The government is submitting a proposed Order of Forfeiture under separate cover and submits this Court should enter the proposed Order.

## V.  Remand

The United States respectfully moves the Court for an order directing that the defendant be remanded immediately after sentence.  See 18 U.S.C. § 3143(b).  The defendant has long been aware of the impending sentencing and faces a significant term of imprisonment under the applicable Guidelines.  The defendant's attorney has not identified any substantial question of law or fact likely to form a viable basis for an appeal.

## VI.  Conclusion

In sum, the defendant is an intelligent, well-educated man who was raised by loving parents in a middle-class home with every opportunity to lead a law-abiding productive life. Instead, he made the deliberate choice to run an elaborate fraud scheme.  He elected to lie to insurance companies, falsify medical records and medical claim forms, steal patients' identities and impersonate them, forge signatures.  And for what?  So that he could make money—as Probation stated, for "outright greed."  The defendant's orchestration of one of the largest healthcare fraud cases in this country significantly harmed the victim insurance companies –which

harm is, ultimately, passed along to the public in the form of higher premiums.  For these reasons, and for all the reasons set forth above, the government respectfully submits that a sentence of 25 years is sufficient, but not greater than necessary to serve the mandates of Section 3553(a).

Respectfully submitted,

BREON PEACE
United States Attorney

By:       /s/
Catherine M. Mirabile
Antoinette N. Rangel
Assistant U.S. Attorneys
(631) 715-7850 / (718) 254-7481

Miriam L. Glaser Dauermann
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section
(718) 254-7575

cc:      Defense Counsel (by E-mail and ECF)