UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

MATHEW JAMES,

Defendant.

19 Cr. 382 (JS)

**DEFENDANT MATHEW JAMES'S SENTENCING SUBMISSION**

KRIEGER KIM & LEWIN LLP
350 Fifth Avenue, 77th Floor
New York, New York 10118
Tel.: (212) 390-9550

*Attorneys for Mathew James*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................... iv

INTRODUCTION ............................................................................................... 1

I.   LIFE AND BACKGROUND ......................................................................... 2

   A.   Mr. James's Childhood in India .............................................................. 2

   B.   Mr. James's Path to Germany and South Dakota ................................... 4

   C.   Mr. James's Work and Life in New York ............................................... 7

   D.   Mr. James's Family ................................................................................. 9

   E.   Mr. James Has Faced Familial and Personal Hardships ........................ 12

   F.   Mr. James's Friends and Community Involvement ................................ 13

   G.   Mr. James Turns to Alcohol As He Struggled To Juggle Family, Business, and His Arrest ................................................................................................. 15

   H.   This Prosecution Has Already Had Significant Consequences for Mr. James and His Family ............................................................................................... 16

II.   MR. JAMES'S OBJECTIONS TO THE PSR AND GUIDELINES CALCULATION .. 18

   A.   Description of the Offense Conduct ...................................................... 19

      1.   Background Section (¶¶ 13-18) ........................................................ 19

      2.   The Scheme to Commit Health Care Fraud and Wire Fraud (¶¶ 19-26) ................. 21

      3.   Victim Impact (¶ 30) ....................................................................... 30

      4.   Objections to the PSR's First Addendum ........................................ 30

   B.   Mr. James Should Not Be Subject to Several of the Sentencing Enhancements Probation Assigned ......................................................................................... 30

      1.   Mr. James Did Not Obstruct Justice ................................................. 31

      2.   A 4-Level Role Enhancement Is Inappropriate ................................ 33

      3.   Mr. James Should Receive A 2-Level Reduction Because He has No Criminal History ......................................................................................................... 36

      4.   Mr. James Did Not Violate a Position of Trust ................................. 37

5.     Acquitted Conduct Should Be Excluded ................................................ 39

6.     Convictions under 18 U.S.C. § 1028A Should Run Concurrently ........................... 41

C.   Probation's Recommended Term of 15 Years' Imprisonment is Flawed and Should Not Be Followed ...................................................................................................... 42

III.     THE LOSS AMOUNT IS VASTLY OVERSTATED AND INSTEAD SHOULD BE CALCULATED AS A PERCENTAGE OF MR. JAMES'S GAINS ............................... 43

A.   The Government Must, But Cannot, Prove A $530 Million Loss With Specific Evidence ....................................................................................................................... 45

1.     The Government Must Provide Specific Evidence to Support Its Proposed Loss Amount Enhancement ....................................................................................... 45

2.     The Government's Trial Patients and Examples of Allegedly Improper Coding Do Not Constitute Specific Evidence ................................................................. 48

B.   The Government Cannot Prove A $530 Million Loss by A Preponderance Of The Evidence ....................................................................................................................... 51

1.     Mr. James Billed For Real Patients Who Received Real Procedures From Real Doctors ................................................................................................................... 54

2.     Many Of Mr. James's Billings Were Plainly Not Fraudulent ................................. 56

3.     There Is No Evidence That Impersonation Calls Led to Any Actual Loss .............. 58

4.     Even for the Trial Witness Patients, the Court Cannot Find That the Entirety of the Payments for Their Treatment Constitutes Loss Amount ...................................... 60

5.     Two Insurance Companies Reported Actual Loss .................................................... 71

C.   The Court Should Substitute A Portion Of Mr. James's Gain In Lieu of Actual Loss, Which "Reasonably Cannot Be Determined" ...................................................... 72

D.   Regardless of the Loss Calculation Used, the Guidelines Range Overstates the Seriousness of the Offense ......................................................................................... 75

IV.     A SUBSTANTIALLY BELOW-GUIDELINES SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE THE PURPOSES OF SENTENCING. 76

A.   Mr. James's History and Characteristics ...................................................................... 77

B.   The Nature and Circumstances of the Offense and the Need for Just Punishment Merit a Substantially Below-Guidelines Sentence .......................................................... 83

   C.   A Substantial Prison Sentence Will Not Further Goals of Specific or General Deterrence ................................................................................................................. 86

   D.   A Significant Variance is Necessary to Avoid Unwarranted Sentencing Disparities .. 88

      1.   Disparities Between Mr. James And Uncharged Co-Conspirator Doctors ............... 89

      2.   Disparities Between Mr. James And Those Sentenced for Healthcare Fraud Nationwide ................................................................................................................. 92

V.   ANY FORFEITURE, RESTITUTION, OR FINE SHOULD BE MINIMAL ................ 94

   A.   Mr. James Has Complied with the Government's Forfeiture Efforts ........................... 94

   B.   Restitution, If Any, Should Not Approach $600 Million ............................................. 95

   C.   The Court Should Not Levy a Fine ............................................................................. 97

VI.   CONCLUSION ........................................................................................................... 98

# TABLE OF AUTHORITIES

## Cases

*Gall v. United States*, 552 U.S. 38 (2007) ............................................................... 83

*Jones v. United States*, 574 U.S. 948 (2014) ........................................................... 43

*Lallave v. Martinez*, 635 F. Supp. 3d 173 (E.D.N.Y. Oct. 13, 2022) ......................... 38

*McClinton v. United States*, 143 S. Ct. 2400 (2023) ...................................... 41, 42, 43

*Nelson v. United States*, 555 U.S. 350 (2009) ......................................................... 83

*S.W. Airlines Co. v. Saxon*, 596 U.S. 450 (2022) ..................................................... 38

*Schad v. Arizona*, 501 U.S. 624 (1991) ................................................................... 55

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93
(2d Cir. 2008) ........................................................................................................ 81

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) ......................................... 81

*United States v. Alphas*, 785 F.3d 775 (1st Cir. 2015) ............................................ 61

*United States v. Anderson*, 747 F.3d 51 (2d Cir. 2014) ........................................... 19

*United States v. Archer*, 671 F.3d 149 (2d Cir. 2011) .............................. 45, 46, 47, 48

*United States v. Bandrich*, 636 F. App'x 65 (2d Cir. 2016) (summary order) ............ 52

*United States v. Beaulieau*, 959 F.2d 375 (2d Cir. 1992) ........................................ 36

*United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015) ......................................... 42, 43

*United States v. Bonanno Organized Crime Fam. of La Cosa Nostra*, 879 F.2d 20
(2d Cir. 1989) ........................................................................................................ 38

*United States v. Broderson*, 67 F.3d 452 (2d Cir. 1995) .......................................... 41

*United States v. Bryant*, 128 F.3d 74 (2d Cir. 1997) .............................................. 57

*United States v. Butler*, 264 F.R.D. 37 (E.D.N.Y. 2010) .......................................... 79

*United States v. Carmona-Rodriguez*, 2005 WL 840464 (S.D.N.Y. Apr. 11, 2005) .................. 89

*United States v. Chibuko*, 744 F.3d 259 (2d Cir. 2014) ........................................... 44

*United States v. Concepion*, 983 F.2d 369 (2d Cir. 1992) ........................................ 19

*United States v. Coppola*, 671 F.3d 220 (2d Cir. 2012)................................................................. 57

*United States v. Cosimi*, 368 F. Supp. 2d 345 (S.D.N.Y. 2005) .................................................. 88

*United States v. Cuti*, 2011 WL 3585988 (S.D.N.Y. July 29, 2011) ........................................... 57

*United States v. Defeo*, 36 F.3d 272 (2d Cir. 1994)..................................................................... 33

*United States v. Deutsch*, 987 F.2d 878 (2d Cir. 1993) .............................................................. 57

*United States v. Eisen*, 1991 WL 180398 (E.D.N.Y. Sept. 3, 1991) ..................................... 33, 34

*United States v. Finazzo*, 850 F.3d 94 (2d Cir. 2017).............................................................. 105

*United States v. Gigante*, 94 F.3d 53 (2d Cir. 1996) ............................................................. 49, 50

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111
    (2d Cir. 2014)........................................................................................................................ 82

*United States v. Hamilton*, 323 F. App'x 27 (2d Cir. 2009)....................................................... 90

*United States v. Hebron*, 684 F.3d 554 (5th Cir. 2012) ............................................................ 58

*United States v. Huggins*, 844 F.3d 118 (2d Cir. 2016)........................................................ 39, 41

*United States v. Johnson*, 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018).................. 55, 73, 76, 77

*United States v. Jones*, 2015 WL 3484466 (S.D.N.Y. June 2, 2015) ......................................... 94

*United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008)................................................................ 61

*United States v. Lin*, 2023 WL 6796390 (E.D.N.Y. Oct. 13, 2023) ........................................... 39

*United States v. Lonich*, 23 F.4th 881 (9th Cir. 2022)................................................................ 51

*United States v. Malki*, 609 F.3d 503 (2d Cir. 2010) ................................................................ 80

*United States v. Martinez*, 133 F. App'x 762 (2d Cir. 2005)...................................................... 49

*United States v. Martinez*, 769 F. App'x 12 (2d Cir. 2019) (summary order)............................ 43

*United States v. Natelli*, 527 F.2d 311 (2d Cir. 1975) ............................................................... 56

*United States v. Nguyen*, 508 F. App'x 39 (2d Cir. 2013) (summary order)............................ 100

*United States v. Paccione*, 202 F.3d 622 (2d Cir. 2000) ..................................................... 35, 36

*United States v. Paccione*, 751 F. Supp. 368 (S.D.N.Y. 1990), *aff'd*, 949 F.2d 1183
    (2d Cir. 1991)........................................................................................................................ 34

*United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) .................................... 80

*United States v. Pena*, 459 F. Supp. 3d 544 (S.D.N.Y. 2020) ................................... 94

*United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) ....................................... 19

*United States v. Peterson*, 768 F.2d 64 (2d Cir. 1985) ........................................... 55

*United States v. Pina*, 2019 WL 1904920 (S.D.N.Y. Apr. 11, 2019) ........................... 57

*United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) ............................................. 105

*United States v. Rivernider*, 828 F.3d 91 (2d Cir. 2016) ......................................... 81

*United States v. Romano*, 794 F.3d 317 (2d Cir. 2015) ........................................... 79

*United States v. Schena*, 2023 WL 7348458 (N.D. Cal. Nov. 6, 2023) .................. 51, 58

*United States v. Schwamborn*, 467 F. App'x 35 (2d Cir. 2012) ............................... 106

*United States v. Shonubi*, 103 F.3d 1085 (2d Cir. 1997) ................................ 49, 50, 52

*United States v. Smith*, 321 F. Supp. 3d 405 (E.D.N.Y. 2018), *aff'd*, 945 F.3d 729
   (2d Cir. 2019) ................................................................................................. 89

*United States v. Spitsyn*, 403 F. App'x 572 (2d Cir. 2010) (summary order) .......... 49, 51

*United States v. Thorn*, 446 F.3d 378 (2d Cir. 2006) .............................................. 39

*United States v. Tonawanda Coke Corp.*, 5 F. Supp. 3d 343 (W.D.N.Y. Mar. 14, 2014) ........... 37

*United States v. Tzolov*, 435 F. App'x 15 (2d Cir. 2011) (summary order) ................. 79

*United States v. Uddin*, 551 F.3d 176 (2d Cir. 2009) .............................................. 56

*United States v. Ware*, 577 F.3d 442 (2d Cir. 2009) ............................................... 37

*United States v. White*, 551 F.3d 381 (6th Cir. 2008) ............................................. 42

*United States v. Wilensky*, 2022 WL 715550 (E.D.N.Y. Mar. 10, 2022) ..................... 40

*United States v. Wills*, 476 F.3d 103 (2d Cir. 2007) .............................................. 100

*United States v. Zagari*, 111 F.3d 307 (2d Cir. 1997) ............................................. 33

*Yaron v. United States*, 586 F. App'x 819 (2d Cir. 2014) (summary order) ................ 79

# Statutes

18 U.S.C. § 1028A ............................................................................................ 41, 42

18 U.S.C. § 3553 ................................................................................................ *passim*

18 U.S.C. § 3663 ...................................................................................................... 97

18 U.S.C. § 3663A .............................................................................................. 96, 97

21 U.S.C. § 848 ........................................................................................................ 37

U.S.S.G. § 2B1.1 ......................................................................................... 59, 74, 76

U.S.S.G. § 2L2.1 ...................................................................................................... 49

U.S.S.G. § 3A1.5 ...................................................................................................... 37

U.S.S.G. § 3B1.1 ........................................................................................ 31, 34, 35, 36

U.S.S.G. § 3B1.3 ........................................................................................ 31, 38, 39

U.S.S.G. § 3C1.1 .................................................................................................. 31, 32

U.S.S.G. § 3D1.2 ...................................................................................................... 42

U.S.S.G. § 4C1.1 .................................................................................................. 36, 37

U.S.S.G. § 5El.2 ...................................................................................................... 98

U.S.S.G. § 5G1.2 ...................................................................................................... 42

U.S.S.G. § 6A1.3 ...................................................................................................... 46

# Other Authorities

Abdominoplasty in Long Island & Huntington Station, NY, Charlotte Ann Rhee MD (last visited Jan. 16, 2024), https://www.liplasticsurgery.com/procedures/for-the-body/abdominoplasty-tummy-tuck-surgery/ .................................................................................................. 91

Adina Genn, *St. James man convicted of $600m healthcare fraud*, Long Island Business News (July 14, 2022), https://libn.com/2022/07/14/st-james-man-convicted-of-600m-healthcare-fraud/ ...................................................................................................................... 88

Alix Tunell, *The Police Broke My Nose at a BLM Protest. This Plastic Surgeon Made Me Look Like Myself Again*, realself.com (July 9, 2020), https://www.realself.com/news/police-broke-my-nose-at-blm-protest .................................................................................................. 90

Costs and Insurance Coverage, Seckin MD Endometriosis Center (last visited Jan. 16, 2024), https://drseckin.com/costs-and-insurance-coverage/ ............................................................. 91

Damien Black, *Conman used phishing techniques to defraud insurers out of million*, Cybernews (Nov. 15, 2023), https://cybernews.com/news/conman-used-phishing-techniques-to-defraud-insurers-out-of-millions/ ............................................................................................................. 88

Dr. Amir Tahernia MD (@amirtaherniamd), Instagram (Dec. 2, 2023), https://www.instagram.com/p/C0UqZFLv_S9/ ........................................................................ 90

*East Northport man convicted of $600M in health care fraud*, Newsday (July 14, 2022), https://www.newsday.com/long-island/crime/convicted-health-care-fraud-east-northport-medical-billing-posed-patients-uaze4rvm ........................................................................................ 88

ECF Nos. 31, 32, *United States v. Pellegrino*, No. 18-cr-496 (E.D.N.Y. Oct. 18, 2019) (Seybert, J.) ............................................................................................................................... 77

Fuentes Cosmetic Surgery (@fuentescosmeticsurgery), Instagram (Nov. 27, 2023), https://www.instagram.com/p/C0J5ZqqOyAO/ ........................................................................ 90

Letter, *United States v. Tea Kaganovich*, No. 17 Cr. 649 (E.D.N.Y. Aug. 16, 2022), ECF No. 131 ............................................................................................................................... 93

Order, *United States v. Small*, No. 16 Cr. 640-6 (E.D.N.Y. Nov. 13, 2023) (Cogan, J.), ECF No. 1018 ............................................................................................................................. 19

Patient Information, Charlotte Ann Rhee MD (last visited Jan. 16, 2024), https://www.liplasticsurgery.com/patient-information/ ............................................................ 91

Press Release, *Brooklyn Doctor Sentenced To 24 Months in Prison For Engaging In A $13 Million Health Care Fraud Scheme*, U.S. Attorney's Office, E.D.N.Y. (Aug. 14, 2015), https://www.justice.gov/usao-edny/pr/brooklyn-doctor-sentenced-24-months-prison-engaging-13-million-health-care-fraud-scheme ..................................................................... 94

Press Release, *Long Island Chiropractor Sentenced to 18 Months' Imprisonment for Multi-Million Dollar Health Care Fraud Scheme*, U.S. Attorney's Office, E.D.N.Y. (Oct. 18 2019), https://www.justice.gov/usao-edny/pr/long-island-chiropractor-sentenced-18-months-imprisonment-multi-million-dollar-health ................................................................................. 94

Press Release, *New York Diagnostic Testing Facility Owners Sentenced for Health Care Fraud Scheme*, U.S. Dep't of Justice (Dec. 1, 2022), https://www.justice.gov/opa/pr/new-york-diagnostic-testing-facility-owners-sentenced-health-care-fraud-scheme ................................ 93

Press Release, *Owner of Home Health Agency Sentenced to 54 Months In Prison For Over $100 Million Health Care Fraud*, U.S. Attorney's Office, S.D.N.Y. (Feb. 1, 2023), https://www.justice.gov/usao-sdny/pr/owner-home-health-agency-sentenced-54-months-prison-over-100-million-health-care-fraud ............................................................................. 93

Prohibiting Punishment of Acquitted Conduct Act of 2023, H.R. 5430, 118th Congress (2023) 40

Prohibiting Punishment of Acquitted Conduct Act of 2023, S. 2788, 118th Congress (2023) .... 40

Rebecca Silber et al., Vera Inst. of Just., *Aging Out* (Dec. 2017),
    https://www.vera.org/downloads/publications/Using-Compassionate-Release-to-Address-
    the-Growth-of-Aging-and-Infirm-Prison-Populations%E2%80%94Full-Report.pdf ............. 83

Sentencing Transcript, *United States v. Thompson*, No. 19 Cr. 698 (ER)
    (S.D.N.Y. Feb. 4, 2021), ECF No. 49 ...................................................................................... 76

Transcript, *United States v. Caspersen*, No. 16 Cr. 414 (JSR) (S.D.N.Y. Nov 4, 2016),
    ECF No. 37 .............................................................................................................................. 86

Transcript, *United States v. Faibish*, No. 12 Cr. 265 (ENV) (E.D.N.Y. Mar. 10, 2016),
    ECF No. 271 ............................................................................................................................ 76

Transcript, *United States v. Levin*, No. 20 Cr. 681 (E.D.N.Y. Feb. 1, 2023), ECF No. 391 ........ 93

U.S. Sentencing Comm'n, *Effects of Aging on Recidivism Among Federal Offenders* 3 (Dec.
    2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
    publications/2017/20171207_Recidivism-Age.pdf .................................................................. 82

U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 5
    (Mar. 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-
    publications/2016/recidivism_overview.pdf ........................................................................... 82

# INTRODUCTION

Mathew James is a devoted husband, father, son, and brother.  He is a beloved and supportive friend, neighbor, and churchgoer.  Mr. James dedicated over 20 years to working as a nurse – more than five years in Germany and South Dakota and more than 15 years on Long Island.  He cared for thousands of sick patients and trained numerous other nurses.  From a modest upbringing in India, to starting over in the United States while sharing a one-room apartment in South Dakota as he obtained a nursing degree, to working as an operating room nurse on Long Island, to starting his own business, Mr. James has always been willing to lend a hand and put his patients, family, friends, and neighbors above himself.  And for approximately 14 years before his arrest in July 2019, Mr. James cared for his elderly parents who lived with Mr. James and his family.

Now 56 years old, Mr. James knows that his otherwise remarkable life will be forever tainted by his conduct that led to his prosecution and conviction.  Mr. James blames no one else for the hurt and damage that he has caused.  He sincerely and deeply regrets his misguided phone calls and communications with insurance companies in which he pretended to be patients in an effort to maximize and expedite payments for the genuine medical services provided by his doctor-clients.  But these "impersonation" recordings and communications – which were a small part of his work as a medical biller and an even smaller fraction of his lifetime of good deeds – are an aberration to who Mr. James is as a person.  The dozens of letters from his family, friends, former colleagues, and neighbors depict who Mr. James has been and always will be:  a caring and decent person who put others first even when no one else was looking.  Mr. James is worthy of a second chance – a chance he will not have if he spends years behind bars.

Despite the difficult four and a half years since Mr. James's arrest, in which his life has been both turned upside down and in a state of suspension, his family has been the light of his life. His primary hope and dream has always been to make a better future for his children, and he is proud to watch them excel in college and beyond. But he knows the devastating and permanent impact that his conduct and the resulting prosecution has had, in particular, on his wife, daughter, and son, and Mr. James humbly comes before this Court with a focus on his family and their future.

For the reasons set forth in detail below, an advisory Guidelines sentence of life, as well as Probation's recommendation of 180 months, do not remotely serve the interests of justice or the U.S.S.G. § 3553(a) factors. Taking into account: (i) Mr. James's unique and extraordinary history and characteristics; (ii) his full compliance with all terms of his pretrial release for four and a half years; (iii) the consequences Mr. James has already faced and will face as a result of this prosecution and conviction; (iv) the fact that the loss amount probation proposes based on the government's theory is vastly overstated, incorrectly calculated, inconsistent with the evidence at trial, and overweighted in the Guidelines analysis; and (v) the astonishing and disturbing disparity between Mr. James's prosecution and punishment and the non-existent consequences for the 150 alleged, uncharged co-conspirator doctors, a significantly below-Guidelines sentence is warranted. The mandatory minimum sentence of 24 months' imprisonment is sufficient but not greater than necessary to satisfy the objectives of sentencing Mr. James.

## I. LIFE AND BACKGROUND

### A. Mr. James's Childhood in India

Mr. James's life began in Bombay, India, where he was born in 1967. PSR ¶ 59. He experienced a mostly happy upbringing in a close, supportive family, which consisted of his

parents and older brother, John. *Id.* ¶ 60. The two brothers were inseparable friends who "shared everything." Ex. 5 (J. James Letter). During academic terms, young Mr. James was a diligent student who applied himself and was also known for his athletic talent on the school cricket team. Mr. James and his brother spent summers with their grandparents in a rural area of India called Kerala, where they played with cousins and were surrounded by extended family who lived in the area. Ex. 4 (A. James Letter). The Kerala region was, and still is, home to the Knānāya community, a religious and ethnic minority group to which Mr. James's family belongs. From an early age, Mr. James's Knānāya identity and Catholic faith were crucial influences on his character and family structure. Growing up, his family attended church every Sunday, a tradition Mr. James continues with his family to this day. *Id.*; PSR ¶ 60.

Even though throughout his childhood, Mr. James's family was part of the Indian middle-class, his parents occasionally struggled to make ends meet. His father, Cherumoodu, worked as a clerk for India's state-owned nuclear research center before retiring and operating a trucking company. Mr. James's mother, Annamma, had a lengthy career as a devoted nurse. Ex. 4 (A. James Letter); Ex. 5 (J. James Letter); PSR ¶ 60. At times, it was hard for Mr. James's parents and later his older brother to find steady employment in India. To provide for her family during one such downturn, when Mr. James was five, his mother relocated to Germany to work as a nurse. During the three years that Mr. James's mother was living abroad, Mr. James's father became the primary caregiver of him and his brother. Mr. James's mother's posting in Germany allowed his family to become more financially stable. During that time, however, the family did not have access to a telephone, so Mr. James and his brother wrote letters to their mother to stay in contact. PSR ¶ 60.

When Mr. James was twelve, his father moved their family from Bombay to Kerala, to be closer to their aging grandparents, relatives, and the broader Knānāya community. Although Mr. James had enjoyed many summers in Kerala, the transition to the more rural state was difficult. As Mr. James entered his teenage years, he struggled with the new pace of his education, the shift in culture, and the general atmospheric contrast between Bombay and Kerala. In moments of loneliness, however, Mr. James was uplifted by support and guidance from his parents, as well as his older brother. His parents, who imparted their strong, shared moral compass onto their sons, reminded them that hard work and familial support were the most crucial elements in life. Ex. 5 (J. James Letter); PSR ¶ 60. When the family had little in terms of material possessions, Mr. James knew that he was still loved by the people around him; in particular, Mr. James's older brother, John, was always able to console Mr. James when he was feeling upset. *Id.*

## B. Mr. James's Path to Germany and South Dakota

When Mr. James was a child, his uncle left for the United States. When his uncle would return to India for visits, he would tell Mr. James and his brother stories about life in the United States, which he described as "the land of opportunity." Throughout his childhood in India, Mr. James dreamed of being able to join his uncle in the United States to pursue an education and start a professional career. Nevertheless, Mr. James's life continued in India, where he graduated from high school, and completed two years of college. Upon his graduation, he began working in construction with his older brother. PSR ¶ 61.

In his early twenties, Mr. James heard about an opportunity to enroll in a nursing program in Germany. Despite not knowing German and without a strong interest in healthcare at that time, Mr. James applied for the position. *Id.* After being accepted, he moved to Haan, a town in western Germany, enrolled in a nursing certificate program, and worked at St. Josef

Krankenhaus Haan, a hospital in Haan. Ex. 4 (A. James Letter); Ex. 5 (J. James Letter). Mr. James enjoyed caring for patients and found the work challenging and fulfilling. PSR ¶ 61.

Mr. James did not know anyone when he first moved to Germany, but the next four years were among the happiest of his life. During his first year there, he studied German while working as an aide at St. Josef. The following year, he was accepted into the hospital's nursing program and spent the next three years studying nursing while working as a training nurse at St. Josef. In that role, Mr. James was responsible for any patient that came to St. Josef for treatment. In addition to his training and studies, Mr. James helped patients take care of themselves, assisted them with their meals and daily activities, and completed a number of different nursing rotations. Caring for patients quickly became Mr. James's passion. He enjoyed everything about his nursing program and his experience in Germany. *Id.*

Around 1994, while Mr. James was still in Germany, his older brother, John, relocated to study in the United States. Before Mr. James completed his final nursing exams in Germany, John suggested that Mr. James join him in South Dakota. Mr. James struggled with the decision to leave Germany before he had completed his exams, but ultimately decided to move to the United States, which he believed would put him on the path to a successful future and reunite him with his brother. Additionally, Mr. James understood that he and John would be better able to help support his family in India, and potentially sponsor them in the United States, if he relocated to live with John in South Dakota. In 1995, Mr. James obtained a student visa and joined John in Rapid City, South Dakota. Ex. 5 (J. James Letter); PSR ¶ 61. There, Mr. James enrolled in an associate degree program in nursing at the University of South Dakota. Given that his German education did not transfer to the United States, Mr. James essentially had to restart his nursing education from scratch. Ex. 5 (J. James Letter); Ex. 4 (A. James Letter).

After Mr. James had finally assimilated into life in Germany, he again had to start over, and struggled during his second significant move to a new country where he had no real network. Mr. James spoke little English and lacked a financial safety net when he arrived in South Dakota. These early years in the United States were extremely difficult, and Mr. James regularly teetered on the edge of poverty. In addition to having to learn the language and his nursing classes, Mr. James worked multiple campus jobs to pay for his tuition and support himself through school. Ex. 4 (A. James Letter); PSR ¶ 61. Mr. James, John, and John's wife, Lenny, only had enough money to rent a single room together. The three students would skip meals when they could not afford to purchase food. In the winter, they could not always afford heat, and to warm the frigid apartment, Mr. James would turn on the oven and sleep next to it. And the primary mode of transportation that Mr. James had access to was a bicycle – often causing Mr. James, John, and Lenny to wrap plastic bags around their feet when leaving the house, so that snow did not soak through their shoes. Ex. 5 (J. James Letter). Mr. James remembers thinking how different his life in South Dakota was from the stories his uncle had shared with him as a child and from how he imagined his future would be if he ever came to the United States. PSR ¶ 61.

Despite Mr. James's own meager conditions, he still served those around him. Mr. James volunteered with the local Well Baby program while in nursing school, where he helped with group programs for high-risk pregnant women in low-income communities. He also worked as an aide for an elderly stroke patient and accompanied senior neighbors to appointments and through other daily activities. Ex. 5 (J. James Letter).

Mr. James redoubled his efforts to graduate so that he could begin working in the field he loved and support his family. He successfully completed the three-year nursing program in two years, all while working and supporting his brother and sister-in-law as they completed their

educations as well. *Id.*; Ex. 4 (A. James Letter). With Mr. James's encouragement, John was eventually able to complete medical school. In his letter to the Court, John reflects, "Despite his limited means at that time . . . [Mathew] supported us financially, helping us with rent and essential expenses and always making sure that [our] kids had everything they needed." Ex. 5 (J. James Letter).

Mr. James's early experiences in nursing defined the rest of his twenty-plus year career in the healthcare industry. After completing a nursing preceptorship in the operating room at Rapid City Regional Hospital, Mr. James was invited to remain as a full-time nurse, where he was assigned to both the Operation Room and the Neurosurgery teams. For the following year, Mr. James worked as a nurse at Rapid City Regional Hospital.

### C.    Mr. James's Work and Life in New York

After meeting his wife, Reena, who is also a nurse, Mr. James relocated to New York and joined her as a nurse at Huntington Hospital in Long Island from 1998 until 2013. PSR ¶¶ 62, 92, 93. During his fifteen years at Huntington Hospital, Mr. James worked primarily as an operating room nurse, where he was responsible for assisting surgeons with any surgeries that came in the door, ranging from eye surgeries to spinal surgeries and everything in between. Mr. James found the work to be rewarding and challenging. He enjoyed helping prepare patients for operations and felt enormous satisfaction seeing patients who had been admitted with life-threatening conditions be released from the hospital and go home.

Mr. James was known by his Huntington colleagues as an "incredible nurse and patient advocate" with "exceptional clinical skills and [a] true caring nature." Ex. 30 (R. Velez Letter); Ex. 14 (M. De Marco Letter). He provided "optimal care for [] patients" by establishing best practices, including through a volunteer group that sought to change the process for collecting and transporting surgical specimens to the lab, which won him and his colleagues the Northwell

Innervation Award.  Ex. 15 (E. Dobson Letter).  A dedicated team player, Mr. James routinely stepped in to cover his colleagues' shifts when they faced conflicts, and he provided encouragement and support to younger staff members as they pursued nursing degrees and searched for full-time nursing positions.  Ex. 14 (M. De Marco Letter); Ex. 15 (E. Dobson Letter); Ex. 29 (M. Sanchez Maharaj Letter); Ex. 30 (R. Velez Letter).

Mr. James's former supervisor described him as being someone on whom she could always rely, particularly "to work overtime when [they] were short staffed or when emergency cases would be added to [their] original schedule."  Ex. 15 (E. Dobson Letter).  He regularly took time out of his day to comfort colleagues, including one whose son was working at the World Trade Center on September 11; Mr. James sat with his colleague throughout the day, providing "emotional support and comfort," until she heard that her son was safe.  *Id.*  During this time, Mr. James also juggled many positions at different area hospitals, including as a nurse in the psychiatric unit at Huntington Hospital, and an operating room nurse at several other local hospitals, including in Syosset and Great Neck.  PSR ¶ 92.

After years of working as a nurse, in the early 2000s, a colleague at Huntington Hospital who worked in medical billing encouraged Mr. James to explore a career in the field.  Mr. James took a single certificate course in billing at Molloy College in 2006.  In 2007, a physician Mr. James worked with mentioned that they were looking for assistance with their medical billing.  Although Mr. James had no prior professional experience with medical billing, he saw the industry as an opportunity to combine his passion for healthcare with his long-held dream of starting his own business and his desire to better provide for his family in the United States and in India.  In 2007, he started his medical billing business, Leale Co., out of the basement of his family home, where he worked until his arrest in July 2019.  PSR ¶ 91.

Since his arrest, Mr. James has been fully compliant with the terms of his release and he has shifted his focus to supporting Reena, who resumed working as a full-time nurse, and being available for his young adult children whenever they need him. *Id.* ¶¶ 63, 69.

### D. Mr. James's Family

Mr. James cares deeply about his family. While living in South Dakota, Mr. James met his future wife, Reena, who was working as a nurse at Huntington Hospital. Mr. James and Reena's marriage was arranged by their families, who both belong to the Knānāya community. The families introduced Reena and Mr. James to each other through a mutual friend. Ex. 3 (R. James Letter); Ex. 6 (Placheril Family Letter). From the beginning, Reena appreciated Mr. James's background as a nurse and saw the love and care that radiated through Mr. James's immediate family. Ex. 3 (R. James Letter). In 1998, Mr. James and Reena decided to get married and moved to Long Island, where they could remain close to Reena's parents and family. PSR ¶¶ 62, 69.

Mr. James and Reena formed a deep bond. Mr. James deeply admires Reena's genuine and down-to-earth nature. Together, Mr. James and Reena have raised two wonderful children who they cherish: Milenia, who was born in 2000, and Evan, who was born in 2004. In addition to working as a nurse at various times, Reena was the primary caretaker of the children before they went to college. Reena has appreciated how Mr. James's dedication to and respect for her as a husband has transformed into unconditional love and encouragement for their children as a father. Ex. 3 (R. James Letter).

As everyone in their family and community can attest, Mr. James's children are the center of his universe. ██████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████ Mr. James decided that, after a difficult beginning to her life, he would not waste a day of it. As one small example of that, some of Milenia's favorite childhood memories include her dad teaching her how to ride a bicycle. Ex. 1 (Milenia James Letter). As for Evan, he describes how Mr. James's devotion, care, and love helped █████

█████████████████████████████████████████████████ Ex. 2 (E. James Letter). ████████████████████████████████████████████████

█████████████████████████████████████████ *Id.*

Even when Mr. James faced 24-hour shifts in the operating room, he spent time with his children as they finished homework or played in the backyard as a family. Ex. 6 (Placheril Family Letter). According to Reena, Mr. James "never missed a tennis match, soccer game or track meet." Ex. 3 (R. James Letter). Later, when the children entered young adulthood, Mr. James was his children's biggest advocate throughout the college admissions process, a time that was particularly stressful for Milenia. This support ultimately led to Milenia's application to New York University, where she was accepted, and from where she graduated in 2022. Ex. 1 (Milenia James Letter). Mr. James and Reena's shared devotion to their children has not gone unnoticed by neighbors, who credit their parenting and strong family values for creating the individuals who Milenia and Evan are today. The two James children are known in their neighborhood and among friends for their mature engagement with adults, respect for those around them, commitment to academics, friendly and warm attitudes, and well-rounded characters. Ex. 12 (K. Bullis-Byrd Letter); Ex. 13 (J. Covello Letter); Ex. 16 (P. Dotzler Letter); Ex, 20 (D. Gelchie Letter); Ex. 21 (J. Gelchie Letter); Ex. 22 (E. Hogan Letter); Ex. 24 (D. Kern Letter).

Mr. James's care for his loved ones has always extended beyond his immediate family. Various cousins, in-laws, and other family relatives all contributed heartfelt letters in support of Mr. James that capture the significance of Mr. James in their lives. At family gatherings and holiday parties, Mr. James lifts everyone's spirits. Ex. 10 (V. Varghese Letter). But, for these relatives, Mr. James's character is defined by his generosity and selflessness. His cousin, Ancy, and her husband, Lajan, have described Mr. James's dedication to their family upon moving to the United States from India in 2009. Motivated to prevent his family members from being overcome by the harsh obstacles he faced after his own immigration, Mr. James ensured that the family was enrolled in health coverage, and he helped Lajan and Ancy connect with their respective industry networks in the United States to obtain steady employment. Ex. 8 (L. Jose Letter); Ex. 9 (A. Joseph Letter). Both of Mr. James's sisters-in-law, Leena and Viji, describe Mr. James as a champion for their educational and professional pursuits, as he has always provided encouragement during stressful academic terms and, for Viji, a successful reference to a nursing job that she still holds today. Ex. 7 (George Family Letter); Ex. 10 (V. Varghese Letter). In 2008, when Mr. James's mother-in-law, Leela,  Ex. 6 (Placheril Family Letter); Ex. 3 (R. James Letter). Ex. 5 (J. James Letter); Ex. 4 (A. James Letter).

Even since his arrest and despite the resulting obstacles, Mr. James still maintains his connections with his extended family and is an active supporter in their lives. But, without a

doubt, Mr. James's number one priority is his wife, Reena, and their two children, Milenia and

Evan.  His children and wife attended almost the entirety of his trial and have remained at his

side during this extremely challenging period.  Milenia, who is now 23, ███████████████

███████████████████████  Evan, who is 19, ████████████████████

████████████████████  PSR ¶ 64.  Mr. James is extremely proud of both of

his children, who know that Mr. James is there for them whenever they need his advice and

support.  Ex. 1 (Milenia James Letter); Ex. 2 (E. James Letter).

   **E.      Mr. James Has Faced Familial and Personal Hardships**

   Mr. James and Reena's marriage has been marked by periods of family hardship and

tragedy.  Earlier in Mr. James's life, his mother, Annamma, ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████  Ex. 4 (A. James Letter); PSR ¶ 65.  As soon as Mr. James could, he sponsored

both of his parents to immigrate to the United States so he could care for them at his home in

New York.  Ex. 3 (R. James Letter).  Not long after his parents moved to the United States in

2006, ████████████████████████████████████████████

████████████  Ex. 5 (J. James Letter); Ex. 3 (R. James Letter).

   Throughout the next fourteen years, Mr. James was primarily responsible for both of his

elderly parents, who moved in with Mr. James and his family, including communicating with

their doctors, managing their medical and personal appointments, financing their needs, and

physically caring for them at home.  Ex. 1 (Milenia James Letter); Ex. 3 (R. James Letter); Ex. 5

(J. James Letter); Ex. 6 (Placheril Family Letter); Ex. 16 (P. Dotzler Letter); Ex. 17 (L. Fasano);

Ex. 18 (M. Fasano Letter); Ex. 20 (D. Gelchie Letter); Ex. 21 (J. Gelchie Letter); Ex. 28 (G.

Pomerantz Letter).  While both of Mr. James's parents struggled with the transition to life in the

United States, and with their own health conditions, their greatest comfort was spending time with their grandchildren, Milenia and Evan. Unfortunately, Mr. James's father passed away ████ ████████████████████████████████████████████████████ After Mr. James's arrest, Mr. James and his brother John arranged for his mother to relocate to Wichita Falls, Texas, where John works as a radiologist. PSR ¶ 65. Since 2019, Mr. James's mother has lived with John and his family. Despite the distance, Mr. James speaks to his mother and brother daily. Mr. James's arrest has had a significant impact on his elderly mother, who has struggled since being separated from Mr. James and his family and is deeply and profoundly pained by Mr. James's prosecution and impending incarceration. PSR ¶ 66; Ex. 4 (A. James Letter).

### F. Mr. James's Friends and Community Involvement

Since moving to East Northport, New York in the early 2000s, Mr. James has developed a network of close friends and neighbors. Many of these individuals have submitted letters that demonstrate Mr. James's genuine impact on their lives and the local community. They describe Mr. James as a resource and sounding board for those in need of medical advice and referrals. In these times of great stress – ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ – these friends and neighbors relied on Mr. James, as he provided a nurse's wisdom and vital emotional support. One of Mr. James's friends, Steve Basso, contextualized the profound impact that Mr. James had on him when Mr. Basso ████████████████████████████████████████████:

> When my friend, [Mr.] James, heard about what I was going through, he came to my house just to sit with me. Most days we just talked, sometimes watched a movie.
> ████████████████████████████████████████████████████████
> ████████████████████████████████████████████████████████
> ████████████████████████████████████████████████████████
> ████████████████████████████████████████████████████████

When I think of someone with
great character, generosity, morals, and willingness to do good things, the person
that always comes to mind is my friend, Matt James.

Ex. 11 (S. Basso Letter). In the eyes of those who know Mr. James best, he is a true and loyal

friend who goes above and beyond for the people around him.

Several of Mr. James's friends joined his family in attending the trial in the summer of

2022 and have articulated that the offense conduct is not consistent with the person who they

have come to know. Ex. 13 (J. Covello Letter); Ex. 20 (D. Gelchie Letter); Ex. 21 (J. Gelchie

Letter); Ex. 23 (D. Kennedy Letter). Their requests for leniency at Mr. James's sentencing are

heartfelt, well-earned, and supported: they know that Mr. James can contribute much more to

society while at home, with loved ones and friends, than he can in a federal prison. These

friends, whom Mr. James considers loved ones, are devastated by the prospect of Mr. James's

incarceration, as it will rattle their support network of which Mr. James is such a crucial member.

Ex. 11 (S. Basso Letter); Ex. 12 (K. Bullis-Byrd Letter); Ex. 16 (P. Dotzler Letter); Ex. 17 (L.

Fasano Letter); Ex. 18 (M. Fasano Letter); Ex. 20 (D. Gelchie Letter); Ex. 21 (J. Gelchie Letter);

Ex. 22 (E. Hogan Letter); Ex. 23 (D. Kennedy Letter); Ex. 24 (D. Kern Letter); Ex. 27 (B.

Pomerantz Letter); Ex. 28 (G. Pomerantz Letter).

Beyond his network of friends and neighbors, Mr. James has contributed to his

community through his religious and philanthropic involvement. Still deeply religious from his

Knānāya upbringing in India, Mr. James has been active in the local Catholic church community

for years. Ex. 4 (A. James Letter); Ex. 13 (J. Covello Letter); Ex. 16 (P. Dotzler Letter); Ex. 26

(S. London Letter). As demonstrated at trial, Mr. James practiced tithing as a parishioner by

making regular donations to his church. GX-1749 at 2, 4, 11, 18, 19, 20, 27. Mr. James is also a

frequent supporter of local campaigns and fundraisers for various organizations, including the local Scouts, the Leukemia & Lymphoma Society, the Endometriosis Foundation of America, and local pantry drives.  Ex. 18 (M. Fasano Letter); Ex. 26 (S. London Letter).  Since the trial's conclusion, Mr. James has made efforts to continue giving back to the local community by volunteering at the Christ Lutheran Church in Northport.  In this capacity, Mr. James assists the elderly members of the congregation during the Fellowship gatherings on Sunday mornings.  He also volunteers his time to help with fundraisers at the church. Ex. 31 (Christ Lutheran Church Letter).

### G.    Mr. James Turns to Alcohol As He Struggled To Juggle Family, Business, and His Arrest

Over the last two decades, Mr. James juggled caring for his parents, raising a family, working as a nurse, and then starting and running his medical billing business.  As the stresses of his job and family grew, and well before his arrest in this case, Mr. James began to rely on alcohol more and more as a coping mechanism, ██████████████████████████████ ████████ often hiding his drinking from his family and drinking excessively on weekends.  PSR ¶ 80.  After his arrest, Mr. James's stress grew considerably.  In addition to facing serious federal charges, Mr. James's personal and professional reputations are ruined.  He worried about supporting his family and what they thought of him now that he had been arrested.  He spent time in jail, was facing a lengthy prison sentence, and could see firsthand the effect that the charges and trial were having on Reena and their children.  Due to feeling increasingly overwhelmed and hopeless, Mr. James resorted to drinking even more.

After the conclusion of his trial, and with the help and support of his friends and family, Mr. James took the first steps towards getting his drinking under control.  Recognizing the personal and professional harm his alcohol consumption has caused, Mr. James enrolled in both

group and individual therapy. His substance abuse therapy sessions have helped Mr. James manage his drinking and identify better coping mechanisms throughout the remainder of 2022 and 2023. PSR ¶ 77, 78, 80. While Mr. James still struggles, he hopes to enroll in programs in prison to help him maintain his sobriety.

**H.** **This Prosecution Has Already Had Significant Consequences for Mr. James and His Family**

Though Mr. James knows that it was his conduct that led to this moment, the instant charges and conviction have had a devastating and indelible impact on Mr. James and his family. Mr. James was on pre-trial release for nearly three years before his trial, and it has been 18 months since his trial ended. The business and relationships that Mr. James spent years building have been eliminated. Mr. James has not worked since his arrest, and his job prospects are dim, at best. Mr. James has lost years of his adult life and is frightened by the uncertainty the future holds. PSR ¶ 78. Also terrified and suffering are Reena, their children, and the rest of his family. Sentencing Mr. James now to a lengthy period of incarceration will only exacerbate these struggles unnecessarily.



Ex. 1 (Milenia James Letter); Ex. 4 (A. James Letter). Milenia attended every day of Mr. James's trial, and now approaches the date of his sentencing with fear. PSR ¶ 64.

Ex. 4 (A. James Letter). Similarly, Evan spent the last years of high school anticipating his father's trial, and then started his first semester of college weeks after Mr. James's conviction. His experience as a young adult is tainted by the criminal case against his father. Already,

PSR ¶ 69.

█████████████████████████████████████████

████████████████  Ex. 1 (Milenia James Letter); Ex. 2 (E. James Letter); Ex. 4 (A. James

Letter).

Similarly, Mr. James's mother, who had to move to Texas following his arrest, misses her

son and is devastated by the current circumstances: "Our family is crumbling." Ex. 4 (A. James

Letter). Elderly and in poor physical condition, Mr. James's mother is unable to travel to see Mr.

James or his family in New York and grieves the loss of family gatherings and once-frequent

visits. Her only hope is to be able to spend time with Mr. James in the last years of her life, a

prospect that is challenged by the possibility of a long prison sentence. *Id.*

Holding the family together is Reena, who has been supporting her family and husband

through the "nightmare [of] these last three years." Ex. 3 (R. James Letter). Given the seizure

and anticipated forfeiture and restitution of Mr. James's assets, Reena faces the burden of

sustaining the family for the rest of their lives, fearing that Mr. James "will come out of prison

barely able to support himself, much less a family." PSR ¶ 69; Ex. 3 (R. James Letter).

Although Reena has always been able to see the positive in everything – and believes that, with

love, Mr. James and her family may move forward – she is overcome by the imminent emotional

and financial challenges that her family faces. *Id.*

As stated above, Mr. James blames only himself for this devastating prospect and for the

shame and uncertainty he has brought on his family. That said, the James family has made its

best efforts to come together since 2019 to face the outcome of Mr. James's prosecution. In

stepping back from work, and later seeking alcohol treatment, Mr. James has tried to strengthen

his relationship with his family. But there still looms the likelihood that Milenia and Evan will

have to navigate years of their young adulthood without their father present. And, given his

presence throughout their lives, this prospect is devastating. Ex. 1 (Milenia James Letter); Ex. 2 (E. James Letter); Ex. 3 (R. James Letter); Ex. 4 (A. James Letter).

It is important to note that Mr. James has been fully cooperative with the government's forfeiture efforts. Just as Mr. James assisted the FBI in its raid of his properties at the time of his arrest in July 2019 – providing passwords to his devices and instructions on accessing his server – Mr. James complied with the government's seizures surrounding his accounts and properties, maintaining timely and complete recordkeeping of the sales of the properties. Tr. 2406–13 (Tumulty). Currently, the government has over $32 million dollars in seized bank accounts held by Mr. James, as well as from properties that Mr. James has sold, of which the proceeds were forwarded to an escrow account for payment of his potential forfeiture obligations. PSR ¶¶ 96, 97. We respectfully submit that the Court should consider these cooperative steps and efforts at remedying the alleged harms Mr. James caused in assessing Mr. James's character and in fashioning a just sentence.

## II.   MR. JAMES'S OBJECTIONS TO THE PSR AND GUIDELINES CALCULATION

The defense filed objections with Probation on November 13, 2023, many of which the defense raised with Probation prior to the issuance of the PSR, and Probation responded on January 3, 2024. *See* Second Addendum to Presentence Report, dated January 3, 2024 ("Second Addendum"). While Probation declined to change any of the challenged aspects of the PSR, the defense respectfully submits that the PSR, the two Addenda, and Probation's Recommendation contain various misleading and inaccurate statements. Similarly, Probation's Guidelines calculation is incorrect because it includes inapplicable enhancements and, as discussed further below, vastly overstates and incorrectly calculates the loss amount.

### A.    Description of the Offense Conduct

Part A of the PSR, which outlines the background and offense conduct, is largely a blind repetition of the government's opening and closing arguments at trial.[1]  The PSR fails to take into account contradictory evidence or testimony.

Because "[w]hat is set forth [in the PSR] is the Government's characterization, not factual recitation,"[2] the PSR's description of the offense conduct should be rejected and amended as follows.  *See, e.g.*, Order at 1, *United States v. Small*, No. 16 Cr. 640-6 (E.D.N.Y. Nov. 13, 2023) (Cogan, J.), ECF No. 1018.

#### 1.    Background Section (¶¶ 13-18)

***Paragraphs 12, 26, 33.***    Contrary to the government's assertion, adopted in the PSR, that "the defendant continued to engage in fraudulent conduct related to his medical billing businesses" "[f]ollowing his release on bond," Mr. James ceased the alleged conduct upon his arrest on July 26, 2019.  On December 13, 2019, the government sought to revoke Mr. James's bail, alleging that he had continued to engage in the same fraudulent conduct that was the subject of the indictment.  *See* ECF No. 23.  The defense responded on December 18, 2019, disputing the government's account and noting that the allegations in the government's letter largely occurred prior to Mr. James's arrest.  ECF No. 25.  During a December 18, 2019 hearing, the

---

[1] The standard for the finding of facts for the PSR is different than the standard on a Rule 29 motion.  On a Rule 29 motion, "[t]he Court must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government."  *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (quoting *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011)).  In sentencing, however, the Court may not draw all inferences in the government's favor, but rather must find facts relevant to sentencing by at least a preponderance of the evidence.  *See United States v. Concepion*, 983 F.2d 369, 388 (2d Cir. 1992).

[2] There are several places where the PSR's description of the offense conduct is almost word-for-word taken from the government's opening or closing arguments.  To provide just one of many examples, the PSR adopts the government's opening statement describing "[t]he defendant's medical billing [that] resulted in grossly inflated claims that were often denied."  *Compare* PSR ¶ 20 ("[T]he defendant's billing practices often resulted in grossly inflated claims that were denied by the insurance companies."), *with* Tr. 17 (Opening).  Throughout the PSR, Probation adopted the government's language wholesale, without any reference to defense arguments and evidence that the jury may have credited.

Court found that much of the conduct in the government's bail revocation request had occurred prior to Mr. James's arrest, and to the extent he continued to engage in medical billing, the defense's explanation put those allegations "in a different light which le[d] [the Court] to believe that there [was] a basis to release" Mr. James. *See* Ex. 33 (Dec. 18, 2019 Transcript at 13). The fact that the Court released Mr. James from detention after this hearing is consistent with Mr. James's position that he did not engage in any fraud post-arrest. *Id.* at 24–25. The government's attempt to shoehorn its failed arguments into the PSR, and the PSR's adoption of this position, should be denied.

Accordingly, Mr. James requests that the following paragraphs of the PSR be amended as follows:

- **Paragraph 12** of the PSR should be amended to read: "Following his release on bond in this matter, as set forth in a letter from the Government to the Court on December 13, 2019, the Government alleged the defendant continued to engage in fraudulent conduct related to his medical billing business. The Court did not agree with this allegation and again released Mr. James. The supervising Pretrial Services officer advised that the defendant has complied with all Court-ordered conditions of release."

- The last sentence of **Paragraph 26** of the PSR should be amended to read: "It is noted that the Government previously alleged that the defendant continued to engage in this criminal activity after his arrest on July 26, 2019, which the defendant disputes. After the Government moved to revoke his bond on December 13, 2019, the Court did not agree with the government's claim that Mr. James continued to engage in improper billing and released Mr. James on bond."

- The fourth sentence of **Paragraph 33** of the PSR should be deleted.

*Paragraph 13.* The PSR adopts the government's unsupported position that "[t]he Government presented evidence at the defendant's trial that he renamed his third-party billing companies several times to facilitate and conceal his fraudulent medical billing conduct." But there was no testimony or evidence at trial that Mr. James ever renamed his companies for the purpose of concealing or facilitating fraud. In fact, there were only a limited number of billing

companies that were operational during the relevant period, all of which were (1) registered under his name; (2) registered to Mr. James's home address; and (3) publicly registered in New York. Tr. 2653–56 (Del Gais); GX-104. Importantly, Mr. James was acquitted of the money laundering charges against him, which further undercuts this paragraph. As such, the last sentence of Paragraph 13 of the PSR should be removed.

*Paragraph 15*. The last sentence of this paragraph states that "[t]he amount of money an insurance company paid a health care professional on a claim was normally determined by certain rates and benefits set forth in the relevant health plan." This sentence creates a misimpression because Mr. James's business primarily involved claims from out-of-network physicians who were able to charge whatever they wanted for their services, as well as situations in which insurance companies were or could have been obligated to pay the entirety of a claim or had agreed in advance to pay for a particular procedure. *See* Expert Report of Wendy Wilkins-Russell (the "Wilkins-Russell Report") ¶¶ 6, 8, 9, 11. Moreover, the government did not introduce at trial any "health plan" that corroborates this statement.

2.  The Scheme to Commit Health Care Fraud and Wire Fraud (¶¶ 19-26)

*Paragraph 19.* The evidence at trial does not support several of the statements in this summary paragraph, as discussed further below. For example, Mr. James did not knowingly or intentionally submit claims that were "completely different than the procedures actually performed by the physician-clients." Nor did he always "use[] the most expensive CPT codes for the claims he submitted." In fact, there were multiple examples in evidence of Mr. James doing the opposite. And lastly, the evidence did not support the allegation that Mr. James "conspired with collusive physician-clients to stage emergency room visits." The defense

therefore requests that Paragraph 19 be amended to qualify the allegations as being the government's version of events.

*Paragraph 20.* Paragraph 20 contains several misstatements. *First*, the PSR claims that Mr. James made "thousands" of calls in which he posed as patients. While Mr. James did regrettably impersonate many patients or patients' family members, the trial record does not establish, let alone by a preponderance, that he did so "thousands" of times. The government did not introduce any evidence at trial about the precise number or percentage of calls on which Mr. James or his employees impersonated a patient. *See* Tr. 2468, 2475 (Tumulty). Agent Tumulty testified that the FBI listened to hundreds of recorded calls with insurance companies and on only a subset of those calls was there any apparent impersonation. *Id*. Moreover, in its case-in-chief, the government called multiple patients who were not impersonated by Mr. James or one of his employees. Tr. 173:6–23 (Breidenbach); Tr. 1137 (Brenner); Tr. 1839–40 (Motley).

In addition, Mr. James did not make these calls "knowing" that the request for additional payments "was completely false." To the contrary, Mr. James generally made these calls after patients underwent medically necessary medical procedures and the insurance company acknowledged services were covered, but commenced a dispute over exactly how much the insurance company was obligated to pay. Many of these disputes ended in a negotiated settlement with the insurance companies, which were premised on the insurance company's review of the patient's medical records and a sophisticated understanding of what out-of-network providers ordinarily charge for the medical treatment in question. DX-401; DX-404.

*Second*, Paragraph 20 states "In addition to making the calls himself, the defendant also directed at least five female employees of his medical billing businesses to make the calls when the patient was female (several employees testified at the defendant's trial, and none have been

charged for their involvement in the fraudulent scheme)." It further states that employees were "expected, as part of their employment, to make the bogus telephone calls." The government only called three (Ms. Nash, Ms. Persky, and Ms. Cutrone), not five, female employees to speak about their experiences making calls while working for Mr. James. And several employees who testified at trial said they never made calls impersonating a patient, nor did they overhear another employee call as or impersonate a patient. Tr. 1268:20–21 (Martinelli); Tr. 1584:4–7 (Flanagan); Tr. 2025:2–3 (Brunner).

*Third*, the trial record does not support the claim that "the defendant sought to hire employees without extensive experience who could be molded to participate in his fraudulent billing practices." To the contrary, several of the employee witnesses had some medical billing training. *See, e.g.*, Tr. 1281:8–13 (Martinelli); Tr. 1317:7–11 (Cutrone); Tr. 1471 (Flanagan).

Accordingly, with respect to Paragraph 20, Mr. James requests:

- In the sentence, "When doing so, he often impersonated the patient or the patient's family member (the insurance policyholder)," replace the word "often" with "sometimes."

- Delete the first half of the sentence "The defendant made thousands of such telephone calls . . ."

- Remove the phrase "knowing that this was completely false" from the fourth sentence of the paragraph.

- Change the sentence: "In addition to making the calls himself, the defendant also directed at least five female employees of his medical billing businesses to make the calls when the patient was female (several employees testified at the defendant's trial, and none have been charged for their involvement in the fraudulent scheme)," to read: "In addition to making the calls himself, three female employees of his medical billing businesses testified at trial that the defendant directed them to make the calls when the patient was female (several employees testified at the defendant's trial, and none have been charged for their involvement in the fraudulent scheme)."

**Paragraph 22.** This paragraph incorrectly recounts the circumstances surrounding an insurance company's payment for a patient's procedure, stating "As a result, the insurance

company paid the physician-client $153,000, an amount that was significantly higher than that which was justified for 11 stitches." Regardless of the code Mr. James or his employees used to bill for a procedure, many of which he received directly from his physician-clients, it is uncontested that each of the patients for whom Mr. James submitted medical bills received real and necessary procedures from real, usually out-of-network, doctors. Because the physicians were out-of-network, they had the discretion to set the price for procedures; they did not have to follow any guidance from insurance companies in setting these prices. *See* Wilkins-Russell Report ¶¶ 6, 8, 9, 11. And it was the doctors who determined where and when the medical treatment was to occur, the contents of their operative reports, and the price for the procedures.

As for this cited patient, Susan Breidenbach, Mr. James coded this claim based on exactly what was in the operative report. GX-1177 at 1; *see also* Tr. 164 (Breidenbach) (testifying that the codes Mr. James selected "matche[d]" the operative report). As Ms. Wilkins-Russell concluded, even if the claim had been submitted as the government purports it should have been, it would have resulted in a loss of $47,191.25 out of $153,250.00, or less than one-third of the originally-billed claim. Wilkins-Russell Report ¶ 76.

With respect to the second example in this paragraph regarding a patient, Victoria Motley, who received "an uncovered cosmetic 'tummy tuck' surgery," the PSR is mistaken to uncritically adopt the government's version of the trial record. Ms. Motley's testimony at trial revealed that her original version of the story – that she wanted and received a tummy tuck, which was then concealed from the insurance companies – was not true, and in any event, would have been unknown to Mr. James. As she was confronted with at trial, Ms. Motley's operative report stated that she received hernia surgery. Tr. 2487–90 (Motley); DX-713. And three hundred pages of medical records reflected the same conclusion: that Ms. Motley received a

single diagnosis of a hernia. GX-136. With respect to the allegation that Mr. James "directed the physician-client to process [Ms. Motley] through the emergency room for a hernia," the government presented no evidence at trial of such collusion. To the contrary, all the evidence showed was that Mr. James received an operative report from a doctor with the subject line "UHC ER patient." DX-713. There is no evidence that Mr. James consulted with the doctor about going to the emergency room, that Mr. James spoke to Ms. Motley, or that he somehow directed her to go to the emergency room. And in any event, the insurance company did not allow payment on the emergency room code that Mr. James submitted with the claim. Wilkins-Russell Report ¶¶ 41, 44. It cannot follow that Mr. James's billing of Ms. Motley's procedure as a hernia was at all improper, or that he had any role in her reporting to the emergency room when she complained of abdominal pain, which had previously been diagnosed as a hernia. *Id.* ¶ 40; DX-226.

Moreover, the evidence at trial does not support that Mr. James submitted falsified claims to insurance companies "by working with collusive physician-clients to manipulate and falsify operative reports." PSR ¶ 22. As the government proposed, the PSR holds Mr. James responsible for every single operative report and medical record presented to the jury as if he were their sole, or even primary, author. But there were no charges brought against any of the alleged co-conspirator doctors. Instead of calling one of Mr. James's alleged co-conspirator doctors, the only doctor-witness the government called, Dr. Kevin Tehrani, supported Mr. James's conduct, testifying that Mr. James correctly coded the claim that Mr. James submitted for Dr. Tehrani. Tr. 1230–31 (Tehrani); DX-222. Dr. Tehrani further testified that it was proper and common for billers like Mr. James to comment on a doctor's operative report and suggest amendments or changes to the report. Tr. 1238–41 (Tehrani); DX-170; *see also* Tr. 2490–92

(Tumulty) (reporting statement from a second doctor that it was common and appropriate for medical billers to suggest changes to operative reports).[3]

Accordingly, Mr. James respectfully requests:

- The sentence "He did so by working with collusive physician-clients to manipulate and falsify operative reports" be removed;

- The last two sentences of Paragraph 22 be removed; and

- The following sentence be added to the end of the paragraph: "The physician-clients for whom Mr. James typically billed were out-of-network, and as such, they permissibly set their own prices for procedures."

**_Paragraph 23._**  Contrary to Paragraph 23, which claims that "the defendant used the most expensive CPT codes in the claims he submitted to insurance companies," the evidence at trial demonstrated that Mr. James did not always use the "most expensive CPT code."  For example, there were numerous claims where Mr. James and his employees submitted codes ranging from simple to complex for debridement, wound closures, emergency consultations, and a host of other categories.  Tr. 1628–30 (Flanagan); GX-1018 at 1; Tr. 1637–50 (Flanagan); DX-221 at 3; DX-224 at 4, 15; DX-601 at 14, 21, 60, 61, 68; GX-601 at 1; DX-710 at 5; GX-1210 at 14. Moreover, Mr. James instructed his employees to use less complex codes in certain situations.  In one example, when an employee asked which debridement code – one of the supposedly lucrative codes the government claimed Mr. James always instructed his employees to use – to enter for a claim where the doctor only coded for simple debridement, Mr. James said "Use [the doctor's] codes."  DX-139.  And when an operative report did not include a description of debridement, Mr. James told an employee not to add it.  DX-141.  In other words, while the PSR parrots the government's unproven theory that every single bill used the most expensive code,

---

[3] Similarly, as the Cigna witness, Ms. McQuade, testified it is not misconduct or fraud for a medical biller to advise a doctor or patient about the financial ramifications of doing a procedure one way or another. Tr. 656 (McQuade).

the evidence showed that Mr. James and his employees regularly used less complex, and therefore less expensive, codes.

Similarly, Paragraph 23 states that "the defendant frequently did not check with his physician-clients regarding clarification of procedures that were performed."  But the government's own evidence at trial showed that Mr. James regularly received CPT codes directly from the physician-clients, communicated with his physician-clients to confirm details of the treatment and the coding, and provided copies of the submitted HCFA forms to his physician-clients for their review.  *See* GX-709 at 22; GX-734 at 22; *see also* DX-113; DX-116; DX-125. In one conversation between Mr. James and a doctor, Mr. James asked the doctor about which debridement codes to use.  The doctor told him "if appropriate use 11011," a more complex debridement code.  Mr. James responded, "U have documented only skin we will have to use 11010," a less complex debridement code.  DX-112.

In addition, only one employee testified at trial that Mr. James "directed his employees to fabricate claims;" other employees testified that they only billed "legitimate codes . . . they weren't made up codes."  Tr. 1304:3–9 (Martinelli); *see also* Tr. 1291 (Martinelli) (testifying employees were not "mak[ing] up" codes, but coding and billing claims based on medical records); Tr. 1424–25 (Cutrone).  These employees described the same basic coding process in which they would "look at the operative reports, code them, and bill them out," Tr. 1282 (Martinelli), with codes selected "based on the procedures that were described in the operative report," Tr. 1283 (Martinelli); *see also* Tr. 1457–58 (Cutrone); Tr. 1588–89 (Flanagan).

Finally, the defense also objects to the last sentence in Paragraph 23 related to Modifier 59, stating that "By using a modification known as 'Modifier 59,' the defendant ensured that his employees were indicating on claim forms that separate and distinct procedures were performed

on different parts of the body when, in actuality, only one part of the body was affected." This sentence is unsupported by the trial record, and there were instances in which Modifier 59 was not used, was used properly, or was irrelevant to the claim evaluation by the insurance company. *See* Wilkins-Russell Report ¶¶ 29, 31, 35, 43, 46, 47, 50, 55, 56, 60, 61, 63, 65, 70.

Accordingly, with respect to Paragraph 23, Mr. James respectfully requests that:

- The paragraph be re-written to make clear that the defendant sometimes used and encouraged his employees to use the most complex CPT codes, but that the evidence and testimony reflects that non-complex codes were routinely used by Mr. James and that Mr. James determined the appropriate CPT codes relying on the operative reports solely generated by his physician-clients.

- Remove the sentence stating "In fact, the defendant frequently did not check with his physician-clients regarding clarification of procedures that were performed."

- Remove the sentence stating "He also directed his employees to fabricate claims" and replace it with "One out of six employees who testified stated that Mr. James directed her to fabricate claims."

- Remove the last sentence of the paragraph that relates to Modifier 59.

***Paragraph 24.*** Contrary to the PSR's assertion, the evidence at trial does not support that Mr. James "worked with corrupt physician-clients who agreed with the defendant's suggestion that the patients should be directed to check in through the emergency room for pre-planned surgeries" because "insurance companies did not question the legitimacy of emergency room visits." *First*, as noted above, there is no evidence that Mr. James ever directed Ms. Motley or her physician to report to the emergency room for a hernia. *Second*, the other patient the government presented who was directed to report to the emergency room unnecessarily, Ms. Guzman, testified that she never communicated with Mr. James. Tr. 288–89 (Guzman). In fact, not a single patient who testified said that they ever spoke with Mr. James prior to being treated with the exception of Heather Quinlivan, a patient who never went to the emergency room and

underwent a surgery that was fully pre-authorized.  Accordingly, the defense respectfully requests that Paragraph 24 be removed from the PSR.

**The defense also requests that the PSR include in the offense conduct the following two points**, which are supported by the trial record and relevant to a fair description of the offense conduct:

*First*, Mr. James's billing practices and procedures also included hundreds of procedures that were pre-authorized by the insurance companies – known as "GAP" procedures.  *See, e.g.*, DX-215.

Before Mr. James or his employees submitted documentation to the insurance companies for compensation, the insurance companies fully pre-authorized many of the claims that Mr. James billed.  Stephanie Brunner, Mr. James's employee, testified that she only worked on pre-authorized procedures, and that pre-authorized procedures were "almost exclusively" the kinds of claims Mr. James submitted for payment.  *See* Tr. 2017:5–7 (Brunner).  With pre-authorized procedures, the insurance company had already made a determination that the procedure was medically necessary and covered before Mr. James got involved with billing a procedure.  *See* Tr. 794:7–9 (Battistoni).  As a result, the insurance companies had promised to pay most, if not all, of the amount of money the doctors charged for these pre-authorized procedures.  And there were instances in which insurance companies negotiated the exact amount they were going to pay for these procedures in advance.

*Second*, not a single witness testified that their credit was harmed, that they were sent to collections agencies, or that they were held responsible for a medical bill as a result of Mr. James's conduct.  To the contrary, multiple witnesses testified that their credit and creditworthiness were not harmed by Mr. James.  Tr. 958 (Pash); Tr. 1020 (Smart).  And no

patient testified that they were obligated to pay the difference between the dollar amount of the claims submitted by Mr. James and the amount actually paid out by the insurance companies.

3.     Victim Impact (¶ 30)

The defense objects to Aetna's calculation of its loss, as Aetna has not presented any explanation or support for its claimed $50,000,000 in loss.  PSR ¶ 30.  As discussed further below, *see infra* Section III, even assuming that the dollar amount accurately reflects the amount Aetna paid to Mr. James's physician-clients in the relevant period, Aetna's actual loss is far less than the total amount it paid.

4.     Objections to the PSR's First Addendum

On October 16, 2023, Probation supplied its First Addendum to the PSR ("First Addendum"), which included "additional information" and a victim impact statement from Cigna.

As discussed further below, *see infra* Section III, the defense objects to Cigna's calculation of the loss amount, as no evidence has been presented as to how Cigna calculated that $33 million amount, and the same issues that pervade the rest of the loss calculation exist in Cigna's calculation.

Additionally, the defense objects to any reliance by the Court upon the factual allegations in Cigna's statement that relate to the underlying offense conduct, which have not been subject to cross-examination or considered by a jury.

**B.     Mr. James Should Not Be Subject to Several of the Sentencing Enhancements Probation Assigned**

The PSR's Guidelines calculation is flawed because the government has sought, and the PSR has adopted, several Guidelines enhancements that are inapplicable.  *See* PSR ¶¶ 27-57.

Starting with the Guidelines calculation, Mr. James has no criminal history, and thus is in Criminal History Category I. In addition, it is undisputed that the base offense level for the conduct of which Mr. James was convicted is 7. Probation, however, then added 28 levels corresponding to a loss amount of more than $250,000,000 and less than $550,000,000. As set forth below, that calculation vastly overstates the loss amount. The government cannot prove by a preponderance of the evidence, let alone with the specific evidence that this Circuit requires, that the purported insurance company victims have suffered such a loss.

In addition, each of the following enhancements Probation recommends are inappropriate given the instant facts and applicable law: (1) 4 levels because Mr. James was the organizer and leader of the offense, which involved five or more participants, pursuant to U.S.S.G. § 3B1.1(a), PSR ¶ 40; (2) 2 levels because Mr. James "abused a position of public and private trust in a manner that significantly facilitated the commission or concealment of the offense" pursuant to U.S.S.G. § 3B1.3, *id.* ¶ 41; and (3) 2 levels for obstruction of justice pursuant to U.S.S.G. § 3C1.1, *id.* ¶¶ 32, 42. Moreover, even if Mr. James receives the 4-level enhancement for an aggravating role, he still qualifies for a 2-level reduction because he has no criminal history.

    1.  Mr. James Did Not Obstruct Justice

The government's sought-after enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1 is based on fundamental factual and legal errors. Specifically, the PSR bases the enhancement for Obstructing or Impeding the Administration of Justice on the government's assertion that "[t]he FBI's investigation into the instant offense had already commenced by [March 2019]" when Mr. James allegedly deleted and encouraged a former employee to delete evidence, and "even if the defendant was not aware of the investigation in March 2019, it appears that the defendant's destruction of evidence was purposely calculated and likely to thwart the investigation or prosecution of the offense of conviction." *Id.* ¶ 32. But there is no

evidence that (1) Mr. James's actions were "purposely calculated and likely to thwart the investigation," or (2) that Mr. James was even aware of the FBI's investigation in March 2019, when he allegedly destroyed evidence.

Section 3C1.1 of the Sentencing Guidelines provides that a 2-point enhancement is appropriate if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." U.S.S.G. § 3C1.1. The Application Notes for Section 3C1.1 state that the adjustment may extend to obstructive conduct that occurred prior to the start of the investigation of the instant offense only "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." U.S.S.G. § 3C1.1, Application Note 1. To be "purposefully calculated," the government must show willfulness and materiality, meaning that the defendant had the "specific intent to obstruct justice, i.e., that the defendant consciously acted with the purpose of obstructing justice." *United States v. Zagari*, 111 F.3d 307, 328 (2d Cir. 1997) (quoting *United States v. Defeo*, 36 F.3d 272, 276 (2d Cir. 1994)) (noting "motivation alone does not equate to materiality"). In other words, the government must show by a preponderance of the evidence that the defendant knew there was an imminent or ongoing federal criminal investigation, and that his actions were taken to thwart that investigation. *See United States v. Eisen*, 1991 WL 180398, at *1 (E.D.N.Y. Sept. 3, 1991).

The government appears to take the position that the obstruction enhancement is appropriate because of a conversation between Mr. James and one of his former employees, Eileen Nash, in March 2019, shortly after Aetna sued Mr. James. During that conversation, Ms.

Nash claimed that Mr. James asked her to get rid of her laptop. PSR ¶ 32. The government also claims that, after that conversation, Mr. James deleted some of his messages with Ms. Nash. *Id.* But the referenced conversation between Ms. Nash and Mr. James occurred (in March 2019) months before Mr. James was charged in the instant case (in July 2019), or before he had any knowledge that there was an ongoing or imminent criminal investigation into his conduct.

Nor is there any evidence that Mr. James acted to thwart or impact an imminent criminal investigation. The conversation with Ms. Nash happened as a result of Aetna filing a civil lawsuit against Mr. James. The government has never alleged or proven that Mr. James knew he was or soon could be under criminal investigation at the time he spoke to Ms. Nash. Mr. James's actions certainly were not, as the government suggests without any evidence, a calculated attempt to evade an investigation he did not know about. As a result, any steps Mr. James may have taken after getting sued in a civil lawsuit, prior to being charged and without any knowledge of an imminent or ongoing criminal investigation, fall outside the obstruction enhancement set forth in Section 3C1.1. *See United States v. Paccione*, 751 F. Supp. 368, 377 (S.D.N.Y. 1990) (rejecting two-level enhancement where defendant "did not know that there was a federal investigation pending at the time of the alleged" obstruction), *aff'd*, 949 F.2d 1183 (2d Cir. 1991); *Eisen*, 1991 WL 180398, at *1 (rejecting two-level enhancement because government provided no evidence that defendant's action were intended to obstruct federal investigation, but rather an investigation by "local authorities" into state law violations).

### 2.      A 4-Level Role Enhancement Is Inappropriate

A 4-level role enhancement is not appropriate in this case. Section 3B1.1 of the Guidelines provides for an offense level enhancement if the defendant was (a) "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" (4 levels); (b) "a manager or supervisor (but not an organizer or leader) and the criminal activity

involved five or more participants or was otherwise extensive," (3 levels); (c) "an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b): (2 levels). U.S.S.G. § 3B1.1.

Mr. James did not function in an organizer, leader, manager, or supervisory role in the offense conduct. Mr. James ran a medical billing business out of the basement of his home. While Mr. James managed his business and his handful of employees, the government did not demonstrate that he acted as the organizer, leader, manager, or supervisor of a criminal enterprise. Nor did the government prove that Mr. James organized, led, managed, or supervised his doctor-clients (and alleged co-conspirators). Indeed, the very nature of his relationship with his doctor-clients was that the doctors were ultimately responsible for all billing, coding, and medical decisions arising out of their practices, and they routinely directed Mr. James to bill certain procedures and claims (and how much, and for what, he should bill those claims for). The government's efforts to transform Mr. James's basement business into a criminal enterprise, and to claim that Mr. James, who performed services for and at the discretion of his doctor-clients, acted as their "organizer," "leader," "manager," or "supervisor," should be rejected.

Regardless of Mr. James's role, the government also failed to prove that the alleged conspiracy had five or more *knowing* participants, or was otherwise extensive, as required for the 3- or 4-level enhancements under U.S.S.G. § 3B1.1(a). "In assessing whether a criminal activity 'involved five or more participants,' *only knowing participants are included*." *United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000) (emphasis added). But the government has not proven by a preponderance of the evidence that either Mr. James's doctor-clients or employees, none of whom were charged, constitutes "knowing" participants for purposes of the aggravating

role enhancement, and even if they were, that Mr. James exercised control or authority over the physician-clients.

The government elicited no testimony from any of Mr. James's physician-clients at all, much less testimony that would demonstrate they were "knowing" participants in any purported criminal scheme or even that they knew Mr. James was impersonating their patients or altering the coding. And, to the extent these physicians were somehow knowing participants for purposes of the enhancement, Mr. James did not exercise control or authority over their actions. *See Paccione*, 202 F.3d at 624 (noting U.S.S.G. § 3B1.1 "depends upon the degree of discretion exercised by" the defendant) (quoting *United States v. Beaulieu*, 959 F.2d 375, 379–80 (2d Cir. 1992)). To the contrary, Mr. James's physician-clients were ultimately responsible for providing medical care to their patients, and in turn directed Mr. James to bill the claims and procedures he submitted to insurers. In addition, Mr. James's physician-clients were ultimately responsible for the health insurance claim forms submitted to insurance carriers. *See* GX-130.

Similarly, Mr. James's former employees also do not constitute "knowing" participants, or otherwise function as the equivalent of a group of five or more knowing participants for purposes of this enhancement. At trial, all of Mr. James's employees except one disclaimed any knowledge of fraud. In fact, they testified to precisely the opposite: that they did not believe they were participating in a fraudulent scheme, and they were uniformly instructed to code and bill claims based on what was in the medical records. Tr. 1291, 1304 (Martinelli). As one employee put it: "No, all codes were legitimate codes . . . they weren't made up codes." Tr. 1304:3–9 (Martinelli). Even the employees allegedly hired to impersonate patients testified that they believed they had the patients' permission to call, and that they made the calls to help patients, not to defraud the insurance companies. Tr. 311, 318:1–3 (Nash); Tr. 885:6–12

(Persky); Tr. 1414:10-11 (Cutrone). *See United States v. Tonawanda Coke Corp.*, 5 F. Supp. 3d 343, 360 (W.D.N.Y. Mar. 14, 2014) ("The Second Circuit has recognized that this enhancement is not appropriate when the supervised participants were unwitting accomplices.").

Because the government has failed to show that Mr. James was the leader of five or more knowing participants, or that the conspiracy was otherwise extensive, the 4-level enhancement should not apply. *See United States v. Ware*, 577 F.3d 442, 543–54 (2d Cir. 2009) (reversing lower court's application of four-level leadership enhancement because the record was not clear whether the "participants" were knowing, or that "unknowing participants" were "criminally responsible").

      3.    <u>Mr. James Should Receive A 2-Level Reduction Because He has No Criminal History</u>

Mr. James should receive a 2-level reduction in his offense level because he has no criminal record, putting him in Criminal History Category I. Under the newly-enacted amendments to the Guidelines, a defendant is eligible for a 2-level reduction if he received no criminal history points and does not fall within one of ten categories. U.S.S.G. § 4C1.1. Relevant here, U.S.S.G. § 4C1.1(a)(10) provides that a reduction is warranted if "the defendant did not receive an adjustment under § 3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848." For a defendant to fall within this exception to the § 4C1.1 reduction, he must have *both* (1) received an aggravating role adjustment, *and* (2) be engaged in a continuing criminal enterprise. The Sentencing Commission used the conjunctive "and" in this provision, whereas it used "or" in other subsections of this amendment. *Compare* U.S.S.G. § 4C1.1(a)(9) (stating that a defendant must not have "receive[d] an adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim), *and* U.S.S.G. § 3A1.5 (Serious Human Rights Offense)) (emphasis added), *with* U.S.S.G.

§ 4C1.1(a)(10) (using "and"). This purposeful choice indicates that subsection 10 is meant to require both an aggravating role adjustment and a continuing crime. *See Lallave v. Martinez*, 635 F. Supp. 3d 173, 187–88 (E.D.N.Y. 2022) (citing *S.W. Airlines Co. v. Saxon*, 596 U.S. 450, 457 (2022)) (referring to the "well-settled presumption of meaningful variation," which "presume[s] that variations among the instances" of repeated words, phrases, or structures from one statutory provision to another "are meaningful"); *United States v. Bonanno Organized Crime Fam. of La Cosa Nostra*, 879 F.2d 20, 24 (2d Cir. 1989) (requiring statutes be read as a whole).

Therefore, regardless of whether this Court agrees that no aggravating role enhancement is appropriate here (and it is not), Mr. James was not engaged in a continuing criminal enterprise as defined by 21 U.S.C. § 848, which applies only to felony drug offenses. And as the PSR states, Mr. James has no criminal history – he has never before been arrested or convicted of any offenses. PSR ¶¶ 52–57. Accordingly, because this was Mr. James's "first encounter with the criminal justice system," and this represents a "clear variation from an otherwise law-abiding life," he should receive a decrease in offense level by 2. *See United States v. Lin*, 2023 WL 6796390, at *4–5 (E.D.N.Y. Oct. 13, 2023) (levying sentence more than one-half of lower end of Guidelines range, in part because of lack of criminal history, applying § 4C1.1).

### 4. Mr. James Did Not Violate a Position of Trust

Probation's application of the 2-level enhancement under U.S.S.G. § 3B1.3 for abusing a position of public or private trust misunderstands the purpose of this enhancement and should be rejected. Under U.S.S.G. § 3B1.3, an additional 2-level enhancement applies where "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The abuse of trust enhancement requires that the defendant: (1) "occupied a position of trust from the victim's perspective," and (2) abused that trust, which "significantly facilitated the commission

or concealment of the offense." *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016) (quoting *United States v. Thorn*, 446 F.3d 378, 388 (2d Cir. 2006)) (rejecting 2-level enhancement for abuse of trust and finding the penalty "should not be read so broadly as to apply to every instance in which a fraud offense is committed").

This enhancement has traditionally been reserved for people who occupied a position of power over the alleged victim, such as a doctor and patient, attorney and client, teacher and student, or the like. *See* U.S.S.G. § 3B1.3, Application Note 1 (noting the enhancement is appropriate for someone in "a position of public or private trust characterized by professional or managerial discretion"); *United States v. Wilensky*, 2022 WL 715550, at *3 (E.D.N.Y. Mar. 10, 2022) (applying 2-level enhancement for physical therapist who was convicted of conspiracy to commit healthcare fraud because she "knew that most of the services were not necessary, and that some of the services were either not rendered or were rendered by unlicensed aides"). Indeed, the commentary provides three examples to illustrate the enhancement's application: (1) an attorney serving as a guardian who embezzles a client's funds, (2) "a bank executive's fraudulent loan scheme," and (3) "the criminal sexual abuse of a patient by a physician under the guise of an examination." U.S.S.G. § 3B1.3, Application Note 1. The application note further states that it would not apply "in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors." *Id.* The enhancement is not, as the government appears to allege, appropriate for a medical biller defendant and an insurance company victim, particularly where procedures were medically necessary and actually performed by real doctors.

Beyond the enhancement's intended purpose, several criteria necessary for its application are absent here. The Second Circuit has "repeatedly held that a 'position of trust' is held by one

who was accorded discretion by the victim and abused a position of fiduciary or quasi-fiduciary status." *Huggins*, 844 F.3d at 124. Neither applies here. *First*, Mr. James did not possess a fiduciary (or fiduciary-like) relationship with any of the insurance company victims in this case. Mr. James was a third-party medical biller who was contracted by his physician clients to submit claims to insurance providers, and it was the physician clients who were ultimately responsible for the coding submitted to insurance companies. His relationship to the victim insurance companies – and his role as a medical biller – do not resemble the fiduciary-like examples provided in the Guidelines. *See United States v. Broderson*, 67 F.3d 452, 456 (2d Cir. 1995) (citing as examples circumstances where an attorney embezzles a client's money, or a physician molests a patient during an examination). *Second*, there is no evidence that Mr. James was granted (let alone abused) "discretionary judgment" that was directly provided to him by a victim, which is another necessary feature required for the enhancement to apply. U.S.S.G. § 3B1.3, Application Note 1. As a result, the abuse of trust enhancement is not warranted here.

     5.     <u>Acquitted Conduct Should Be Excluded</u>

The Court should decline, in its discretion, to consider the acquitted money laundering conduct as a basis for an upward departure or variance. *See* PSR ¶ 29.

The practice of considering acquitted conduct has been widely criticized. *See McClinton v. United States*, 143 S. Ct. 2400, 2402–03 (2023) (Sotomayor, J., dissenting from denial of certiorari) ("With an acquittal, the jury as representative of the community has been asked by the State to authorize punishment for an alleged crime and has refused to do so . . . . [A]cquitted-conduct sentencing also raises questions about the public's perception that justice is being done, a concern that is vital to the legitimacy of the criminal justice system."); *United States v. Bell*, 808 F.3d 926, 927 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of r'hrg *en banc*) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences than

they otherwise would impose seems a dubious infringement on the rights to due process and to a jury trial."); *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) ("To say that district court judges may enhance a defendant's sentence based on acquitted conduct, however, is not to say that they *must* do so.").[4]

At least four current Supreme Court justices have opined that considering acquitted conduct violates the Sixth Amendment and the Supreme Court's jurisprudence regarding what a sentencing court may consider. *See McClinton*, 143 S. Ct. at 2401 (Sotomayor, J., dissenting) (noting Justices Thomas, Kavanaugh, Gorsuch, and Sotomayor have indicated they believe considering acquitted conduct at sentencing is unconstitutional).[5] In short, considering acquitted conduct at sentencing violates the Due Process Clause and the Sixth Amendment's right to a jury trial because it results in the judge stepping into and disagreeing with the jury's fact-finding. *See, e.g.*, *Jones v. United States*, 574 U.S. 948, 948 (2014) (Scalia, J., dissenting from denial of certiorari) (opining that the imposition of "sentences that, but for a judge-found fact, would be reversed for substantive unreasonableness" had "gone on long enough"); *United States v. Martinez*, 769 F. App'x 12, 17 (2d Cir. 2019) (Pooler, J., concurring) (summary order) (stating that "using acquitted conduct to enhance a defendant's sentence . . . is fundamentally unfair" and "deeply troubling," and agreeing with Justices Scalia and Gorsuch that such a practice "disregards the Sixth Amendment"); *Bell*, 808 F.3d at 929 (D.C. Cir. 2015) (Millett, J., concurring in denial of r'hrg *en banc*) ("[A]llowing a judge to dramatically increase a defendant's sentence based on jury-acquitted conduct is at war with the fundamental purpose of

---

[4] Both houses of Congress recently introduced bipartisan legislation that would prohibit punishment based on acquitted conduct. *See* Prohibiting Punishment of Acquitted Conduct Act of 2023, S. 2788, 118th Congress (2023); Prohibiting Punishment of Acquitted Conduct Act of 2023, H.R. 5430, 118th Congress (2023).

[5] Justices Kavanaugh, Gorsuch, and Barrett joined Justice Sotomayor's dissent to granting certiorari in *McDonald*. *Id.* at 2403.

the Sixth Amendment's jury-trial guarantee."). Considering acquitted conduct here would "raise[] questions about the public's perception that justice is being done," *McClinton*, 143 S. Ct. at 2402, and thus it should be disregarded for sentencing purposes.

In any event, the jury found that Mr. James did not commit money laundering, and the government has not proven that conduct by a preponderance of the evidence. At trial, the government failed to prove that all of Mr. James's gains from his medical billing business were fraudulently obtained and, more importantly, that Mr. James hid or concealed his investments and purchases or conspired with anyone to engage in money laundering. Accordingly, an upward departure or variance for Mr. James's acquitted conduct is inappropriate here.

### 6. Convictions under 18 U.S.C. § 1028A Should Run Concurrently

Probation appropriately recommends – without objection from the government – that Mr. James's sentence on the three counts of conviction pursuant to 18 U.S.C. § 1028A should run concurrently to each other (with the understanding that the two-year mandatory minimum must run consecutively to any term of imprisonment on the other counts). *See* PSR ¶ 44 & n.6; *United States v. Chibuko*, 744 F.3d 259, 263 (2d Cir. 2014). The "general rule that the § 1028A sentences should run concurrently when the underlying crimes were grouped." *Chibuko*, 744 F.3d at 264 (citing U.S.S.G. § 5G1.2, Application Note 2(B)(ii)). Where the offenses are groupable pursuant to U.S.S.G. § 3D1.2, courts also consider the nature and seriousness of the underlying offenses and the § 3553(a)(2) factors. *See* U.S.S.G. § 5G1.2, Application Note 2(B) (discussing 18 U.S.C. § 1028A).

Mr. James's underlying convictions for conspiracy to commit health care fraud, health care fraud, and wire fraud should all be grouped under U.S.S.G. § 3D1.2. Where "the offense level is determined largely on the basis of the total amount of harm or loss," U.S.S.G. § 3D1.2(d), the § 1028A convictions should be run concurrently to one another. Here, the

offense level is predominantly driven by the alleged loss amount underlying Mr. James's health care fraud substantive and conspiracy counts, and wire fraud. Moreover, the seriousness of the underlying offense does not call for consecutive sentences, *see infra* Section IV.B, and the 18 U.S.C. § 3553 factors weigh in favor of a substantially below-Guidelines sentence, *see infra* Section IV.

### C. Probation's Recommended Term of 15 Years' Imprisonment is Flawed and Should Not Be Followed

Like the advisory Guidelines sentence of life imprisonment, which is wholly inappropriate as discussed throughout this submission, the Court should not follow Probation's Sentencing Recommendation of 15 years' imprisonment. *See* Sentencing Recommendation at 4, dated Feb. 9, 2023 ("Recommendation"). Throughout its Recommendation, Probation relies on the government's flawed description of the offense conduct and various enhancements, which, as discussed above, are rife with inaccuracies and unproven allegations.

For example, in fashioning its recommended sentence, Probation relies on a loss amount of $528 million and several other sentencing enhancements, which, as discussed above and below, are inapplicable. Probation similarly cites to the acquitted, alleged money laundering conduct in its Recommendation, even though that conduct has not been proven by a preponderance of the evidence, and the Court should not consider it. Probation also relies on the government's disproven argument that Mr. James continued his criminal conduct after his arrest. And it claims that Mr. James was the "primary beneficiary" of the criminal activity, ignoring the fact, by its own calculations, that Mr. James's alleged co-conspirator physician-clients were paid approximately $465 million (out of $528 million) in fraud proceeds and have suffered no consequences as a result. *Id*. at 3.

Finally, Probation asserts that the only "mitigating factors" in Mr. James's favor are his "lack of criminal history" and "his family situation" – an entirely insufficient assessment of Mr. James's personal history and characteristics.  Mr. James's overcoming of substantial hardships to immigrate to the United States and become a nurse, his contributions to society as a nurse for nearly two decades, his exemplary good deeds to his family, friends, and neighbors, his housing and support of his parents for nearly 14 years, his faith and involvement with his church, his complete compliance with the terms of his pretrial release for four and a half years, and the complete lack of prosecution or any negative consequences for the alleged 150 physician co-conspirators, are just some of the other mitigating factors that Probation fails to consider.  Accordingly, like the vastly overstated advisory Guidelines sentence of life imprisonment, Probation's recommendation of 15 years – which would lead to Mr. James being released when he is 70 years old – should be rejected by the Court.

III.  **THE LOSS AMOUNT IS VASTLY OVERSTATED AND INSTEAD SHOULD BE CALCULATED AS A PERCENTAGE OF MR. JAMES'S GAINS**

The Court should decline to adopt the government's draconian, illogical, and unsupported overstatement of the loss amount.  The government has not come close to meeting its burden of proving Probation's loss amount of $528,183,741.83 (much less the $600 million the government claimed in a post-trial press release) by a preponderance of the evidence, let alone with the heightened specific evidence standard that should apply here.  The PSR estimated this loss – based on the government's theory – by first taking the total amount of money that Mr. James earned from his medical billing business during the relevant time period, approximately $63 million.  Then, to get to $528 million, the PSR divided $63 million by 12%, which the government purports is the percentage of the total amount of money the insurance companies paid to the doctors, which Mr. James was then compensated by his physician-clients.  In other

words, the government and Probation have backed into an alleged total amount of money Mr. James's physician-clients were paid by insurance companies for claims Mr. James purportedly billed by using an estimated percentage of that total that Mr. James was paid.

This calculation is, from the outset, pure conjecture. But most troubling is that the sole basis for this conjectured loss amount is the government's assertion that ***every single claim*** Mr. James submitted for approximately seven years was ***entirely*** fraudulent, and therefore ***every single dollar*** paid by the insurance companies qualifies as "loss." But that position is speculative, inconsistent with positions the government itself took throughout the pendency of this case, flatly contradicted by the evidence at trial, and, in any event, dramatically overstates the seriousness of the offenses with which Mr. James (and none of the alleged 150 doctor co-conspirators) was prosecuted.

An expert analysis of eight of the patients who were the focus of trial confirms that calculating the loss amount by accounting for every single dollar paid by the insurance companies is fundamentally flawed. *See* the Wilkins-Russell Report. In advance of sentencing, counsel for Mr. James retained Wendy Wilkins-Russell, who has decades of experience as a healthcare finance executive and in the medical billing industry, to review the records for eight of the nine patients who were the focus of trial.[6] Ms. Wilkins-Russell compared the amount that insurance companies allowed for each of the billed codes for these eight patients with what the insurance companies likely would have allowed if Mr. James had billed the codes according to the government's allegations. Ms. Wilkins-Russell's analysis confirms that the vast majority –

---

[6] The ninth, Samuel Brenner, was excluded from the expert analysis. At trial, the government did not contest any aspect of the coding for Mr. Brenner's medically necessary treatment, and thus considering what the insurance company would have paid out if the billing were done differently was not necessary. That said, Mr. Brenner's case further demonstrates the absurdity of the government's loss theory in that it includes the payment for his medical treatment despite no claim that it was billed improperly, or that any payment resulted from impersonation.

*just over 80%* – of the total amount of money the insurance companies allowed for Mr. James's physician-clients treatments of the patients at issue would have been paid even if every one of the purportedly fraudulent codes were never used.

Accordingly, the defense objects to a 28-level enhancement for a loss amount between $250,000,000 and $550,000,001 and a restitution amount that is equal to the loss amount. PSR ¶¶ 27, 38, 115. As set forth in more detail below, the Court should find the loss amount to be zero, or in the alternative, use Mr. James's total gain from his medical billing business of approximately $63M as its starting point in calculating a reasonable and defensible loss amount and discount that gain by approximately 80%, for a loss amount of about $**12,226,397.26**.

### A. The Government Must, But Cannot, Prove A $530 Million Loss With Specific Evidence

#### 1. The Government Must Provide Specific Evidence to Support Its Proposed Loss Amount Enhancement

As an initial matter, if the government persists in seeking a loss amount in the tens or hundreds of millions of dollars, the Court should only find such a loss amount if the government has proven it by a higher level of proof than a "preponderance of the evidence." While the advisory Guidelines contemplate a preponderance of the evidence standard "for resolving all disputed fact issues at sentencing," the Second Circuit has instructed that "a more rigorous standard should be used in determining disputed aspects of relevant conduct where such conduct, if proven, will significantly enhance a sentence." *United States v. Shonubi*, 103 F.3d 1085, 1089 (2d Cir. 1997) (citing U.S.S.G. § 6A1.3); *see also United States v. Archer*, 671 F.3d 149, 164 (2d Cir. 2011) (applying "specific evidence" standard and noting that the Second Circuit has held that "simply because a defendant was convicted of cashing forged checks, it was error to conclude that every check he cashed was fraudulent") (citing *United States v. Spitsyn*, 403 F. App'x 572 (2d Cir. 2010) (summary order)); *United States v. Martinez*, 133 F. App'x 762, 764–

65 (2d Cir. 2005) (applying "specific evidence" standard); *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) ("[T]he preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered . . . . [T]he Court may examine whether the conduct underlying multiple upward adjustments was proven by a standard greater than that of preponderance, such as clear and convincing or even beyond reasonable doubt where appropriate.") (emphasis in original). The Second Circuit has reasoned that this higher burden is necessary to counteract the advisory Guideline's "extraordinary and totally unprecedented step" of "prescrib[ing] punishment for unconvicted conduct at the same level of severity as convicted conduct." *Shonubi*, 103 F.3d at 1088, 1089.

The government's and Probation's proposed loss amount of more than $500 million elevates Mr. James's offense level by 28 – increasing his proposed sentence on the fraud counts from a maximum advisory guidelines sentence of six months (if the other disputed enhancements are excluded), or twenty-four months (if the other disputed enhancements are included), to ***life imprisonment***. Because this loss calculation, which was not necessary to – or included in – the jury's verdict at trial, "will significantly enhance [Mr. James's] sentence," this Court should require that the government provide "specific evidence" sufficient to meet the heightened burden of proof that Mr. James's conduct led to a $530 million loss. *Shonubi*, 103 F.3d at 1089–90; *cf. Gigante*, 94 F.3d at 56 (opining that the more upward adjustments lengthen a sentence, the more likely it is that those adjustments should be based on facts proven by a standard higher than a preponderance of the evidence); *see also Archer*, 671 F.3d at 163 (stating the "specific evidence" standard requires "(a) there must be evidence regarding the quantity of illicit of fraudulent goods and (b) it has to be specific to the defendant").

Courts have required that the government prove sentencing enhancements with specific evidence where it "substantially enhance[s] the Guidelines penalty" in the contexts of drug quantities, loss amount for insurance fraud, and the number of fraudulent visa applications and fraudulent checks at issue. *See, e.g.*, *Shonubi*, 103 F.3d at 1089 (drug quantities); *Archer*, 671 F.3d at 164 (visa fraud); *United States v. Spitsyn*, 403 F. App'x 572 (2d Cir. 2010) (summary order) (fraudulent checks); *United States v. Lonich*, 23 F.4th 881, 915–16 (9th Cir. 2022) (loss amount for insurance fraud); *United States v. Schena*, 2023 WL 7348458, at *2 (N.D. Cal. Nov. 6, 2023) (loss amount for insurance fraud).

Here, the loss amount for which the government and the PSR purport Mr. James is responsible is "dramatic":  the 28 level-enhancement for the $530 million that the PSR adopts increases Mr. James's advisory Guidelines minimum sentence to life imprisonment.  The government did not prove – nor could it – that Mr. James's conduct actually resulted in this substantial loss, but instead focused on nine patients out of tens of thousands of claims that purportedly contained fraud.  In fact, the government – after the defense submitted a detailed written objection during trial – declined to introduce in evidence a summary chart purporting to analyze all of Mr. James's total claims and billings.[7]  Thus, the jury had no occasion to consider, much less deliver a verdict on, the government's allegations with respect to Mr. James's total

---

[7] Prior to trial, the Court directed the government to disclose to Mr. James a "chart that identifies the specific documents, transactions, forms, or claims that the Government intends to prove at trial were fraudulent."  ECF No. 69 at 14.  The resulting claims chart, which the government described as a "master trial chart," was riddled with errors, including claims Mr. James never billed, medical practices he never worked with, duplicate claims, erroneous or blank procedure codes, and an assortment of numerical errors throughout the data.  *See* ECF No. 191 (Mr. James's motion to preclude the trial chart).  Following the defense's motion to preclude the trial chart, the government withdrew the chart in its entirety.  ECF No. 200.  The fact that that the government ultimately withdrew the trial chart casts further doubt on the government's current claims that the loss amount even approaches the government's figure of $600 million.  To the extent the government intends to produce the trial chart in sentencing, it remains infirm for the reasons set forth in the defense's motion *in limine*.  ECF No. 191.

billings.  And the jury was not asked to and did not find that the entire amount Mr. James

received from the insurance companies was tainted by fraud.

2.    The Government's Trial Patients and Examples of Allegedly Improper Coding
        Do Not Constitute Specific Evidence

The government cannot meet their burden of proving that Mr. James's conduct led to a

$530 million, or $600 million, loss by specific evidence or by a preponderance of the evidence.

Courts have specifically pointed to several flaws that are present in the government's case here

as reasons why the proposed loss enhancement is wildly unjustified.

*First*, the government's underlying assumptions about Mr. James's billings are not based

on a representative sample of all of the patients and doctors for whom Mr. James billed.  The

government has not and could not represent that nine patients (or their family members) who

testified at trial were selected randomly or that they were a "representative slice" of Mr. James's

book of business.  *Archer*, 671 F.3d at 163.  To the contrary, there is "good reason to think that

the [examples] presented at trial were not random, but were instead the most egregious cases" of

alleged fraud.  *Id*. (differentiating from the sampling in *Shonubi*, where an expert randomly

selected four out of 103 balloons passed by the defendant after his arrest to test drug quantity and

extrapolated for quantity enhancement purposes); *cf. United States v. Bandrich*, 636 F. App'x 65,

67 (2d Cir. 2016) (summary order) (finding there was specific evidence at trial from multiple

witnesses "that the vast majority of the [asylum] applications were fraudulent" sufficient to adopt

an enhancement for one hundred or more fraudulent documents under U.S.S.G.

§ 2L2.1(b)(2)(C)).

Like the imperfect selection in *Archer* that failed to meet the "specific evidence" standard

necessary to apply the proposed loss enhancement, the government here almost certainly chose

the nine patients out of thousands for whom Mr. James billed as, in the government's view,

particularly egregious examples of Mr. James's conduct to present at trial. These nine patients were "the easiest ones for agents to identify as fraudulent, both because the [patients] who were most badly misrepresented were most likely to complain and those [patients' claims] involved assertions that were easiest to prove false." *Archer*, 671 F.3d at 163. But no witness testified that the characteristics that appeared for the treatment of and billing for these nine patients existed in all, or even a majority, of the other patients and doctors for whom Mr. James billed. To the contrary, Agent Tumulty testified that Mr. James had physician-clients, like Dr. Anita Bhola, whose medical practice areas did not even fall within the offense conduct the government alleged, and also testified that the government did not consider various billing codes Mr. James used.[8] Tr. 2447–52 (Tumulty); Tr. 2454–64 (Tumulty); Tr. 2464:6–23 (Tumulty). Because the nine patients were almost certainly chosen for their dramatic effect at trial – and even those patients demonstrate that the entire amount paid by the insurance companies to their treating physicians cannot be included in the loss amount, *see infra* Section III.B.4 – they cannot serve as a basis for the proposed loss amount enhancement.

*Second*, the government has provided no context about the prevalence of certain alleged issues with Mr. James's coding such that its use in any particular patient's billing "tells us very little that is helpful to determining whether" its use elsewhere was similarly fraudulent. *Archer*, 671 F.3d at 164. In *Archer*, the court was concerned that the government noted the prevalence of certain aspects in the 171 visa applications, suggesting that those aspects were what made those applications fraudulent. *Id.* But the government did not provide a "baseline" for how often those

---

[8] Agent Tumulty swore in a search warrant affidavit in 2019 that Mr. James's allegedly improper billing was just a subset of all his billing. Tr. 2417:17-22 (Tumulty).

aspects – for example, the use of fill-in-the-blank affidavits – appeared in the broader population of visa applications, which indicates "nothing about the truth or falsity of the applications."  *Id.*

Similarly, here, the government has posited, for example, that Mr. James's use of Modifier 59, which is "a valid modifier used in industry standards," Tr. 1956 (Shohan), and CPT code 11011 (complex debridement), were always used improperly, resulting in overbilling.  But the mere fact that Mr. James *sometimes* inappropriately used Modifier 59 or CPT 11011 codes does not indicate that (i) *every* use of these codes was fraudulent, (ii) that every claim used these codes, or (iii) that the insurance companies always accepted and paid out on those codes, such that the government can extrapolate the loss amount to include all of Mr. James's claims.

*Third*, the government presented multiple sets of facts and theories at trial it purports to demonstrate why Mr. James was guilty of the underlying offenses and which resulted in the government's proposed loss amount:  (1) that Mr. James used improper coding, often using more complex codes when simpler ones should have been used, (2) that Mr. James worked with his physician-clients to encourage patients to report to the emergency room when they should have reported for procedures elsewhere, which would have resulted in lower reimbursements, (3) that Mr. James impersonated clients, and (4) that Mr. James used Modifier 59 to garner higher payouts.

Because the government pursued its case under multiple theories, there is no reason to believe that the jury found each of these theories believable beyond a reasonable doubt.  For example, the jury could have found that Mr. James was guilty of health care fraud solely because of the impersonation calls, which were played repeatedly at trial, but not viewed the other conduct as problematic at all.  Or, the jury could have found that some of Mr. James's coding practices were fraudulent, but rejected the idea that Modifier 59 was part of those fraudulent

practices.  Or, the jury could have only taken issue with the practice of physicians sending patients to the emergency room when they should have reported elsewhere.

In short, neither the government, nor Probation, nor this Court can be clear on what set of facts the jury based its verdict.  And because of that uncertainty, Mr. James's sentence, including the loss amount, should not include every factual theory the government presented at trial. Doing so would "create[] an intolerable risk that a sentencing judge may subsequently impose a [] sentence based on findings that contradict those made by the jury during the guilt phase, but not revealed by their general verdict."  *Schad v. Arizona*, 501 U.S. 624, 659 (1991) (White, J., dissenting); *see also United States v. Peterson*, 768 F.2d 64, 66 (2d Cir. 1985) (recognizing "the jury must be unanimous as to each 'specification' in a count of an indictment, on which it finds the defendant guilty") (citing *United States v. Natelli*, 527 F.2d 311, 324–25 (2d Cir. 1975)).

The government's selection of the patients to focus on at trial and its flawed coding allegations, as well as the fact that the jury did not specify the set of facts on which it based its verdict, render the government's loss calculation fundamentally flawed.  However, even beyond these defects, as discussed further below, the government's and PSR's loss calculation is rife with additional irreparable errors and should be rejected entirely.

B.       **The Government Cannot Prove A $530 Million Loss by A Preponderance Of The Evidence**

The PSR correctly acknowledges that calculating loss amount here is exceedingly difficult because "(a) the monetary figures above assume that all monies were obtained by the defendant's billing companies fraudulently, and (b) the Probation Department does not have the ability to independently analyze the voluminous claims at issue in this case."  PSR ¶ 27. Notably, the case agent conceded to Probation that he was not sure whether one of the identified victim insurance companies suffered an actual loss in this matter, which by itself undercuts the

government's position on loss amount that every single payout by an insurance company to Mr. James's doctor-clients was wholly fraudulent. *Id.* ¶ 15 n.2.

At base, the government cannot prove by a preponderance of the evidence (much less with specific evidence) that Mr. James's actions resulted in a $530 million loss (or even a lower loss). *See United States v. Uddin*, 551 F.3d 176, 180 (2d Cir. 2009) (holding government must prove loss amount by a preponderance of the evidence). "In determining a loss amount for purposes of Guidelines calculation, a district court's findings must be grounded in the evidence and not derive from mere speculation." *United States v. Coppola*, 671 F.3d 220, 249 (2d Cir. 2012). While the Guidelines do not require "certainty," they do require that the loss be "a reasonable estimate based on the available facts." *United States v. Bryant*, 128 F.3d 74, 75-76 (2d Cir. 1997) (quoting U.S.S.G. § 2B1.1, Application Note 3). Where, as here, because the loss amount alleged by the government is speculative and unsupported by the evidence, it should be entirely disregarded. *See, e.g.*, *United States v. Pina*, 2019 WL 1904920, at *3 (S.D.N.Y. Apr. 11, 2019) (not crediting portion of loss asserted by government that was unsupported by evidence and speculative); *United States v. Cuti*, 2011 WL 3585988, at *4 (S.D.N.Y. July 29, 2011) (finding no loss shown for sentencing purposes despite government's claimed loss amount of $20 million to $50 million because, among other reasons, the evidence did not show that victims relied exclusively on fraudulent information in overpaying, making any calculation of what overpayment was due to the fraudulent information "difficult and speculative"); *see also United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993) (vacating sentence where trial court's approximation of loss amounted to "pure speculation").

The government's theories for how Mr. James's actions led to a $530 million (or, in its iteration, $600 million) loss cannot withstand even a modicum of scrutiny. As a preliminary

matter, the government's recitation of the loss amount has changed drastically over the course of this prosecution, each time without any explanation for its calculations or response to the defense's objections, exhibiting these figures' unreliability. Originally, at a December 13, 2019 status conference, the government alleged that Mr. James's actions led to a $500 million dollar loss among six insurance companies. Ex. 32 (Dec. 13, 2019 Transcript, Status Conference). Just months later, the government stated that it did not "want to say every single claim" would count toward the total amount of the fraud. Ex. 34 (April 22, 2020 Transcript, Status Conference). Then, on the eve of trial – presumably after the government had reviewed the majority of the evidence it planned to present at trial – the government took the position in its motion in *limine* that the loss amount was $100 million, ECF No. 110 at 2 ("Law enforcement agents estimate that the defendant fraudulently induced Insurance Companies to pay more than approximately $100 million during the course of his fraudulent scheme."), a fact that the Court acknowledged during a status conference on May 23, 2022, Ex. 35 (May 23, 2022 Transcript). At trial and with Probation, however, the government returned to an unsupported position that the appropriate loss amount is $600 million. At no time during this prosecution has the government been able to justify any of its roaming loss amount figures.[9]

---

[9] The government also cannot credibly argue that the fraud here was so "pervasive" as to justify inclusion of all of the billings in the loss amount. Some courts outside of this Circuit have suggested that where "the fraud was so extensive and pervasive that separating legitimate [claims] from fraudulent ones is not reasonably practical," the burden of showing that the loss amount is improper shifts to the defendant. *United States v. Hebron*, 684 F.3d 554 (5th Cir. 2012). But no cases within the Second Circuit have relied on this line of cases in determining loss amount, and some courts, including those that align with this Circuit's call for a heightened standard where an enhancement threatens a substantially lengthier sentence, have expressly rejected this "extensive and pervasive" burden shifting mechanism. *See, e.g.*, *Schena*, 2023 WL 7348458, at *7. Of the handful of courts across the country that have shifted the government's heavy burden in this way, the vast majority were in the government benefits context. That context stands in stark contrast to the Out-of-Network providers here, who have substantial authority in choosing what and how much to bill for their treatment. Wilkins-Russell Report ¶¶ 8–11. This Court should decline to adopt a novel standard here, but even if it did, Mr. James more than meets his burden in showing the government's flawed calculations, as discussed above and below.

While each of the aforementioned and below issues with the loss amount suffices to render the government's loss amount too speculative on which to rely on their own, all of these issues together should result in a loss amount of zero for purposes of calculating the Guidelines range, or at most, an evidence-based percentage of Mr. James's gains from only demonstrably fraudulent billings.

1. Mr. James Billed For Real Patients Who Received Real Procedures From Real Doctors

It is undisputed that every single claim Mr. James submitted involved real patients who received real medical treatment from real doctors. In other words, at no point did the government allege, let alone prove, that Mr. James billed for procedures that never happened. To the contrary, every single patient who testified had out-of-network coverage, was treated by an out-of-network doctor (who had the discretion to set their own price for the procedures), and received medical treatment that was eligible for reimbursement because it occurred either in the emergency room, or as part of a pre-planned (and therefore pre-approved by the insurance company) surgery with a specialist. Tr. 88–91 (Quinlivan); Tr. 173:12–23 (Breidenbach), Tr. 921:4–14 (Pash); Tr. 1000:5–14 (Smart); DX-215. While some patients (or their family members) disputed how their physicians handled their medical treatment – that is, how their care was described in the medical records the physicians prepared or whether the physicians appropriately determined that some aspects of their treatment were medically necessary – there was no dispute that they all received genuine medical care, often for serious, if not life-threatening, conditions. Tr. 1133 (Brenner). And it was the doctors, not Mr. James, who created the operative reports on which Mr. James relied to determine the appropriate coding. *See, e.g.*, Tr. 1209:17–18 (Tehrani); Tr. 1282-83, Tr. 1286:12-22 (Martinelli); Tr. 1588:7-13 (Flanagan). To say now that the entirety of the amount paid to these doctors for treatments that were actually

performed should be part of the loss amount equates to an argument that these services should have been provided for free. Calculating the loss amount as if Mr. James billed for services never rendered, or submitted claims on behalf of patients who never received treatment, is therefore clearly inappropriate here. Wilkins-Russell Report ¶ 13 ("Even if a health plan/payer/third party administrator/lease network determines to deny the majority of line items on a claim, that does not equate to the entire claim being invalid, and that does not permit a health plan/payer/third party administrator to decline to pay the remaining valid or approved medical procedure codes."); *id.* ¶ 27 ("A determination by a health plan/payer/lease network/third party administrator to not allow benefits on a specific claim line item does not have any bearing on the validity of the overall claim.").

Similarly, the jury's conclusion that Mr. James impersonated patients does not support a $530 million loss amount. Far from it. The starting point for all or nearly all the claims in which Mr. James or one of his employees posed as a patient was that the out-of-network healthcare plan had paid some – or even a substantial amount – of a medical bill following a procedure. *See, e.g.*, DX-221 (noting initial payment of over $98,000 by Cigna on a patient claim). The sole function of the impersonation calls or follow-up correspondence was to recover an outstanding balance expeditiously and without involving the patient. It cannot be seriously disputed insurance companies did or should have paid at least some amount of money for these surgeries and medical procedures and thus those sums are not attributable to any improper impersonation or fraud. *See United States v. Johnson*, 2018 WL 1997975, at *2 (E.D.N.Y. Apr. 27, 2018) (finding government did not prove loss amount by a preponderance of the evidence because it did not show that "no profit would have resulted from the [] transaction but for [defendant's] fraudulent behavior"); *see also United States v. Alphas*, 785 F.3d 775, 780–84 (1st Cir. 2015)

(holding in insurance fraud case, where fraud involved artificially inflating insurance claims, loss amount should not include amount the insurance company would have paid absent the fraud); *cf. United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) (holding district court should have deducted purchase price of stock from actual value of stock when calculating loss amount where, notwithstanding fraud, investors obtained stock in real company, and thus instruments were not "entirely without value").

### 2. Many Of Mr. James's Billings Were Plainly Not Fraudulent

Setting aside the fact that it cannot be seriously disputed that the insurance companies did pay, should have paid, and would have paid Mr. James's physician-clients at least some amount for their real and necessary medical procedures even assuming Mr. James's engaged in the alleged misconduct, the government has not proven – of even set out to prove – that Mr. James upcoded, applied a multiplier, or impersonated a patient on *every single claim and every single CPT code he submitted.* The evidence that *was* presented at trial demonstrates that Mr. James's alleged misconduct was not as systematic as the government wishes it was.

- **FBI Analysis of Mr. James's Calls**:  The lead case agent charged with reviewing Mr. James's claims testified that, out of the tens of thousands of phone calls that Mr. James and his employees made in connection with his billing business, *see* GX-2325, Special Agent Tumulty and another case agent identified at most several hundred calls in which Mr. James or one of his employees pretended to be patients, Tr. 2475:14–20 (Tumulty).  The "several hundred calls" aside, the fact that Mr. James or his employees pretended to be patients on potentially hundreds of calls to two insurance companies does not mean that every single (much less any) such call resulted in an overpayment by the insurer.  Tr. 2477–78 (Tumulty).

- **Pre-Approved Claims**:  Mr. James submitted hundreds (if not thousands) of claims for fully pre-approved procedures, known as GAP claims; in other words, procedures that had been vetted, reviewed by patient health care plans, and pre-approved for payment prior to the procedure taking place.  *See* Wilkins-Russell Report ¶¶ 11(a), 63.  As demonstrated at trial, these claims – code by code, procedure by procedure – entirely or almost entirely track the codes provided in the insurance pre-approval letters, and the procedures described in the underlying operative report.  *See, e.g.*, DX-215; GX-107; GX-437.  Indeed, for certain of the pre-authorized procedures, Mr. James billed fewer procedures than authorized by

removing from the bill procedure code(s) that the insurance company had already pre-approved because the doctor ended up not performing that procedure. *See, e.g.*, GX-944; DX-217. One of Mr. James's former employees verified that she only worked on pre-authorized surgeries when she worked for Mr. James, and that these kinds of pre-authorized procedures were "almost exclusively" the kinds of claims Mr. James submitted for payment. *See* Tr. 2017:5–7 (Brunner). It cannot be seriously disputed that the insurance company still needed to pay for the pre-authorized services, and the payments to Mr. James's doctors for the procedures that were pre-approved do not belong in any loss amount calculation.

- Unrelated, Legitimate Claims: Similarly, the government's proof at trial was limited to attempting to prove that Mr. James fraudulently coded certain categories of CPT codes, such as wound closures and debridement. But Mr. James's physician-clients provided an array of other medical services that the government never introduced at trial that Mr. James billed for hundreds, if not thousands, of times. This indisputably legitimate coding included, for example, sleep studies performed by Dr. Anita Bhola, *see* DX-235, in-office visits with an established patient by Dr. Christos Stavropoulos, *see* DX-232, and surgical procedures on a thyroid, all of which were often billed as a single CPT code, *see id.*; *see also* DX-233-257. The government never alleged before or during trial that Mr. James's coding for medical procedures outside of the handful of categories they identified were fraudulent, nor could it. Tr. 2467:3–5 (Tumulty); Tr 2468:2–7 (Tumulty).

- Limited Evidence of Any Loss Amount Attributable to Specific CPT Codes or Modifier Codes: The government's loss figure relies on a wholly imprecise extrapolation from the billing of a handful of patients (or their family members) who testified at trial to the thousands of claims Mr. James filed over a multi-year period. The government's loss amount calculation depends on the premise that Mr. James always selected the wrong code or modifier, or more complex codes than he should have. *See* ECF No. 224 (describing Mr. James's coding as the "core" of his "fraudulent scheme"). But there was much evidence that disproved that contention, *see supra* Section II.A.2, and no evidence at trial actually demonstrating: (i) any calculated reimbursement difference between more complex codes and the code the government purports should have been used, (ii) no claims data demonstrating how often Mr. James used each of the disputed codes, or (iii) even evidence that, every single time Mr. James used what the government identified as codes generally used in a fraudulent manner, that his choice of code was unsupported by the underlying medical records. The government similarly failed to prove that Mr. James was able to collect more money or get automatic reimbursement for claims by applying Modifier 59 to claims (let alone proving how often he did so). Even if the government is right that Mr. James could have used (or should have used) different modifiers or procedure codes, the government never proved that those choices of codes led to insurance companies losing money. In any event, even if an insurance company denies one line item on a claim, or rejects certain line items because of the improper use of a modifier, that has "no bearing on the coverage/payment of other

line items on the claim." Wilkins-Russell Report ¶ 13. In fact, many claims involve at least one denied line item, but the insurance company is still required to pay out for medically necessary, covered services for the rest of the claim. *Id.* In other words, the government's failure to determine how much would have been paid out if the allegedly improper codes and modifiers were not used is fatal to its theory.

- Negotiated Settlements: Many of the claims that Mr. James submitted (and were paid) ultimately featured negotiated, signed agreements between the insurance providers and Mr. James, which were signed only after the insurance companies received and reviewed the underlying medical records. *See* Wilkins-Russell Report ¶¶ 11(b), 45, 47, 72. Similarly, the government's calculation of the loss amount entirely ignores the fact that some doctors paid money back to the insurance companies both before and after charges were levied against Mr. James. DX-202 at 2; DX-206 at 2; DX-210; DX-211 at 2; DX-217 at 2; DX-400–404; *see also* Ex. 36 (Settlement involving Cigna and a physician client). Under the Guidelines, repayments made before the discovery of this offense must be discounted from the loss amount, which the government has not even attempted to do. U.S.S.G. § 2B1.1(b)(1), Application Note 3(E)(i).

As each of these categories demonstrates, and for the reasons set forth throughout Sections III herein, the government's proposed loss amount calculation is unreliable, speculative, and riddled with errors. Accepting it is contrary to the evidence presented at trial. And it can only be supported by transforming claims and coding that were indisputably legitimate into fraud.

3.      <u>There Is No Evidence That Impersonation Calls Led to Any Actual Loss</u>

To the extent that the government's sentencing submission will point to payments that the insurance companies made to Mr. James's doctor-clients following the "impersonation" communications as a substitute or alternative way to calculate the loss amount in this case, such an approach should also be rejected by the Court. Preliminarily, the government failed to prove that the impersonation calls actually or consistently caused any "loss" to insurance companies – *i.e.*, that the calls led insurance companies to pay more for a specific claim than they should have (or otherwise would have) done. In fact, the insurance companies often paid the doctor or negotiated with the doctor for a procedure without any follow-up from Mr. James or his

employees. *See, e.g.*, GX-1190 at 2. Similarly, the trial evidence showed that there were several instances where Mr. James or his employees impersonated a patient (or a patient called on their own behalf), and the insurance company did not make any additional payments. For instance, Mr. James's impersonation of Marcus Smart did not result in a single additional dollar paid out to Mr. Smart's physicians. GX-1228 at 4. Nor did his impersonation of Jeff Pash. Tr. 972:21–24 (Pash). Nor did Sam Brenner calling and stating that he had been balance billed. Tr. 1149 (Brenner). Moreover, there was no evidence presented at trial that Mr. James ever made any such calls to United Healthcare, meaning that the government cannot include in its loss calculation any amount received from UnitedHealth on the basis of impersonation calls. There is a clear distinction between an alleged fraudulent act (i.e., impersonation calls) being "material" for the purposes of a jury verdict and such a fraudulent act causing actual loss.

Because the government failed to prove any causation between the impersonation calls and a specific payment by the insurance company, it cannot rely on the amount insurance companies paid after the impersonation calls in calculating loss amounts or the calculations in the spreadsheet that Mr. James's former employee, Eileen Nash, maintained.[10] Particularly because each out-of-network doctor also had complete freedom to charge whatever they wanted for their services, the government has failed to prove that the phone calls Mr. James or his

---

[10] This spreadsheet, GX 101a, cannot serve as the basis for a loss calculation for Mr. James, as it contains a host of deficiencies for several reasons. First, it is not clear whether the individuals identified on this spreadsheet were all impersonated by Ms. Nash or whether this spreadsheet reflected all of the patients about whom Ms. Nash was tasked with following up about with the insurance companies. Second, and more importantly, it not clear whether the dollar figures reflected on this document were paid by the insurance companies as a result of any impersonation by Ms. Nash or if they were paid for some other reason – for example, the insurance companies determined that they owed that amount regardless of any impersonation communications. Third, and relatedly, some of the listed patients had UnitedHealth as their insurance carrier and there was no evidence at trial that there were any impersonation calls made to UnitedHealth.

employees made had an actual effect on the amount of money each insurance company ultimately paid.

4. Even for the Trial Witness Patients, the Court Cannot Find That the Entirety of the Payments for Their Treatment Constitutes Loss Amount

A review of the evidence concerning each of the patients who testified at trial, or whose treatment and billing was the subject of testimony at trial, definitively undercuts the government's claim that the entire amount billed to the insurance companies for each of these patients was fraudulent. In fact, an objective review of the treatment and billing for each of these witnesses supports the aforementioned point that the jury did not find and could not have found that Mr. James actually engaged in all of the government's theories of health care fraud. As set forth below, even for the nine trial patients, the evidence does not support a conclusion that every dollar the insurance companies paid was the result of fraud by Mr. James. Far from it. As is demonstrated by the expert report of Ms. Wilkins-Russell, even accepting each and every one of the government's claims of fraudulent miscoding, 80.71% of the amounts allowed by the insurance companies for the treatment of these patients would have been paid to Mr. James's physician-clients.

**Denise Baker**:  After Ms. Baker shattered a wine glass in her hand and received treatment, including stitches, her hand surgeon, Dr. Mark Shoemann, submitted Ms. Baker's medical records and a list of recommended codes to Mr. James. GX-121. The operative report described Ms. Baker's injury as a "penetrating wound of the extremity" and claims that Dr. Shoemann "visualiz[ed] and explor[ed] the deeper layers of the wound" before closing the "deep layer" with two layers of stitches. GX-921 at 4. Mr. James ultimately changed one of the codes regarding removal of a foreign body from a muscle or tendon that he was provided (from 20520, a lower-complexity code, to 20525, a higher-complexity code). Tr. 2787:9–15 (Closing). Mr.

James otherwise coded Ms. Baker's claim exactly as it was provided to him by Dr. Schoemann. DX-700 at 2. After submitting the full claim with the accompanying medical records to Aetna, Mr. James later submitted a full copy of the HCFA form to Dr. Schoemann, who acknowledged receipt. DX-702. While Ms. Baker contested that there was any glass in her wound at trial, Tr. 1100, she agreed that she received treatment from Dr. Schoemann after she shattered a glass on her hand and had to receive stitches. Tr. 1100–1 (Baker). Ultimately, after a review of the medical records, Aetna allowed $55,567.54 of the $62,500 amount billed. GX-118; GX-119; Wilkins-Russell Report ¶ 34.

After submitting the insurance claim form to Aetna, Mr. James pretended to be Ms. Baker's husband in communications with Aetna. But this misguided impersonation notwithstanding, the government did not even attempt to prove that Aetna would not have paid any amount, let alone the $55,567.54 it did allow, for Ms. Baker's treatment. Put another way, the government cannot now claim that Aetna was defrauded out of the entirety of what it paid Dr. Schoemann simply because Mr. James impersonated Ms. Baker's husband in seeking to maximize and expedite the payment for this procedure.

Ms. Baker received real, medically necessary, and covered medical care that required insurance coverage under her healthcare plan. Wilkins-Russell Report ¶ 30. And the government has made no effort to establish the payment disparity that would have resulted had Mr. James billed the lower-complexity code, 20520, instead of the higher complexity code, 20525, which was in any event justified by the medical records. Indeed, as Ms. Wilkins-Russell found, there is only a total difference of $6,255.18 between the amount the insurance company actually allowed and the amount it would have allowed if Mr. James had billed 20520 instead of 20525. *Id.* ¶ 34.

**Deja Guzman**:  The government has argued that Ms. Guzman was instructed by her physician, Dr. Tahernia, to report to the emergency room for a pre-planned surgery.  That said, Ms. Guzman testified that she did, in fact, receive that surgery after two years of discussions with Dr. Tahernia.  Specifically, Ms. Guzman testified that she had severe flareups over many years which caused her significant pain.  Tr. 272:11–12 (Guzman).  Ms. Guzman stated that she had been communicating with Dr. Tahernia about potentially getting treatment for her medical condition, but that she never communicated with Mr. James – before, during, or after her medical care.  Tr. 288–89 (Guzman).  While Ms. Guzman was at the hospital, her pain was further documented by medical staff with no connection to Dr. Tahernia or Mr. James, who said that Ms. Guzman was experiencing "worsening pain/swelling/redness/drainages" and that her "symptoms are worsening."  GX-800d at 10.

Dr. Tahernia's decision about where to meet Ms. Guzman, where to treat her, and what surgery to perform did not involve Mr. James in any way.  Tr. 289:8–15 (Guzman).  Ultimately, it is not disputed that Mr. James coded and submitted Ms. Guzman's claim using the codes he received from Dr. Tahernia, as well as the accompanying operative report, except for one code that Mr. James actually ***downcoded***.  *See* GX-602, GX-935.

Even if the government had shown that Mr. James conspired with doctors to encourage patients like Ms. Guzman to report to the emergency room when otherwise unnecessary in an effort receive larger insurance payouts (and it did not), that also does not prove that the entire amount actually paid for Ms. Guzman's medically necessary surgery should be considered loss amount.  In fact, United Healthcare only allowed $16,000 of the billed charge for Ms. Guzman, and explicitly denied the CPT code that corresponded to an emergency room visit.  Wilkins-Russell Report ¶¶ 36–38.  Accordingly, the $16,000 that United paid is entirely unrelated to the

one component of this patient's case that the government claimed was fraudulent:  the

emergency room admission.  This $16,000 should not and cannot be counted toward the loss

amount in this case.  *Id.*

**Heather Quinlivan**:  In advance of her much-needed surgery, Ms. Quinlivan and her

doctor, Dr. Seckin, requested GAP pre-authorization from her insurance company, Aetna, for

coverage for her operation.  Aetna pre-approved five different medical procedure codes.  DX-

215; GX-107; GX-437.  This GAP pre-authorization meant that Ms. Quinlivan's insurer agreed

to pay for Ms. Quinlivan's endometriosis excision surgery by Dr. Seckin and authorized each of

the pre-approved billing codes.  DX-215.

During her pre-approved operation, for which she did not report to the emergency room,

Ms. Quinlivan had to have 35 different samples from her pelvis and abdomen removed, as well

as her appendix.  Tr. 108 (Quinlivan).  Neither the government nor Ms. Quinlivan disputed that

adding a code, which was not pre-approved, to account for her appendix removal was

appropriate given this unexpected development during surgery.  Nevertheless, Aetna did not

allow payment for that additional CPT code.  Wilkins-Russell Report ¶ 68.  Thus, even though

Mr. James impersonated Ms. Quinlivan's husband ***after*** Aetna's pre-approval and after the

surgery itself, Aetna was required by contract to pay for this pre-approved surgery using the pre-

approved codes.  *Id.* ¶¶ 63–65.  But even if Mr. James's impersonation of Ms. Quinlivan's

husband resulted in any additional, unwarranted payment by Aetna to Dr. Seckin (and there is no

evidence that it did, given the entire claim was GAP pre-authorized), there is no basis for the

Court to find that ***the entirety*** of the amount Aetna allowed was the result of fraud or should be

included in any loss amount in this case.  Indeed, as determined by Ms. Wilkins-Russell, there is

no basis to consider any of the paid amount on this claim to be fraudulent at all.  *Id.* ¶¶ 63–68.

**Susan Breidenbach**: Ms. Breidenbach cut her index finger with a rotary cutter. Tr. 121 (Breidenbach). An urgent care center referred Ms. Breidenbach to the emergency room at Cedars-Sinai Hospital, where the doctor on staff X-rayed her finger, gave her lidocaine to numb her finger, and went to stitch her hand, when Dr. Desai, a plastic surgeon, gave her 11 stitches. Tr. 157:15–16 (Breidenbach). A few days later, Ms. Breidenbach returned to Dr. Desai to have some bandaging removed, and again saw him a few weeks later to have the stitches removed. Tr. 131–32 (Breidenbach).

The evidence at trial showed that Mr. James coded Ms. Breidenbach's health insurance claim based on the operative report that he received from Dr. Desai. *See* Tr. 164 (Breidenbach) ("I am agreeing that the statement of account reflects operation report."); GX-949; GX-1189. In fact, when Blue Cross Blue Shield of Illinois considered her claim, it paid out each line item without reference to the specific CPT codes and modifiers that were included in the billed charge that Mr. James submitted. Wilkins-Russell ¶¶ 70–71. This is because Blue Cross Blue Shield of Illinois was serving as a Third-Party Claims Administrator, not an insurer, for Ms. Breidenbach's provider, who usually process the claims to pay whatever was billed, irrespective of what CPT codes and modifiers were billed. *Id.* ¶ 70. Moreover, there is also no allegation that Mr. James impersonated either Ms. Breidenbach or her husband. Accordingly, there should be no aspects of Ms. Breidenbach's claims that should be included in the loss amount, or even viewed as fraudulent.

Nevertheless, the government has alleged that Mr. James should have used a less complex code instead of CPT code 11012 and should have omitted any codes in connection with a hand reconstructive surgery, which Ms. Breidenbach claimed she did not receive. Tr. 496–97 (McQuade-Lantzy); Tr. 2741:7–13 (Closing). But even if the government had provided evidence

that Mr. James somehow influenced the creation of the operative report by Dr. Desai, on which the medical billing codes were based (it did not), the loss amount for Ms. Breidenbach should only include the difference between what the insurance company would have paid if CPT code 11012 were replaced with a less complex code and the code associated with a hand reconstructive surgery were omitted. Tr. 658 (McQuade-Lantzy), Tr. 762 (Battistoni). According to Ms. Wilkins-Russell's analysis, making these two changes would have resulted in a difference of $47,191.25 out of $153,250.00. Wilkins-Russell Report ¶ 76. In other words, even assuming the veracity of the entirety of the government's allegations, the $106,058.75 paid to Dr. Desai was not the result of actual or even alleged fraud.

Accordingly, for Ms. Breidenbach and every other patient, it cannot be sufficient for proving loss amount for the government to blithely – and without any actual analysis – assert that just because one code on a claim may have been wrong, then all the coding and all the payments were fraudulent and constitute "loss."

**Sheila Sperber:** Ms. Sperber went to the emergency room after falling during dance class and cutting her right eye. Tr. 190 (Sperber). At the emergency room at Huntington Hospital, Ms. Sperber saw a nurse and a plastic surgeon, Dr. Candido Fuentes. Tr. 191 (Sperber); GX-906. Dr. Fuentes gave Ms. Sperber stitches and later removed the stitches. Tr. 192 (Sperber). Mr. James billed exactly what the operative report conveyed to him – that Ms. Sperber received stitches in the emergency room.

The government alleged that (1) Mr. James improperly used CPT code 11011 instead of a less complex code, and (2) improperly attached Modifier 59 to the claim. Tr. 2746–47 (Closing); Tr. 2752:5 (Closing). In her expert analysis, Ms. Wilkins-Russell opines that even if Modifier 59 had not been included with this claim, Aetna still would have permitted the same amount to be

paid to the physicians because this claim was resolved through a negotiated settlement, which requires careful review of each line item on a claim. Wilkins-Russell Report ¶ 47. But even if these two elements were removed from the claim, it would have only resulted in a difference of $17,638.38 out of $43,671.11. *Id.* ¶ 49.

It is undisputed that Mr. James subsequently pretended to be Ms. Sperber's father on calls with Ms. Sperber's insurance company, Aetna, to expedite and obtain additional payment to Dr. Fuentes for his charges for this procedure. The government, however, presented no evidence that Aetna would not have paid the total amount billed for the emergency stitches that Ms. Sperber received regardless of whether Mr. James made his ill-advised calls. But even if the government had made that showing, it cannot be seriously disputed that the entire amount paid out by Aetna for Ms. Sperber's claims should not be included in the loss amount.

Indeed, as with the other trial witness patients, real and necessary medical services were provided that warranted payment by Aetna regardless of any impersonation or alleged upcoding by Mr. James. And according to Ms. Wilkins-Russell's analysis, even assuming the veracity of the government's allegations of miscoding, the payment of $21,671.11 out of $43,671.11 on this claim was not the result of actual or even alleged fraud. *Id.* ¶ 51.

**Elizabeth Pash**: Ms. Pash cut open her chin while on vacation. Tr. 898 (Pash). That day, Ms. Pash ran into a friend who suggested she see Dr. Robert Jetter. Tr. 899 (Pash).[11] Ms. Pash was able to speak with Dr. Jetter, who instructed her to report to Lenox Hill Hospital emergency room when she arrived in New York. *Id.* When she reported to the hospital's emergency room later that night, she received stitches.

---

[11] Ms. Pash's husband, Jeff Pash, testified about her injury and experience.

There was no evidence at trial that Mr. James had any role in Dr. Jetter's suggestion that Ms. Pash report to the emergency room. And Mr. James coded Ms. Pash's claim based on Dr. Jetter's operative report, which included specific CPT codes that Dr. Jetter had selected, including Modifier 59. *See* GX-1235; DX-703. To the extent the government has alleged that using Modifier 59 was improper here, the Explanation of Benefits that Cigna provided excluded the modifier, "indicating that Cigna administered the claim as if there was no -59 modifier present." Wilkins-Russell Report ¶ 60.

Further, while Mr. James acknowledges that he should not have impersonated Mr. Pash in an effort to persuade the insurance company, Cigna, to pay Dr. Jetter additional money for this case, these impersonation calls ***did not*** result in any further payment by Cigna. Accordingly, Ms. Pash's treatment and billing involved, at worst, an attempted fraud by Mr. James on account of his impersonation communications, but there is no basis to include any amount that Cigna paid Dr. Jetter in the loss amount calculation. Wilkins-Russell Report ¶¶ 58–62.

**Marcus Smart**: Mr. Smart was rushed to the emergency room to treat his lacerated hand after he punched a picture frame in a hotel room. Tr. 984:3–13 (Smart); GX-916 at 5. When he got to the emergency room, Mr. Smart had to undergo a complicated hand surgery to address significant injuries, including the removal of a substantial amount of glass. GX-916 at 6. The operative report stated that during surgery, Mr. Smart received pain numbing medication, including nerve blockers, and Dr. Desai performed an irrigation, debridement with removal of a foreign body, wound exploring, soft tissue repair with removal of glass, and repair of tendons. GX-916 at 6.

At trial, Mr. Smart disputed that Dr. Desai actually repaired his tendon, as the operative report stated. Tr. 1007–09 (Smart); GX-916 at 1. But, as Mr. Smart's explanation of benefits

reflects, GX-1228, it was not disputed that Mr. James billed Cigna exactly what was described in the operative report: nothing more and nothing less. Indeed, for a medical biller like Mr. James to not include a CPT code for a clearly identified procedure in a medical report would itself be improper. And after requesting and reviewing the underlying medical records, Cigna allowed $98,537.75 for the treatment Mr. Smart received in the emergency room. Wilkins-Russell Report ¶ 57; DX-221. To the extent the jury actually believed that Mr. Smart's tendons were not repaired during this surgery, removing that claim would not have resulted in a non-payment by Mr. Smart's insurance company, Cigna. Wilkins-Russell Report ¶¶ 13, 57. Instead, it would have resulted in a payment reduction of $39,000 out of $98,537.75. *Id.* ¶ 57.

While it is again undisputed that Mr. James impersonated Mr. Smart on subsequent telephone calls with Cigna, Tr. 1013 (Smart); GX-35, he only did so after Cigna had completed their own independent review of Mr. Smart's medical records and agreed to pay for the bulk of Mr. Smart's medical bills. And it is important to note that Cigna ***did not*** make any additional payments to Mr. Smart's physicians after Mr. James called and attempted to collect the outstanding balance. Tr. 1013:8–17 (Smart); Tr. 1018–20 (Smart).

Accordingly, at most, even if the tendon repair coding was somehow improper – which would have been entirely unknown to Mr. James – the loss amount should only include the amount the insurance company would have paid for that single tendon repair code, $39,000, not the entire $98,000.

**<u>Samuel Brenner</u>**: The evidence at trial indisputably supported the following as to Mr. Brenner: (i) he received medically necessary treatment after an accident during which he hit his head and received stitches; (ii) Dr. Desai performed that treatment; (iii) Mr. James properly

coded for this claim; and (iv) the insurance company, Cigna, did not pay Dr. Desai any additional amounts following Mr. Brenner's calls to Cigna claiming he was being balance billed.

Mr. Brenner testified that he got into an accident on an e-scooter. Tr. 1120:4–7 (Brenner). He went to a nearby hospital, Cedars-Sinai, where the hospital staff cleaned his wound, which spanned 3-4 inches on his forehead, Tr. 1134 (Brenner); DX-704, and gave him stitches, Tr. 1120:11–12 (Brenner). As he went to leave the hospital, his forehead started to bleed again, and he was readmitted to the emergency room. Tr. 1120:14–17 (Brenner). Dr. Desai reopened the wound, cleaned it, and stitched him back up. Tr. 1120:18–21 (Brenner). Mr. Brenner testified that he was pleased with the work that Dr. Desai performed, and he posted a Google review praising his treatment. Tr. 1137–38 (Brenner).

The government has never alleged – nor could it – that (1) Mr. James's HCFA form for this procedure was fraudulent, Tr. 1139:16–21 (Brenner); (2) Mr. James billed for codes that were inappropriate for the procedures performed; or (3) Mr. James impersonated Mr. Brenner in seeking to have Cigna pay the balance of the costs of his medical treatment. In other words, any amount Cigna paid in connection with Mr. Brenner's medically necessary treatment at Cedars-Sinai should not be included in the loss amount, as the government incredulously argues it should.

To the extent the government argues that Mr. James's encouraged Mr. Brenner to call Cigna himself and claim he was balance billed demonstrates that Cigna's payments to Mr. Brenner were all a result of fraud, that argument fails for various reasons. First, Cigna did not pay Dr. Desai any additional money after Mr. Brenner's calls. Second, it is clear that Cigna owed Dr. Desai payments for his medically necessary, covered services to Mr. Brenner regardless of whether Mr. Brenner falsely claimed to be balance billed for this procedure. Put

another way, a manufactured assertion that a patient was balance billed does not and cannot turn an otherwise legitimate healthcare claim form into a wholly fraudulent one.

**Victoria Motley**:  As discussed *supra* Section II.A.2, the PSR mistakenly adopts the government's version of events regarding Ms. Motley's treatment, who implausibly claimed to the jury that she only had a tummy tuck surgery and not a hernia surgery, when thirty-three separate notations in her medical records by many medical staff other than Dr. Rhee indicated she received hernia surgery.  Tr. 2487–90 (Tumulty); DX-713; GX-136.  With respect to the allegation that Mr. James "directed the physician-client to process [Ms. Motley] through the emergency room for a hernia," the evidence at trial showed no such thing.  In fact, Mr. James received an operative report for Ms. Motley with the subject line "UHC ER patient."  DX-713; DX-226.  There was no evidence presented at trial that Mr. James had any role in directing Ms. Motley to report to the emergency room for her hernia surgery or in altering Ms. Motley's operative report to indicate that she in fact received hernia surgery.  No reasonable juror could have concluded that Ms. Motley did not receive a hernia surgery or, if she did not, that Mr. James was aware of this fact.  Thus, this treatment's inclusion in Mr. James's billing should not be taken into account when calculating the loss amount.

To the extent any of Mr. James's conduct was improper in relation to Ms. Motley – and it was not – the only amount that could have been included in the loss amount was the amount paid in connection with any CPT codes related to reporting to the emergency room.  But United denied the CPT code associated with an emergency room admission.  Wilkins-Russell Report ¶ 44.  Accordingly, there is no aspect of Ms. Motley's treatment and subsequent billing that could contribute to the loss amount, and the allowed amount of $19,000 cannot and should not be included in any loss amount.  Wilkins-Russell Report ¶¶ 39–44.

*    *    *

These nine patients are just a snapshot of the claims for which Mr. James billed, and each, on its own, demonstrates a fundamental flaw with the government's theory for calculating the loss amount. For ***none*** of these patients would Mr. James's conduct have resulted in *no* payment from the insurance company, as the government suggests was the case for every single claim for which Mr. James billed. *See* Wilkins-Russell Report ¶ 13 ("[T]he denial of one procedure code line item on a claim has no bearing on the coverage/payment of other line items on the claim."). The government thus cannot, nor has it attempted to, prove by a preponderance of the evidence, much less by the heightened specific evidence standard, that the entirety of the amount the insurance companies billed in connection with Mr. James's billings was fraudulent and thus should be included in the loss amount.

### 5.     Two Insurance Companies Reported Actual Loss

Two of the purported six insurance company victims have provided a statement as to how much they believe they lost as a result of Mr. James's alleged misconduct: a total of $83 million, far short of the $600 million the government proposes. Specifically, Aetna estimated – with no explanation for how it made its calculation – that it paid out approximately $50 million for ***all*** of Mr. James's claims. In addition to being unsubstantiated, this figure appears to suffer from the same flaws as the government's overall calculation. For example, Aetna's figure accounts for "the total amount Aetna paid to Mathew James affiliated medical providers," PSR ¶ 30, during the relevant time period, rather than the difference between that total amount and what Aetna would and should have paid for the procedures absent Mr. James's alleged misconduct; as importantly, it does not account for legitimately billed claims and CPT codes.

Similarly, Cigna claims that it "paid over $33M as a direct result of [Mr. James's] scheme of billing for services not rendered, misrepresenting the nature of the services provided and routinely impersonating Cigna customers with fabricated complaints of balance billing." But there is no dispute that all of these procedures were actually performed, and Cigna provides no explanation for how it calculated this figure, making it inherently unreliable.

While both of these figures are fundamentally flawed, these are the only two insurance companies that have provided a statement as to how much Mr. James's conduct allegedly cost them. Indeed, as previously noted, one of the case agents responsible for this matter acknowledged to Probation that it is unclear whether HealthFirst, another of the alleged victim insurance companies, suffered any loss at all. PSR ¶ 15 n.2. After four and a half years since Mr. James's arrest and many months, if not years, of investigation before then, the government should not be permitted to now assign massive loss figures in the hundreds of millions of dollars to four of the six alleged victim insurance companies who did not report an actual loss amount to the government or Probation, despite ample opportunity to do so.

C.      The Court Should Substitute A Portion Of Mr. James's Gain In Lieu of
        Actual Loss, Which "Reasonably Cannot Be Determined"

As set forth above, the government has not (and cannot) proven that Mr. James's conduct led to an actual loss of nearly $530 million (or $600 million) by a preponderance of the evidence, let alone under the applicable specific evidence standard. The government's back-of-the envelope extrapolation methodology in calculating the loss amount fails to take into account the difference (if any) between the amount the insurance companies paid to Mr. James's physician-clients as a result of using more costly codes and/or modifiers inappropriately on the one hand, and the amount that the insurance companies would have paid for the out-of-network procedure but for the alleged fraud on the other. This calculation would require a comparison between the

codes, the underlying medical records, and the amount that specific doctors decided to charge for the out-of-network procedures, which the government has not endeavored to undergo. Even if that calculation had been done, the government's loss amount also fails to identify and exclude (1) all properly-billed claims and codes, (2) all pre-approved claims, (3) all payouts that would have been paid regardless of whether an impersonation call was made, and (4) all amounts Mr. James's physician-clients paid back to insurance companies after they agreed to a settlement of a contested claim and before the offense was detected.[12]

Because the loss "reasonably cannot be determined," the Guidelines instruct the Court to calculate the loss amount as "the gain that resulted from the offense." U.S.S.G. § 2B1.1, Application Note 3(C). To determine the defendant's gain, the Court must make a "reasonable estimate" of the gain that resulted from the offense. Guidelines § 2B1.1, Application Note 3(B); *see United States v. Tzolov*, 435 F. App'x 15, 16–17 (2d Cir. 2011) (summary order) (affirming lower court's use of gain instead of actual loss where "the loss inflicted was not readily calculable"); *Yaron v. United States*, 586 F. App'x 819, 822 (2d Cir. 2014) (summary order) (affirming use of gain instead of loss where "precise amount of the loss could not be reasonably determined" in kickback scheme); *United States v. Romano*, 794 F.3d 317, 338–39 (2d Cir. 2015) (using gain to calculate actual loss because loss could not be reasonably determined); *Johnson*, 2018 WL 1997975, at *1 (using gain to calculate Guidelines and rejecting government's contention that all profit made as a result of fraudulent scheme should constitute loss because the "causal connection between the criminal conduct for which [the defendant] was

---

[12] At trial, the government conceded that all of these physicians were permitted to charge however much they wanted for their out-of-network services. Tr. 828 (Battistoni). And conversely, to the extent those patients had out-of-network coverage with their respective insurance plans, it is not in dispute that each of the victim insurance companies was obligated to pay some (if not all) of the amount to, among other reasons, prevent their members from bearing any of the costs. Tr. 1874–75 (Shohan).

convicted and the approximately $4.2 million in profit that [the defendant's employer] made on the deal is too attenuated to support this enhancement"); *United States v. Butler*, 264 F.R.D. 37, 39 (E.D.N.Y. 2010) (affirming use of gain instead of actual loss because "the loss attributable to the offenses was found to be impossible to determine"); *United States v. Parris*, 573 F. Supp. 2d 744, 748 (E.D.N.Y. 2008) (calculating loss by determining gain traceable to defendants' frauds and sentencing defendants to 60 months incarceration, where Guidelines range was 360 months to life).

Admittedly, substituting gain for loss is subject to some of the same issues as the government's loss estimate. For instance, using Mr. James's gain as a loss estimate would not take into account the amount Mr. James would have earned but for the offense conduct, which as set forth above, would have been a substantial sum even assuming the veracity of the government's fraud allegations. Thus, to best account for the Guidelines' "rigidity and artificial precision," *United States v. Malki*, 609 F.3d 503, 508 n.3 (2d Cir. 2010), the Court should deduct from the total amount of compensations Mr. James received any amount that he would have been paid but for any of the alleged fraud. As set out in Ms. Wilkins-Russell's report, for the eight trial patients she reviewed, the insurance companies would have paid 80.71% of the allowed amounts if all of the CPT codes and modifiers the government alleges were fraudulent had been the "proper" or "correct" CPT codes. Put another way, accepting all of the government's miscoding allegations as true, 19.29% of the payments to Mr. James were the result of the alleged fraud. 19.29% of Mr. James total gain of $63,382,049.02, PSR ¶ 25, is **$12,226,397.26**. Accordingly, at most, Mr. James's Guidelines range should include a 20-level enhancement (as opposed to 28) for the loss amount. Using this 20-level enhancement for loss amount, plus a base offense level of 7, and deducting 2 levels for Mr. James's lack of criminal history pursuant

to U.S.S.G § 4C1.1, Mr. James's total offense level should be 25, for a Guidelines range of 57 to 71 months' incarceration.

### D. Regardless of the Loss Calculation Used, the Guidelines Range Overstates the Seriousness of the Offense

Regardless of the loss amount this Court applies, it is widely recognized that in fraud cases, the Guidelines' emphasis on loss amount drastically "overstate[s] the seriousness of [the] offense." *United States v. Rivernider*, 828 F.3d 91, 111, 114 (2d Cir. 2016); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) ("[T]he Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors."); *see also* Transcript at 23:1–7, *United States v. Faibish*, No. 12 Cr. 265 (ENV) (E.D.N.Y. Mar. 10, 2016), ECF No. 271 (decrying the loss table's tendency to "just mindlessly accelerate[] once you have numbers of any size added in the loss or gain table," and noting "a whole host of judges . . . have said so publicly and scores of others . . . have . . . grumbled about it privately"). The Second Circuit has recognized the disproportionate effect a high loss amount can have on a sentence and has invited district courts "to consider whether the significant effect of the loss enhancement, in relation to the low base offense level, should result in a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016); *see also* U.S.S.G. § 2B1.1 Application Note 21(C) (noting that the basis for a "downward departure may be warranted" where the offense level "substantially overstates the seriousness of the offense").

Courts within this Circuit, including this Court, have accepted the Second Circuit's invitation to depart downward where the loss amount drastically inflates a proposed sentence.

*See, e.g.*, *Johnson*, 2018 WL 1997975, at *1, *6 (finding the Guidelines' "feeble underpinnings of the loss enhancement" to be "galling," and departing from Guidelines imprisonment range of 87 to 108 months to impose a sentence of 24-months imprisonment); Sentencing Tr., *United States v. Thompson*, No. 19 Cr. 698 (ER), at 28-29 (S.D.N.Y. Feb. 4, 2021), ECF No. 49 (departing from Guidelines imprisonment range of 36 to 47 months to impose a sentence of time-served and three years' supervised release when "the fraud guidelines put entirely too much emphasis on the amount of the fraud"); *United States v. Gupta*, 904 F. Supp. 2d 349, 353, 355 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) (departing from Guidelines range of 78–97 months' imprisonment to impose a sentence of 24 months' imprisonment because the guidelines range – two-thirds of which is the product of the gain calculation – "does not rationally square with the facts of this case"); *see also* Letter in Conjunction with the Sentencing, *United States v. Pellegrino*, No. 18-cr-496 (E.D.N.Y. Oct. 10, 2019) (Seybert, J.), ECF No. 31, *and* Minute Entry, *id.* (Oct. 18, 2019), ECF No. 32 (sentencing defendant convicted of submitting fraudulent claims to private insurers, who had Guidelines range of 37-72 months, to 18 months' imprisonment).

In sum, the loss enhancement *alone* increases Mr. James's sentencing range on the healthcare fraud counts from 18-24 months (level 15) to life imprisonment (level 43). Sentencing Mr. James to a term of imprisonment reserved for the most violent offenders would be, to put it mildly, "galling." *Johnson*, 2018 WL 1997975, at *1.

## IV. A SUBSTANTIALLY BELOW-GUIDELINES SENTENCE IS SUFFICIENT BUT NOT GREATER THAN NECESSARY TO SERVE THE PURPOSES OF SENTENCING

This Court should impose a substantially below-Guidelines sentence of the mandatory minimum 24 months' incarceration, which is sufficient but not greater than necessary to reflect Mr. James's history and characteristics, seriousness of the offense, promote general and specific

deterrence, and protect the public. *See* 18 U.S.C. § 3553(a); *Gall v. United States*, 552 U.S. 38, 50 (2007) (noting the court should "not presume that the Guidelines range is reasonable" but "must make an individualized assessment"). Particularly because the Guidelines range is "not to be *presumed* reasonable," *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original), and the loss enhancement here, as in most cases, "leads to a patently absurd sentence," this Court should "rely more heavily on the § 3553 factors," *Johnson*, 2018 WL 1997975, at *4.

### A. Mr. James's History and Characteristics

The depth and breadth of Mr. James's service as a nurse in this district and elsewhere, his longtime role as caregiver to his parents, his devotion to his wife and children, his struggles with alcohol, and his countless selfless (and quiet) acts of support to extended family, friends, neighbors, and his church distinguish Mr. James from many, if not most, defendants who the Court has sentenced. Mr. James's extraordinary history and characteristics, as well as how this lengthy prosecution has affected his life and impacted his family, strongly mitigate in favor of a substantially below-Guidelines sentence.

*First*, Mr. James has dedicated his life to building up and helping people around him. From his early days in India, to his time studying and working as a nurse in Germany, to moving to the United States to be hopefully able to send money to his family back home, to housing and caring for his elderly and infirmed parents for 14 years, Mr. James's primary objective has always been to serve those in need and support his family and friends. As more fully described *supra* Section I.D–H, Mr. James has always found his purpose through his family and community, which has grown to include the network of friends, neighbors, colleagues, and patients that he has cultivated and assisted over the years. As noted above in Section I, Mr. James's support for his nephew helped allow him to overcome a substance abuse problem and obtain a nursing degree, Ex. 4 (A. James Letter), and Mr. James's assistance to his cousin and

sister-in-law were instrumental to their lives and careers in this country, Ex. 8 (L. Jose Letter); Ex. 9 (A. Joseph Letter); Ex. 10 (V. Varghese Letter).

Mr. James's care for his friends and neighbors led one such friend to credit Mr. James with ██████████████████████████████████ during the pandemic.  *See* Ex. 11 (S. Basso Letter).  Another friend recognized Mr. James's efforts in *physically* caring for the friend's father before he passed away with ██████ that same friend ██████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ *See* Ex. 23 (D. Kennedy Letter).  Mr. James's care for those around him extends beyond his nursing support for friends; even in the aftermath of a devastating conviction, Mr. James has pushed forward in ecumenical volunteer service, regularly spending time contributing to the operations of Christ Lutheran Church.  *See* Ex. 31 (Christ Lutheran Church Volunteer Letter). As the Honorable Joseph Covello, a neighbor and former judge in New York's Appellate Division, Second Department and other jurisdictions, as well as a member of the New York State Joint Commission on Public Ethics, recalls, Mr. James quickly provided ████████████ ████████████████████████████████████ Ex. 13 (J. Covello Letter).  Judge Covello further describes Mr. James as "a leader in our community as well as extremely benevolent."  *Id.*  Mr. James's community knows him best—and the person who they know is "kind," "family-oriented," "sincere and comforting," "considerate, generous," and a "rare [person] that is willing to [go the extra mile] … without expecting anything in return." Ex. 12 (K. Bullis-Byrd Letter); *see also* Ex. 13 (J. Covello Letter); Ex. 22 (E. Hogan Letter); Ex. 24 (D. Kern Letter); Ex. 28 (G. Pomerantz Letter).

Mr. James first started studying medicine at a nursing program in Germany while working at an area hospital. He decided to move to the United States after a few years to join his brother and try to build a better life for himself and his family. With both moves, Mr. James had to start from scratch, find his community, learn the language, and develop the skills to serve patients at their most vulnerable. When he first moved to the United States, Mr. James lived with his brother, John, and John's wife in a small, single room, had to skip meals when they could not afford to purchase food, and worked multiple jobs to make ends meet. Ex. 4 (A. James Letter); Ex. 5 (J. James Letter). He used what little free time he had to volunteer to help women with high-risk pregnancies in low-income communities. Ex. 5 (J. James Letter).

After he graduated early with his nursing degree from the University of South Dakota, Mr. James started his career in the United States as a nurse in Long Island hospitals. He began as an operating room nurse at the Rapid City Regional Hospital in South Dakota, and then spent fifteen years at Huntington Hospital. Not only was he a "well-respected member of the surgical team" at Huntington Hospital, but he also addressed "unexpected emergencies," was "the first to volunteer to step up to meet the needs of the operating room as well as offering assistance to his coworkers," and served as "a mentor to several new staff members during their orientation." Ex. 15 (E. Dobson Letter). During this time, Mr. James worked to balance his hectic, but personally meaningful, role as a nurse with building his family, and his children became the primary focus of his life. Ex. 3 (R. James Letter); Ex. 6 (Placheril Family Letter). Mr. James exhibited the same care as he did for his patients when his daughter, Milenia, ███████████████████ ███████████████████ Ex. 1 (Milenia James Letter); Ex. 2 (E. James Letter).

After more than fifteen demanding years as a nurse – and years of training before then – helping thousands of patients and training other nurses, Mr. James transitioned full time to the goal he always had: running his own business. And when he made the transition to the medical billing industry, one of Mr. James's priorities was to do the best job he could for his doctor-clients, but also to try to have these doctors' patients avoid needing to interface with insurance companies while they recovered from often serious medical conditions and treatments.

But, while Mr. James could never have dreamed of the financial renumeration he obtained during these years, he understands that his troubling and lamentable "impersonation" communications were the result of the ends justifying the means, cutting corners, and getting carried away with trying to maximize and more quickly get his doctor-clients (and by extension Mr. James) paid for their legitimate and necessary medical services without involving the patients themselves. Mr. James was also undoubtedly rude, obnoxious, and crude on several occasions when pretending to be patients on calls with insurance companies. It is an understatement that those are not proud moments for Mr. James, and he does not seek to minimize the offensive nature of those calls. Mr. James's impersonation calls and those of his employees will always be a significant stain on Mr. James, and he feels deep remorse for his actions. If Mr. James could turn back time, he would never have taken those steps pretending to be patients and communicating to the insurance companies that the patients had been balance billed, when they had not.

Nevertheless, this prosecution has already all but destroyed Mr. James's livelihood and devastated his family. During the four and a half years since his arrest – an inordinately long time to be kept under the threat of conviction, and now prison – Mr. James has fully complied with the conditions of his release, continued to rely on his faith, tried to be there for his friends

and family as Ms. James went back to work as a nurse and his children continued their studies, and he has cooperated with the government to sell his properties and forfeit his earnings.

Mr. James's family has watched in fear as Mr. James awaits his uncertain future. His daughter, Milenia, ████████████████████████████████████████████████████ ████████████████████████████████. And his son, Evan, ████████████████████████████ ████████████████████████████████████. Mr. James's mother, ████████████████████ ████████████████████████ is concerned that the "whole family is crumbling" under the stress of this prosecution. Ex. 4 (A. James Letter). That Mr. James has already lost so much, and that he has had his life frozen in time since July 2019, should be taken into account when the Court determines his sentence. Although his children are now young adults, a lengthy prison sentence will deprive them and Ms. James of the essential support and love that Mr. James provides.

*Second*, Mr. James's complete lack of any criminal history, placing him in Criminal History Category I, makes the likelihood of him recidivating extremely low. *See* U.S. Sentencing Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* 5 (Mar. 2016), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf ("A federal offender's criminal history [is] closely correlated with recidivism rates . . . . Each additional criminal history point [is] generally associated with a greater likelihood of recidivism."); *United States v. Cosimi*, 368 F. Supp. 2d 345, 349 (S.D.N.Y. 2005) (noting that defendant's "lack of criminal history," among other things, "indicate[s] that he presents a low danger of recidivism"); *see also United States v. Smith*, 321 F. Supp. 3d 405, 409 (E.D.N.Y. 2018) (noting defendant's lack of criminal history makes him "unlikely to recidivate"), *aff'd*, 945 F.3d 729 (2d Cir. 2019). In fact, as argued above, Mr.

James is eligible for a 2-level reduction in his Guidelines calculation because of his lack of criminal history.  *See supra* II.B.3.

*Third*, older offenders like Mr. James, who is 56, PSR at 2, are far less likely to recidivate than younger offenders.  *See* U.S. Sentencing Comm'n, *Effects of Aging on Recidivism Among Federal Offenders* 3 (Dec. 2017), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf (finding that older offenders are "substantially less likely than younger offenders to recidivate following release" and that age "exert[s] a strong influence on recidivism across all sentence length categories"); *see also United States v. Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. Apr. 11, 2005) (collecting cases) (granting below-Guidelines sentence in part due to defendant being 54 years old and "low probability" that she would recidivate").  Statistics show that the older an offender is, the less likely he is to recidivate.  For example, arrest rates drop to just over two percent for people ages 50-65, and to almost 0% for those older than 65.  *See* Rebecca Silber et al., Vera Inst. of Just., *Aging Out* 3 (Dec. 2017), https://www.vera.org/downloads/publications/Using-Compassionate-Release-to-Address-the-Growth-of-Aging-and-Infirm-Prison-Populations%E2%80%94Full-Report.pdf; *see also United States v. Hamilton*, 323 F. App'x 27, 30–31 (2d Cir. 2009) (holding lower court abused discretion by not considering age recidivism as a policy argument for a downward variance).  A lengthy prison sentence, such as 15 years, would result in Mr. James getting out of jail at close to 70 years old, which would make it even more challenging for Mr. James to reintegrate into and meaningfully contribute to society.

*Finally*, although he has long struggled with alcohol abuse, which began years prior to his arrest, Mr. James sought outpatient alcohol abuse treatment following his trial at WellLife Network in Huntington, New York.  PSR ¶ 80.  Through this program, Mr. James attends

therapy sessions weekly.  *Id.*  WellLife has reported to Probation that Mr. James was doing well as of this summer.  First Addendum at 1.  Mr. James hopes to take advantage of programs while incarcerated to maintain his sobriety.  *See* 18 U.S.C. § 3553(a)(2)(D) (considering "medical care, or other correctional treatment" when determining the need for the sentence).  And Mr. James's efforts to control his drinking reflect positively on his ability to be a contributing member of society after his, hopefully, limited jail term.

Mr. James's history and characteristics, including his long service as a nurse, his dedication to and many quiet good deeds toward his family, friends, and his church, his lack of criminal history, his long-term compliance with the conditions of his pretrial release, and his age, support a significantly below-Guidelines sentence.

### B.  The Nature and Circumstances of the Offense and the Need for Just Punishment Merit a Substantially Below-Guidelines Sentence

While Mr. James's crimes of conviction are undoubtedly serious, the advisory Guidelines and Probation's recommendation provide for a penalty that is disproportionate to Mr. James's conduct and would serve no legitimate sentencing purpose.

*First*, as noted already, Mr. James fully recognizes the harm that his impersonation communications have caused.  He got lost along the way in his efforts on behalf of his doctor-clients and their patients.  These actions, as well as the content of these calls, are serious and Mr. James is genuinely sorry for them.  Mr. James considered the medical billing space as a struggle between insurance companies who would do everything to shortchange his physician-clients and their patients,[13] for whom he had an obligation to seek maximum reimbursement for their services.  *See* GX-102 at 3 (Mr. James's coding class at Molloy College regarding "maximum

---

[13] As one insurance company representative testified at trial, his team was evaluated based on how much money they clawed back from doctors for insurance payments.  Tr. 1928:1–24 (Shohan).

reimbursement").  This was particularly true for the patients who underwent surgery, were

critically ill, or suffered from a cancer diagnosis for whom interfacing with insurance companies

would have added to their post-recovery burdens.  Indeed, even accepting the government's

characterization of the offense conduct, the evidence at trial demonstrated that Mr. James viewed

his efforts as well-intentioned, though undoubtedly financially beneficial to his physician-clients

and him.  *Cf.* Tr. 311, 318:1–3 (Nash); Tr. 885:6–12 (Persky); Tr. 1414:10–11 (Cutrone).  Mr.

James never intended to harm patients financially or otherwise, and no patient testified that their

credit was impacted or that they were actually balance billed.  *See* Tr. 958 (Pash) (testifying Mr.

James's conduct did not harm credit); Tr. 1020 (Smart) (same).  And although it was not a legal

defense that the Court permitted at trial, Mr. James believed that the insurance companies'

consistent approval of claims he submitted, including after the insurance companies reviewed

every medical record to which he had access or engaged in a prolonged negotiated settlement,

was proof that his billing and coding were proper and certainly not criminal.

*Second*, as the above objections to the PSR's offense conduct and opposition to the

proposed loss amount make clear, the defense takes issue with the government's view that the

nature and circumstance of the offense include intentional, bad faith, and systematic upcoding

and miscoding by Mr. James or conspiring with doctors to have non-urgent procedures through

the emergency room.  Accordingly, the defense respectfully submits that Mr. James should not

be sentenced for that alleged and unproven misconduct.  This submission details several

examples of Mr. James's indisputably legitimate coding efforts, and even undercoding claims,

*see supra* Sections II.A.2, III.B.4, but there were many others that came out at trial.  *See, e.g.*,

DX-112; DX-113; DX-116; DX-125; DX-126; DX-129; DX-139; DX-140; DX-141; DX-142.

To detail just one additional example, Cigna's witness at trial, Barbara McQuade, reviewed Mr. James's coding of an operative and consultation report, GX-1093 at 4-7, compared it to Mr. James's HCFA form for that procedure, GX-448, and testified that Mr. James's coding, including the use of an emergency room CPT code, was entirely appropriate. Tr. 677 (McQuade).[14] In a similar vein, there were examples of Mr. James billing for fewer procedure codes than insurance companies pre-authorized in a GAP procedure. GX-944, for example, is a GAP authorization for patient Leah Morton, which reflects the pre-approval of four CPT codes. GX-944 at 6–7. But Mr. James ultimately only billed for three of those codes because the fourth CPT code was not reflected in the actual operative report of Ms. Morton's procedure. *See* DX-217 at 1. These examples of Mr. James coding in good faith and based on the doctor's operative report even if the financial ramifications were less remunerative for the doctor and Mr. James undermine the government and Probation's portrayal of Mr. James and the offense conduct. And the government could not identify a single case where Mr. James sought more money from an insurance company than the doctor charged for their services or that was owed on an outstanding balance.

Considering these factors, and in light of the "draconian" nature of the advisory Guidelines, particularly for financial crimes and fraud, *see* Transcript at 80, *United States v. Caspersen*, No. 16 Cr. 414 (JSR) (S.D.N.Y. Nov 4, 2016), ECF No. 37, Mr. James should receive a substantially below-Guidelines sentence.

---

[14] Ms. McQuade also testified that even the most experienced and certified medical biller, which Mr. James was not, can make mistakes in coding and those mistakes can repeat themselves, if not corrected. Tr. 664 (McQuade), Tr. 1942–3 (Shohan).

### C.    A Substantial Prison Sentence Will Not Further Goals of Specific or General Deterrence

A significantly below-Guidelines sentence will satisfactorily further the goals of specific and general deterrence.

As discussed above, the consequences of this prosecution, as well as Mr. James's familial support, make it exceedingly unlikely that Mr. James will recidivate, negating the need for further specific deterrence.  Mr. James's business and professional reputation have been destroyed as a result of this case.  His family already has been, and will continue to be, significantly impacted by its patriarch losing his livelihood, the past 54 months of this prosecution, and Mr. James being imprisoned.  But even with the prospect of prison hanging over his head, Mr. James has followed every pre-trial condition of release, and made efforts to continue to positively contribute to the lives of his family, friends, neighbors, and church.

Even with his career decimated and future uncertain, Mr. James's family and community have stood by him, which "speak[s] to his character and, importantly . . . a very decreased likelihood of recidivism going forward." *United States v. Pena*, 459 F. Supp. 3d 544, 547 (S.D.N.Y. 2020); *United States v. Jones*, 2015 WL 3484466, at *5 (S.D.N.Y. June 2, 2015) (finding letters of support from friends and family evidenced defendant had "a life and a community to return to, and a good chance at not recidivating").  At home, Mr. James's wife, Reena, has reiterated that "only love can put Matt back on track," and his daughter has begged the Court to allow Mr. James to remain with his family to experience significant future milestones with her and so that her "brother [may] retain one of the few male figures in his life." Ex. 3 (R. James Letter); *see also* Ex. 1 (Milenia James Letter).  His mother, who is aging and in declining health, prays several times throughout the day that she may be able to spend her final

years with her son, who supported her in her move to the United States and through significant medical issues.  Ex. 4 (A. James Letter).

Beyond the James household, Mr. James's friends and community members are similarly prepared to face the years ahead by his side.  "This world would be a much better place if there were more people like Matt in it" and "I have always known [Matt] to be an upstanding and valued member of our community" are just some of the sentiments that capture Mr. James's impact within his neighborhood.  Ex. 28 (G. Pomerantz Letter), Ex. 24 (D. Kern Letter).  Denis Kennedy, Mr. James's neighbor and friend, succinctly articulates the stance that all of Matt's loved ones take at this time:  "[Matt] has offered and contributed a lot to our community and his neighbors and can continue to do the same. Matt being in the community and with his family is a lot more valuable than being incarcerated." Ex. 23 (D. Kennedy Letter).  It is clear from the voluminous support Mr. James has received throughout this prosecution that he will be welcomed back into his family and community with open arms and support.

Turning to general deterrence, as discussed throughout this submission, none of Mr. James's many purported doctor-client co-conspirators, who undoubtedly collectively gained significantly more money from the victim healthcare insurance companies than Mr. James, has been prosecuted for their roles in the offenses at issue.  Mr. James should not shoulder the entirety of the wrong here and should not be punished excessively on the theory of the need to promote general deterrence when the government itself has declined to hold others who participated in this scheme accountable.  In any event, Mr. James's arrest and conviction were widely reported in the press and are certainly known to the medical profession on Long Island

and beyond.[15]  Because Mr. James's professional and personal ruin has been so publicly reported, the need for general deterrence does not weigh in favor a lengthy period of incarceration.

**D.     A Significant Variance is Necessary to Avoid Unwarranted Sentencing Disparities**

A substantially below-Guidelines sentence is appropriate to avoid unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a)(6).  *First*, Mr. James is not close to bearing primary responsibility for the entirety of the purported fraudulent conduct or financial loss.  The PSR states that Mr. James had numerous "co-conspirators" including "several employees and physician-clients for whom he and his companies provided billing services."  PSR ¶ 15 n.1.  In fact, "[t]he evidence adduced at trial revealed that the defendant and his medical billing companies had close to 150 physician-clients" – each of whom were allegedly aware of and complicit in Mr. James's billing practices.  *Id.* ¶ 16.  Nevertheless, although the FBI identified 150 physician-clients who the government claims all conspired with Mr. James to commit healthcare fraud, ***none*** of them has been charged, leaving Mr. James as the ***only*** person who is being held responsible for any engagement in this "scheme."  This is despite the undisputed facts that it was the doctors, not Mr. James, who decided when, where, and how to treat ***their patients***, and it was the doctors, not Mr. James, who were responsible for their patients' operative reports and the HCFA forms submitted to the health insurance companies.  In fact, Mr. James's

---

[15] *See, e.g.*, Adina Genn, *St. James man convicted of $600m healthcare fraud*, Long Island Business News (July 14, 2022), https://libn.com/2022/07/14/st-james-man-convicted-of-600m-healthcare-fraud/; *East Northport man convicted of $600M in health care fraud*, Newsday (July 14, 2022), https://www.newsday.com/long-island/crime/convicted-health-care-fraud-east-northport-medical-billing-posed-patients-uaze4rvm; Damien Black, *Conman used phishing techniques to defraud insurers out of million*, Cybernews (Nov. 15, 2023), https://cybernews.com/news/conman-used-phishing-techniques-to-defraud-insurers-out-of-millions/.

physician-clients regularly provided Mr. James with billing codes to use, and they would often review the HCFA forms before they were submitted to the insurance companies.

1.    Disparities Between Mr. James And Uncharged Co-Conspirator Doctors

Throughout this case, Mr. James's physician-clients have retained the vast sums they have recovered from the medical procedures for which Mr. James billed.  By the government's own theory, these physicians pocketed nearly ***90%, or $540 million*** out of $600 million, of the proceeds of this allegedly fraudulent scheme.  And even the physicians who were featured prominently at the trial have been totally unimpacted in their medical practices.  None of the doctors has lost their medical licenses or faced any repercussion for their alleged complicity in the crimes charged.  In fact, Mr. James's physician-clients have not only continued to treat patients, but advertise the same procedures and services about which they allegedly conspired to overbill by hundreds of millions of dollars.

For example, Deja Guzman's surgeon, ***Dr. Amir Tahernia*** – who had Ms. Guzman admitted and treated via the emergency room – extensively promotes his surgical practice on social media.[16]  He regularly posts TikTok videos and Instagram Reels advertising his services, including videos explaining how patients can get treated for hidradenitis, and tells his audience that insurance may cover their procedures "depending on the plan," while boasting that his patients travel to him from around the country.  Yet, Mr. James, who had no involvement in deciding when, where, and how to treat Ms. Guzman, and who coded Ms. Guzman's operation exactly as Dr. Tahernia described in his operative report, faces a mandatory minimum of two

---

[16] Dr. Amir Tahernia MD (@amirtaherniamd), Instagram (Dec. 2, 2023), https://www.instagram.com/p/C0UqZFLv_S9/.

years in prison and a Guidelines sentencing range of life imprisonment, not to mention the many other collateral consequences of his prosecution.

Another example – **Dr. Urmen Desai** – who treated Marcus Smart, Samuel Brenner, and Susan Breidenbach – not only operates his independent plastic surgery business, but patients have continued to receive his services in the Cedars-Sinai emergency room.[17]

On the testimonials section of **Dr. Candido Fuentes's** webpage, multiple customers describe the emergency care he administers to young patients with laceration injuries – the same treatment that was administered to Sheila Sperber. Dr. Fuentes's Instagram actively advertises his services and encourages patients to call his practice.[18] If Dr. Fuentes dramatically overcharged Sheila Sperber for her stitches and was complicit in upcoding her health insurance claim form, it raises serious and substantial questions about why Dr. Fuentes has gone unprosecuted and wholly unpunished for years while Mr. James was prosecuted alone, even though Mr. James had no say whatsoever in Ms. Sperber's treatment.

**Dr. Charlotte Rhee**, Victoria Motley's surgeon, has an entire section of her website dedicated to a "Mommy Makeover," including "tummy tuck" procedures (the same procedure that witness Victoria Motley testified she sought from Dr. Rhee).[19] On another page, she urges customers to call her office "for additional information on insurance plan[s] and coverage."[20] To the extent Dr. Rhee instructed Ms. Motley to go the emergency room for a tummy tuck and her

---

[17] *See* Alix Tunell, *The Police Broke My Nose at a BLM Protest. This Plastic Surgeon Made Me Look Like Myself Again*, realself.com (July 9, 2020), https://www.realself.com/news/police-broke-my-nose-at-blm-protest.

[18] Fuentes Cosmetic Surgery (@fuentescosmeticsurgery), Instagram (Nov. 27, 2023), https://www.instagram.com/p/C0J5ZqqOyAO/.

[19] *See* Abdominoplasty in Long Island & Huntington Station, NY, Charlotte Ann Rhee MD (last visited Jan. 16, 2024), https://www.liplasticsurgery.com/procedures/for-the-body/abdominoplasty-tummy-tuck-surgery/.

[20] Patient Information, Charlotte Ann Rhee MD (last visited Jan. 16, 2024), https://www.liplasticsurgery.com/patient-information/.

hernia operation was just a cover story Dr. Rhee created, even if Mr. James was complicit, it is profoundly unjust that Mr. James has faced severe and life-altering consequences for this misconduct and Dr. Rhee continues her medical practice unimpeded.

Similarly, **Dr. Tamer Seckin's** website advertises the possibility of "certain insurance plans" qualifying for his out-of-network gynecological services, "if [the] plan includes out-of-network benefits" – which is likely the same coverage that Heather Quinlivan had, through which she applied for and received pre-approval before undergoing Seckin's treatment.[21] Also actively practicing without a single adverse consequence or loss of medical license are Dr. Mark Schoemann, Dr. Robert Jetter – who treated Denise Baker and Elizabeth Pash, respectively – as well as many of Mr. James's former physician clients whose patients did not testify at trial.

This significant and astonishing disparity between the consequences for Mr. James as a result of his conduct (e.g., a substantial period of incarceration) and the consequence for his alleged co-conspirators (e.g., no prosecution, no impact on their medical licenses or ability to prescribe controlled substances) merits a significant downward variance. *See United States v. Wills*, 476 F.3d 103, 100 (2d Cir. 2007) ("[I]t is appropriate for a district court, relying on its unique knowledge of the totality of the circumstances of a crime and its participants, to impose a sentence that would better reflect the extent to which the participants in a crime are similarly (or dissimilarly) situated and tailor the sentences accordingly."); *United States v. Nguyen*, 508 F. App'x 39, 40–41 (2d Cir. 2013) (summary order) (affirming sentence that took into account co-defendants' sentences). It is not reasonable or fair for Mr. James to alone bear the full weight of the consequences of this expansive misconduct while the licensed medical professionals, who

---

[21] *See* Costs and Insurance Coverage, Seckin MD Endometriosis Center (last visited Jan. 16, 2024), https://drseckin.com/costs-and-insurance-coverage/.

swore an oath to do no harm to their patients, continue on in their lives and medical practices as if nothing untoward took place. While any term of imprisonment would result in unwarranted sentencing disparities between Mr. James and his alleged doctor-client co-conspirators, a substantially below-Guidelines sentence would best address the need to minimize such a dramatic disparity.

     2.      <u>Disparities Between Mr. James And Those Sentenced for Healthcare Fraud Nationwide</u>

Below-Guidelines sentences in fraud cases are exceedingly common. The Eastern District of New York's mean sentence for fraud-related crimes is 15 months, and the median is 3 months; nationwide, fraud-related crimes receive a 22-month sentence on average, with a median of 12 months.[22] If the Court adopts Probation's recommended sentence of 15 years, Mr. James's sentence would exceed the highest end of what is typical in similar healthcare fraud cases in this Circuit. In *United States v. Levin*, for example, Judge Cronan sentenced Marianna Levin to 54 months imprisonment for her leadership role in a large-scale scheme that defrauded Medicaid and Medicare by billing for services by home health aides that were never performed. Transcript, No. 20 Cr. 681 (E.D.N.Y. Feb. 1, 2023), ECF No. 391. Ms. Levin had a stipulated advisory Guidelines range of 87 to 108 months imprisonment and a loss amount of $25-65 million, but the government claimed the conduct of Ms. Levin's agencies caused more than $100 million in fraudulent billings. *See id.* at 9:16–17, 10:10–14; Press Release, *Owner of Home Health Agency Sentenced to 54 Months In Prison For Over $100 Million Health Care Fraud*, U.S. Attorney's Office, S.D.N.Y. (Feb. 1, 2023), https://www.justice.gov/usao-sdny/pr/owner-home-health-agency-sentenced-54-months-prison-over-100-million-health-care-fraud.

---

[22] U.S. Sentencing Comm'n, Statistical Information Packet 11 (2022), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2022/nye22.pdf.

In *United States v. Kaganovich*, Chief Judge Brodie sentenced Tea Kaganovich to 36 months imprisonment, with a loss amount of over $18 million (with an addition $7.8 million to be paid to the IRS for tax fraud) for "systematically and covertly pa[ying] illegal kickbacks and manipulated Medicaid and further defrauded the IRS." Letter at 5, *United States v. Tea Kaganovich*, No. 17 Cr. 649 (E.D.N.Y. Aug. 16, 2022), ECF No. 131; Press Release, *New York Diagnostic Testing Facility Owners Sentenced for Health Care Fraud Scheme*, U.S. Dep't of Justice (Dec. 1, 2022), https://www.justice.gov/opa/pr/new-york-diagnostic-testing-facility-owners-sentenced-health-care-fraud-scheme. There, the defendants paid a co-conspirator over $18 million in illegal kickbacks in exchange for access to patients for whom diagnostic testing could be billed to Medicaid. At the same time, the defendants deducted the illegal kickback payments as legitimate business expenses in their tax returns, resulting in an additional loss to the IRS of $7.8 million.

Notably, many of the defendants who are sentenced for health care-related crimes have been convicted of submitting fraudulent claims to Medicare or Medicaid or for submitting claims for services that were never provided.[23] While Mr. James recognizes that fraudulent conduct aimed at private insurance companies can still have an effect on the cost of insurance policies, Mr. James only submitted claims to private insurance companies for services that had actually been performed by real doctors. To avoid unwarranted disparities between Mr. James and his alleged co-conspirators, as well as similarly-situated defendants in this District and nationwide, this Court should impose a substantially below-Guidelines sentence.

---

[23] *See, e.g.*, Press Release, *Long Island Chiropractor Sentenced to 18 Months' Imprisonment for Multi-Million Dollar Health Care Fraud Scheme*, U.S. Attorney's Office, E.D.N.Y. (Oct. 18 2019), https://www.justice.gov/usao-edny/pr/long-island-chiropractor-sentenced-18-months-imprisonment-multi-million-dollar-health; Press Release, *Brooklyn Doctor Sentenced To 24 Months in Prison For Engaging In A $13 Million Health Care Fraud Scheme*, U.S. Attorney's Office, E.D.N.Y. (Aug. 14, 2015), https://www.justice.gov/usao-edny/pr/brooklyn-doctor-sentenced-24-months-prison-engaging-13-million-health-care-fraud-scheme.

## V. ANY FORFEITURE, RESTITUTION, OR FINE SHOULD BE MINIMAL

Finally, this Court should decline to impose a substantial restitution, forfeiture, or fine, if any.

### A. Mr. James Has Complied with the Government's Forfeiture Efforts

Mr. James has cooperated with the government throughout this case with respect to forfeiture. As the PSR recites, Mr. James has identified ten bank accounts with a combined balance of $13,037,470.44, PSR ¶ 96, and various properties, vehicles, and securities that he has sold for the purposes of forfeiture, *id.* ¶¶ 97–100. Mr. James has spent hours selling these properties, compiling paperwork, and working with counsel to comply with the government's forfeiture requests and process. In total, Mr. James has already provided $32,057,421.04 to the U.S. Marshal's Service.

Additionally, Mr. James has sold two more properties for forfeiture purposes that are reflected in the Second Addendum to the PSR. Second Addendum at 14–15. The first, a residential property at 9 Stoddart Court, Locust Valley, New York 11560, sold on October 24, 2022, for $7,950,000.00. The second, a land parcel at 99 Cedar Swamp Road, Lot 48 or Lot B, Brookville, New York 11545 (also known as "High Point Court"), sold on July 20, 2023, for $2,575,000.00. *See* Second Addendum at 15. Mr. James has continued to cooperate with the government by forwarding the proceeds from these sales to the United States Marshals Office.

Mr. James respectfully requests that he be permitted to maintain two of the properties listed in the indictment: 24 Forsythe Drive, East Northport, New York 11731. Mr. James and his wife purchased this residence in 2004 prior to Mr. James opening his medical billing business. Additionally, it is the James family's primary residence, and has been for the last nineteen years. Second, 8 Richard Path, St. James, New York 11780, was purchased prior to the time period of the offense conduct, the government's financial analysis of Mr. James's bank

records began in 2014, and the government has not established that the property was purchased with the proceeds of any fraud.  GX-2347, GX-2358.  Therefore, these two properties are inappropriate for forfeiture and should be excluded from any forfeiture order.

**B.    Restitution, If Any, Should Not Approach $600 Million**

Like the challenges with calculating a reliable loss amount, the government cannot prove by a preponderance of the evidence that Mr. James caused an actual loss warranting anything close to a $600 million restitution order.  *See United States v. Finazzo*, 850 F.3d 94, 117 (2d Cir. 2017) (noting government must prove actual loss by a preponderance of the evidence for restitution purposes).  Probation acknowledges that "the specific amount of restitution owed to each of the victim insurance companies . . . has not been ascertained by the Government," and suggests that the Court hold an evidentiary hearing to "determine the loss attributable to each of the victim companies."  Probation Recommendation, dated Feb. 9, 2023; *see also* PSR ¶ 115.  Indeed, Aetna and Cigna are the only two insurance companies that have submitted a proposed loss figure and for the reasons set forth above, those numbers are unsupported and flawed.

As explained *supra* Section III, the government has made no effort to, among other things:  (i) calculate the amount that insurance companies would have paid but for Mr. James's supposedly fraudulent billing; (ii) exclude claims and CPT codes that were properly billed; or (iii) take into account the fact that Mr. James's physician-clients paid back some of the outstanding claims both before and after Mr. James's arrest.  Where, as here, there remain "complex issues of fact related to the . . . amount of the victim's losses," which would "complicate or prolong the sentencing process," the Mandatory Victim's Restitution Act "shall not apply" because "the need to provide restitution to any victim is outweighed by the burden of the sentencing process."  18 U.S.C. § 3663A(c)(3)(B); *see generally United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) (vacating restitution order where government's evidence about actual loss

was flawed). This Court should not rely on the government's overstated and counterfactual estimate of the actual loss the insurance companies experienced here in determining a restitution order.

Nor should the Court rely upon the estimates from two of the six purported insurance company victims, Cigna and Aetna; the other four insurance companies named in the indictment have not, after more than four and a half years of litigation, reported any loss to the government. *See* PSR ¶ 30; First Addendum. As discussed, Aetna estimated that it paid out a total of approximately $50 million as a result of Mr. James's claims. PSR ¶ 30. And Cigna claims that it "paid over $33M as a direct result of [Mr. James's] scheme of billing for services not rendered, misrepresenting the nature of the services provided and routinely impersonating Cigna customers with fabricated complaints of balance billing." First Addendum at 2. Beyond the fact that there is no dispute that these claims concerned actually-performed and necessary medical procedures, neither Aetna nor Cigna includes any back-up or calculation for how they determined these loss amounts. And with respect to Aetna, as the PSR notes, it has brought a civil lawsuit against Mr. James. PSR ¶ 26.

These loss estimates that two of the insurance companies reported, which suffer from the same issues as the government's overall loss calculation, do not satisfy the government's burden of proving an appropriate restitution amount by a preponderance of the evidence. *See United States v. Schwamborn*, 467 F. App'x 35, 39 (2d Cir. 2012) (reversing district court's restitution order because it was "impossible to determine from the affidavits submitted by the government whether the losses alleged represent anything more than rough estimates").

In any event, particularly because much of Mr. James's financial means have been or will be forfeited as a result of this case, *see supra* Section I.H, he does not have the financial

resources to pay any additional, substantial restitution amount, even if it could be reasonably calculated. A restitution order requires that the Court consider "the financial resources of the defendant," the "financial needs and earning ability" of him and his dependents, and to determine whether restitution would complicate or prolong the sentencing process. 18 U.S.C. § 3663(a) (1)(B)(i)(II). Mr. James will not be able to earn any significant income in the future due to his conviction. As such, Mr. James and his dependents' financial resources leave no room for a substantial restitution order here.

Even if the Court determines that the victims did incur an actual loss that can be reasonably determined, and that Mr. James is able to pay it, any restitution order must be reduced by the amount Mr. James's physician-clients returned to the insurance companies through clawbacks and negotiated agreements, amounts that the government has not calculated even though such clawbacks and agreements are known to the insurance companies identified as victims in this matter. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii) (offsetting restitution by value of property returned to victim). And, of course, any restitution order should be made "joint and several" with every doctor the government claims was involved with or benefited from Mr. James's misconduct, which the government asserts is approximately 150 doctors for whom Mr. James billed from January 2013 through December 2019 and who allegedly earned approximately $540 million from claims Mr. James billed.

### C. The Court Should Not Levy a Fine

In light of the substantial restitution and forfeiture orders that are likely to be issued by this Court, the anticipated term of imprisonment, and Mr. James's financial means, the Court should exercise its discretion and not order a fine. *See* PSR ¶ 104 ("[T]he defendant appears unable to pay a fine."); U.S.S.G. § 5E1.2, Application Note 3 ("The determination of the fine

guideline range may be dispensed with entirely upon a court determination of present and future inability to pay any fine.").

## VI. CONCLUSION

Mr. James deeply and sincerely regrets the hardships that his conduct has put his family, friends, and loved ones through over the past four and a half years. He understands the damage he has caused for his former employees and the healthcare industry more generally, regardless of the sentence the Court imposes. Mr. James also recognizes that the lamentable communications in which he pretended to be patients were misguided and problematic. And although Mr. James has suffered substantial consequences from his prosecution already, he knows and understands that a prison term is required. But, for all the reasons set forth above, an advisory Guidelines sentence and Probation's recommendation is not warranted or in the interests of justice here.

We respectfully submit that the mandatory minimum sentence of 24 months' incarceration is sufficient, but not greater than necessary, to serve the objectives of sentencing in this case.

Respectfully submitted,

KRIEGER KIM & LEWIN LLP

By: _____

Paul M. Krieger
Molly K. Webster

cc:    All counsel of record (via ECF)
       U.S. Probation Office