# KRIEGER KIM & LEWIN LLP

350 Fifth Avenue, 77th Floor
New York, NY 10118
Telephone: (212) 390-9550
www.KKLllp.com

Paul M. Krieger

Direct Dial: (212) 390-9552
paul.krieger@KKLllp.com

January 29, 2024

<u>By ECF and Email</u>

The Honorable Joanna Seybert
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

      Re:    *United States v. Mathew James*, No. 19 Cr. 382 (JS)

Dear Judge Seybert:

      We write on behalf of Mathew James following the sentencing proceeding on January 23, 2024 (the "January 23 Proceeding"), and in advance of the continued sentencing proceeding scheduled for January 31, 2024, at 10:30am. We write for three purposes.

      *First*, at the end of the sentencing proceedings last week, the Court expressed its clear intent to sentence Mr. James to a total of 10 years' incarceration, but then contemplated adding two additional years because of the potential applicability and implications of the First Step Act, P.L. 115-391. As set forth below, Your Honor should not consider the availability of good time credit under the First Step Act in fashioning Mr. James's sentence, and he should receive a sentence of no more than 10 years. And even if the First Step Act was a proper sentencing consideration, and assuming the Bureau of Prisons ("BOP") determined Mr. James was eligible for the Act's full relief, he could not receive anywhere close to 50% off his sentence in good time credits under the program, as the government incorrectly asserted in its sentencing submission. *See* ECF No. 245 ("Gov. Mem.") at 34 n.13.

      *Second*, the Court should not adopt the government's proposed $63 million forfeiture number as set out in its Amended Preliminary Order of Forfeiture, ECF No. 255. As discussed in detail in the defense's sentencing submission and during the hearing last week – and as the Court itself concluded – not close to every dollar Mr. James was paid in connection with his medical business was the result of fraud. Accordingly, it would be wholly improper to order Mr. James to repay every single dollar he earned from his medical business. Instead, for the reasons set forth below, the Court should impose forfeiture in the amount of no more than $33 million.

      *Third*, the Court should not order restitution in the amount of $342,822,962.93, as the government has proposed. *See* Gov. Memo at 35. Like the government's forfeiture proposal, that amount hinges on the wholly flawed and disproven theory that every single dollar paid out by the insurance companies in connection with Mr. James's impersonation and use of Modifier 59 to Mr. James's (uncharged and unsanctioned) physician-clients over the course of seven years was the direct result of the alleged fraud. For the reasons set forth below, restitution should not

exceed the $63 million that Your Honor used as the loss amount for the purposes of calculating the sentencing guidelines.

I.      **This Court Cannot Enhance Mr. James's Sentence Because of the First Step Act**

Mr. James should not receive a prison term in excess of the 10 years, to which the Court stated he was going to be sentenced because of the First Step Act. During the January 23 Proceeding, the Court determined that a total period of incarceration of 10 years was appropriate. Tr. 154:25–155:4 ("I was intending to give him ten years . . . ."). While this sentence is greater than necessary to serve the purposes of sentencing, and more prison time than the relevant, in-Circuit comparators, *see* ECF No. 246 ("D. Mem.") at 92–93, the Court may not, as it has contemplated, increase Mr. James's sentence based on the possibility he earns good time credit under the First Step Act.[1]

The case law is clear that a court may not lengthen a sentence based solely on the amount of good time credit that a defendant could possibly accrue while incarcerated. *See United States v. Roberts*, 919 F.3d 980, 992 (6th Cir. 2019) (indicating it would be impermissible for a court to "consider good-time credit as a stand-alone factor in fashioning the length of the sentence"); *cf. United States v. Fowler*, 948 F.3d 663, 669 (4th Cir. 2020) (finding mention of good times credit permissible where judge "did not consider good-time credits as a stand-alone factor during sentencing, nor did he utilize them as any sort of vehicle for an enhanced sentence term"); *see also Tapia v. United States*, 564 U.S. 319, 328 (2011) (holding a judge may not elongate a sentence to promote rehabilitation because "imprisonment is not appropriate to promote rehabilitation when the court considers the applicable factors of § 3553(a)(2)"). This is in line with long-standing precedent that a court may not use an "overall outcome-oriented approach" in fashioning a sentence. *United States v. Weakley*, 175 F. App'x 847, 852 (9th Cir. 2006).

Although this clear prohibition on increasing a sentence based on the possibility of good time credit had not been briefed for the Court, the Court proposed to add two years to the sentence it intended to impose solely because the Court came to the incorrect conclusion, based on misstatements from the government, that the First Step Act could result in Mr. James earning up to 50% off his sentence in good time credit. As the Court began to discuss its potential sentence, it stated "[m]y understanding is that [the 4 leadership points pursuant to U.S.S.G. § 3B1.1(a)] would exclude [Mr. James] from the First Step Act consideration and the halving of the sentence." Tr. 148:2–4. The Court then indicated that it was going to sentence Mr. James to 10 years' incarceration. Tr. 143:20–144:4 ("At [age] 56 a sentence of ten years is a substantial one."); Tr. 154:25 ("I was intending to give him ten years . . . ."). However, after the government misinformed the Court that Mr. James would be eligible to receive good time credit that would cut his prison term in half, the Court added two additional years to his sentence. In so doing, the Court explicitly explained that it "was intending to give him ten years, but that was based on the court's misunderstanding of the ability of the defendant to engage in programs and

---

[1] We continue to firmly believe that a substantially shorter term of prison than 10 years is sufficient but not greater than necessary for Mr. James, especially in light of his extraordinary history and characteristics and the disturbing and astonishing fact that not one of Mr. James's 150 alleged co-conspirator physician clients – who collectively earned hundreds of millions of dollars (approximately 90%) of the alleged fraud proceeds – has faced any consequences, let alone been prosecuted, for their significant alleged misconduct.

potentially halve his sentence. That's why I changed my initial determination." Tr. 154:25–155:4. In other words, the Court was on the precipice of improperly adding two years to Mr. James's sentence because of the possibility that Mr. James could receive good time credit under the First Step Act. *See Roberts*, 919 F.3d at 992.

That a court may not lengthen a sentence based on the availability of good time credit is consistent with the First Step Act's purpose "to promote rehabilitation of prisoners and unwind decades of mass incarceration." *Johnson v. Thompson*, 2020 WL 2106345, at *1 n.3 (E.D. Cal. Mar. 19, 2020) (citing Congressional Research Service, R45558, The First Step Act of 2018: An Overview (Mar. 4, 2019), https://crsreports.congress.gov/product/pdf/R/R45558). Congress intended to incentivize incarcerated individuals toward self-improvement and rehabilitation by participating in recidivism reduction programming and other productive activities while in the custody of the Bureau of Prison ("BOP"). *See* Congressional Research Service, R45558, The First Step Act of 2018: An Overview (Mar. 4, 2019), https://crsreports.congress.gov/product/pdf/R/R45558). To provide this incentive, the First Step Act allows certain qualifying individuals the opportunity to receive more good time credit than was previously available if they participate in programming and are eligible under a BOP risk assessment. But if a court adds prison time to a defendant's sentence because of the possibility of obtaining good time credits in the future, it would entirely undermine the congressional intent for the First Step Act and would render the First Step Act obsolete.

Accordingly, because the Court cannot lengthen its sentence based on the possibility of Mr. James receiving good time credit while incarcerated, Mr. James should be sentenced to, at most, 10 years' incarceration, which the Court had already determined was sufficient, but not greater than necessary, to serve the purposes of sentencing.[2]

## II. Even if the Court Could Consider the First Step Act, the Government is Incorrect that Mr. James Could Receive a 50% Reduction in Sentence

In determining Mr. James's sentence, the Court should not consider whether Mr. James would receive good time credit while incarcerated – a decision that is left to the BOP's sole discretion. But even if it could, the government's simplified description of the First Step Act's available good time credit is inaccurate. *See* Gov. Memo at 34 n.13.

As a preliminary matter, the BOP has sole discretion in the implementation and application of the programs that permit a prisoner to accrue good time. *See Tapia*, 564 U.S. at 330–31 ("When a court sentences a federal offender, the BOP has plenary control, subject to statutory constraints, over . . . the treatment programs (if any) in which he may participate.").

---

[2] At the January 23 Proceeding, the government requested that Mr. James report to prison within 48 hours of being designated to a BOP facility. We respectfully request that Mr. James be required to report to prison 60 days from the date of sentence, which date may be extended to the extent Mr. James is not yet designated at that time. A fixed date for reporting is customary in this district, and it allows for a more orderly appeal from a decision on bail pending appeal. There is no reason for the government's 48-hour request in light of Mr. James's 4.5 year record of complying with the terms of his release.

Accordingly, it is impossible to predict whether Mr. James would actually receive any good time credit at all, much less an amount that would significantly reduce his sentence.

It is true that Mr. James's offenses here are not disqualifying under the First Step Act. *See* 18 U.S.C. § 3632(d)(4)(D) (describing offenses that are carved out of the First Step Act's good time credit provisions). And there is no provision that precludes someone from participating because he received leadership points pursuant to U.S.S.G. § 3B1.1. But the accuracy of the government's description of the First Step Act's application to Mr. James ends there. For example, it is not a forgone conclusion – or a question of "whether or not [Mr. James] chooses to participate," at the government posits, Tr. 150:18–24 – that Mr. James would be eligible for or receive the maximum amount of good time under the First Step Act.

With respect to the former, for a prisoner to be eligible for the First Step Act's good time credit, he must undergo a risk of recidivism assessment called the Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"). *See* The First Step Act of 2018: Risk and Needs Assessment System, U.S. Dep't of Justice, Office of the Attorney General, https://www.bop.gov/inmates/fsa/docs/the-first-step-act-of-2018-risk-and-needs-assessment-system.pdf. This risk assessment tool groups prisoners into a classification describing the offender's recidivism risk. *Id.* at 45–63. That classification will determine in which programs a prisoner may participate, only some of which may permit Mr. James to apply good time credit to early release. Regardless, what risk level he will be adjudicated is purely within BOP's discretion.

Regarding the latter consideration – how much good time credit Mr. James could receive – the government ignores the First Step Act's caps on such time credit. While it is true that good time credits are auto-calculated based on 30-day periods, with the opportunity to earn 10 or 15 days in each period, depending on the PATTERN risk level, the total number of good time credit days is capped by statute at 54 days per year, *see* 18 U.S.C. § 3624(b)(1), and further limited by the BOP guidance to 365 total days.[3] Thus, even if Mr. James qualifies to participate in those programs at the highest level and he successfully completes these programs, both of which possibilities are uncertain at best, he will only receive 365 days' worth of good time credit toward an early release, with possible additional credits applied toward release to a halfway house or home confinement. In other words, if Mr. James is sentenced to 10 years in prison, he could earn up to 540 total good credit time days – not anywhere close to the 50%, five years, or

---

[3] As it is permitted to do, the BOP has issued interpretive guidance regarding the First Step Act's two programs that permit prisoners to receive good time credit: the Evidence-Based Recidivism Reduction ("EBRB") and Productive Activities ("PAs"). In guidance that was distributed to incarcerated individuals in BOP custody in or about November 2023, the BOP articulated a limit on the total number of earned good time credit a prisoner may receive under the First Step Act, providing that "credit earned in excess of 365 days is applied toward increased pre-release placement in halfway house or home confinement." Ex. A (BOP Guidance dated November 2023); *cf.* Press Release, *Federal Inmate Sentenced to Seven Months for Possession of Contraband Cell Phone*, U.S.A.O. E.D.N.C. (Jan. 11, 2024), https://www.justice.gov/usao-ednc/pr/federal-inmate-sentenced-seven-months-possession-contraband-cell-phone-0 (referring to First Step Act's ability to earn time credits "up to 365 days off of their sentence for participating in eligible programming while incarcerated").

1,825 days that the government baldly asserted – but he would not complete his incarceratory sentence until 365 days prior to the end of his prison term, *i.e.*, after 9 years.[4]

### III.  The Court Should Reject A Forfeiture Order For $63 Million

The Court should reject the proposed forfeiture amount of $63 million set forth in the Amended Preliminary Order of Forfeiture, ECF No. 255.  As the Court acknowledged during the January 23 Proceeding, $63 million far exceeds the amount that Mr. James actually made from proven fraudulent conduct.  To the contrary, that figure includes the total amount that Mr. James made from his medical billing business, which indisputably includes legitimate earnings.  During the January 23 Proceeding, both the Court and the government acknowledged that not "every single dollar was fraudulently obtained."  Tr. 64:1–3; Tr. 42:16–20 ("I will make a finding that not all of the claims were false, fraudulent, et cetera.  There were some, even the Government admits, that there were some that were legitimate."); Tr. 43:23–25 ("I'm also, with the 3553(a) factors, I'm going to not determine that every single dime that the defendant got was a result of fraud.").  Accordingly, the Court should issue a forfeiture order accounting for the fact that a meaningful portion of Mr. James's medical billing business, and thus his earnings therefrom, were not fraudulent.

### *$30-33 Million*

Based on the accurate conclusion that not every portion of Mr. James's earnings was the result of fraud, the Court considered reducing the amount that Mr. James would be required to forfeit:  "And if I calculate additional funds that were legitimately put together, I think a reduction of 30 million or 33 million loss is accurate."  Tr. 63:18–24.  Such a reduction would properly account for the legitimate claims and codes that Mr. James billed as part of his medical billing business, which only billed claims for real patients, who received real procedures, from real doctors.

The Court's proposed $30 to $33 million forfeiture figure better reflects the amount that Mr. James made from his alleged fraudulent conduct, as compared to the government's vastly overstated $63 million, which undeniably includes earnings made from legitimate billing.  *See United States v. Porcelli*, 865 F.2d 1352, 1365 (2d Cir. 1989) ("The Congressional aim guiding these forfeitures is to recover all of the racketeer's ill-gotten gains but not to seize legitimately acquired property.").

When calculating forfeiture and restitution, the government, despite its admission at sentencing, has ignored the fact that Mr. James's business (and thus earnings) include non-fraudulent claims or codes and has not even attempted to calculate the amount that Mr. James gained that was "involved" or "traceable" to the offense pursuant to 18 U.S.C. § 982(a)(1).  Nor has the government attempted to: (1) explain whether and how the impersonation calls actually

---

[4] If the Court (incorrectly) determines that the First Step Act justifies sentencing Mr. James to more than 10 years in prison, we respectfully request that Court sentence to Mr. James to no more than 11.5 years in custody.  A sentence longer than that will not only punish Mr. James for the existence of a program designed to incentivize prisoners to participate in recidivism-reducing programming, a sentence of longer than 11.5 years would also prohibit Mr. James from serving his sentence at a minimum-security camp and may deprive him crucial programming and treatment.

caused a 100% loss, particularly where the impersonations took place solely after the insurance company made its final payout, as was the case for three of the six trial patients for whom impersonation was an issue, ECF No. 254 at 8 (detailing the timing of the trial patients' impersonations and payments); (2) calculate the difference between the amount the insurance companies paid out and what they would have paid out absent the alleged fraud, *see* Wilkins-Russell Report ¶ 13; or (3) deduct from the total the properly billed claims, all pre-approved claims, and amounts Mr. James's physician-clients paid back to the insurance companies after they agreed to a settlement. The government's repeated attempts to ignore the facts of the case that run contrary to its absolutist theory should be rejected.

If the Court prefers an alternative to the $30 or $33 million it cited during the January 23 Proceeding, there are several means of calculating forfeiture here, each of which appropriately extrapolates the trial evidence to reach a reasonable and reliable figure corresponding to the amount Mr. James earned from the allegedly fraudulent conduct here.

### *19.29% of Mr. James's Total Gain*

The Court can reliably use the Expert Report of Wendy Wilkins-Russell and her calculations regarding how much the insurance companies would have paid without the allegedly fraudulent aspects of the claims the government identified for eight of the trial patients. As more fully explained in the defense's sentencing submission and its response to the government's motion to preclude Ms. Wilkins-Russell's report, D. Mem. At 74; ECF No. 254 at 1–6, the insurance companies would have paid 80.71% of the allowed amounts if all of the CPT codes and modifiers the government alleges were fraudulent were removed. Put another way, accepting all of the government's miscoding allegations as true, 19.29% of the payments to Mr. James were the result of the alleged fraud. 19.29% of Mr. James's total gain of $63,382,049.02, PSR ¶ 25, is ***$12,226,397.26***.

### *10% of Impersonations + Modifier 59*

For the reasons set forth in the defense's letter requesting that the Court reject the government's proffered "loss" spreadsheets, *see* ECF No. 254 at 7–9, these loss spreadsheet contain fundamental flaws and vastly overstate the loss amount at issue.[5] Nevertheless, even if the Court were to accept at face value the government's deeply problematic spreadsheets, the Court should set forfeiture as equal to 10% of the total amount of money the insurance companies paid out for claims allegedly involving impersonation calls and use of Modifier 59 – a theory of loss that the government vigorously advocated for at sentencing. *See* Gov. Mem. At 13–15. More specifically, because Mr. James was paid by his physician-clients approximately

---

[5] In its January 22, 2024 letter, the defense raised several errors in the government's spreadsheets, including double counting, several entries with a blank "charged" column, patients for whom the payment date precedes the "received date," and entries that do not include dates. ECF No. 254 at 7 n.6. Since then, the defense has identified several additional errors in the spreadsheets, including numerous entries that have no associated insurance company, and at least one patient that appears on both spreadsheets but has mismatching dates of service (with all other information identical). These errors are surely just illustrative, particularly given that the government provided no underlying records by which to confirm the spreadsheets' data, and it is nearly impossible at this late date in the proceeding to perform a detailed analysis of these voluminous spreadsheets.

10% of what the insurance companies paid the doctors for the claims Mr. James billed, this proposed methodology of calculating forfeiture reasonably estimates the amount that Mr. James himself earned from the claims the government says involved impersonation calls and claims that had Modifier 59 included on the billed charge.

While taking a percentage of the impersonation and Modifier 59 related claims may exclude the amounts paid out for other potentially fraudulent codes, this approach would, in fact, significantly overstate Mr. James's fraudulent earnings because it would include claims that have no nexus to the fraud, including those for which (1) the impersonation could not have led to a fraudulent payment because the impersonation occurred after the insurance company made its final payment on the claim, (2) Modifier 59 was properly used; and (3) the procedures were pre-approved. And this methodology for determining forfeiture would further be overinclusive because it accepts the government's specious and disproven theory that just because there was impersonation on a claim or an improper use of Modifier 59, that the ***entire*** payment on a claim should be considered fraudulent. *See* Wilkins-Russell Report ¶ 13. Accordingly, this method provides a reasonable (though unfavorable to Mr. James) tradeoff between excluding some potentially fraudulent payouts and including substantially more legitimate payments.

With respect to the appropriate percentage to take from these two categories of claims, the government and Probation have both argued that Mr. James made approximately 10-12% of the total payout from the insurance companies to Mr. James's physician-clients. PSR ¶ 16. The Court should use the lower percentage, 10%, to account for the undeniable fact that this calculation would sweep in legitimate earnings from legitimate claims and because of the fact that the impersonation spreadsheet and explanations of benefits spreadsheet contain duplicates. *See* ECF No. 254 at 7 & nn.4 & 5.

According to the government's calculation, the insurance companies paid a total of $342,822,962.93 for the claims in which a patient was allegedly impersonated or Modifier 59 was on the billed charge. Gov. Mem. at 14. The spreadsheets themselves present a slightly different total than the government reported in its sentencing memorandum, of $342,138,374.60. Taking the latter dollar figure that the spreadsheets actually reflect, 10% of $342,138,374.60 is ***$34,213,837.46***.[6]

---

[6] Alternatively, the Court could calculate forfeiture by taking (1) 10% of the total amount the insurance companies paid from the government's impersonations spreadsheet, and adding (2) 19.29% of Mr. James's total gain. With respect to the first component, as discussed above, this calculation would overrepresent the approximate amount Mr. James earned from the impersonations. With respect to the second component, this calculation would represent the amount that Mr. James likely earned from the additional amount the insurance companies paid out because of the alleged fraud. As Ms. Wilkins-Russell calculated in her report, 19.29% of the total dollar amount actually allowed by the insurance companies for eight of the trial patients was attributable to the coding that the government alleged was improper. Wilkins-Russell Report ¶ 77. Thus, calculating 19.29% of Mr. James's total gain of $63 million would best represent the portion of Mr. James's gain that could be attributable to the allegedly fraudulent coding. 19.29% of $63,382,049.02 is $12,226,397.26. $12,226,397.26 plus 10% of the total from the impersonation spreadsheet ($12,752,523.51) is **$24,978,920.77**.

### IV.     The Court Should Order No More Than $63 Million in Restitution

The government has requested $342,822,962.93 in restitution *See* Gov. Mem. at 35.  But this overblown and inaccurate calculation should be rejected.  The Court should instead order restitution in line with the evidence presented at trial and during sentencing, and taking into account Mr. James's financial resources.  The Court should thus limit a restitution order to the amount it deemed constitutes loss under the Guidelines – $63 million.

By using $63 million for the purposes of calculating "loss" under the Guidelines, an amount that the government has stated is Mr. James's gain from his medical billing business, the Court acknowledged that the loss figures the government proposed were not reliable or accurate enough on which to base the loss amount.  *See* Tr. 63:18–22 (concluding $63 million is "a reasonable estimate" of loss).  The same logic holds true with respect to restitution, and the Court should reject the government's continued efforts at overreach.  In fact, where, as here, there remain "complex issues of fact related to the . . . amount of the victim's losses," which would "complicate or prolong the sentencing process," the Mandatory Victim's Restitution Act "shall not apply" because "the need to provide restitution to any victim is outweighed by the burden of the sentencing process."  18 U.S.C. § 3663A(c)(3)(B); *see generally United States v. Reifler*, 446 F.3d 65 (2d Cir. 2006) (vacating restitution order and remanding where government's evidence about actual loss was flawed).

The Court should also consider the flawed loss calculations made by Aetna and Cigna in determining restitution.  As the Court knows, only two of the purported six insurance company victims have come forward with the amount they proclaim they lost due to Mr. James's medical billing business.  But both insurance companies have explained that their purported loss figures are the entire amounts that were paid out in connection with Mr. James's billings.  *See* Tr. 103–11 (Aetna); Tr. 111–14 (Cigna); *see also* Gov. Mem. Exs. C–D.  These figures, like the total loss amount the government has put forth in this case, do not account for the claims that were fully or partially legitimate or in which impersonation did not affect the payout, among other flaws.

On the one hand, Aetna has explained that it calculated its $50 million loss figure by compiling the amount it paid to various doctors whom it connected to Mr. James's billing business.  But as the Aetna representative claimed at the January 23 Proceeding, there is no way for Aetna to identify the medical biller associated with each claim.  Tr. 106:8–14.  The government has not established that Mr. James's doctor-clients, none of whom have been arrested, charged, or testified at trial, used only one medical biller (or that using only one medical biller is common practice).  Therefore, it is entirely possible that Aetna overcounted the amount attributable to Mr. James's medical billing business, *see United States v. Schwamborn*, 467 F. App'x 35, 38 (2d Cir. 2012) (reversing district court's restitution order because it was "impossible to determine from the affidavits submitted by the government whether the losses alleged represent anything more than rough estimates"), and the Mandatory Victims Restitution Act does not authorize a victim to recover more than its total loss, 18 U.S.C. § 3663(a)(1).

Cigna, on the other hand, has not explained how it reached its loss amount at all.  Moreover, the government's restitution proposal does not discount, as it must, the money that any insurance carrier has recouped from Mr. James's physician clients.  *See* D. Mem. at 97

(citing 18 U.S.C. § 3663A(b)(1)(B)(ii); D. Mem., Ex 36 (settlement between Cigna and a physician-client of Mr. James).

In addition, the restitution amounts ordered in the comparator cases to which the government cited in its sentencing submission were in line with, or less than, the loss amounts calculated for Guidelines purposes in those prosecutions. *See* Gov. Mem. at 31–33. For example, in *United States v. Mohammed*, No. 18-CR-509 (E.D.N.Y. 2022), the plea agreement between the parties set the loss amount between $3.5 million and $9.5 million, and Judge Vitaliano issued a restitution order for $6.5 million. *Id.*, ECF No. 80 at 4; *id.*, ECF No. 86. In *United States v. Esformes*, No. 16-CR-20549 (S.D.F.L. 2019), where the government asked for the Court to find that the loss amount exceeded $500 million, the Court held that the loss amount was between $4.9 million and 8.3 million, and restitution should be made in the amount of $5.5 million. *Id.* ECF No. 1439 at 51; *id.*, ECF No. 1459. And in *United States v. Walters*, No. 19-CR-51 (S.D.M.S. 2021), the Court found that the loss amount was approximately $500 million, and restitution should be repaid in the amount of $287 million. *Id.*, ECF No. 103 at 25. To order a restitution figure that is nearly triple what the Court has already held was the loss amount for purposes of calculating the Guidelines would not only be illogical, counterfactual, and excessive, it would also be out of step with the government's own precedent and lead to an unwarranted sentencing disparity.[7]

Finally, in addition to the substantial forfeiture order that will likely be entered and the $32 million of Mr. James's assets that have already been seized, Mr. James will likely be unable to pay any significant restitution order. *See* 18 U.S.C. § 3663(a)(1)(B)(i)(II) (noting the Court must consider "the financial resources of the defendant"). Thus, even though the comparator cases to which the government points are vastly distinguishable in Mr. James's favor, and for all the reasons set for above and in the defense's sentencing submission, the Could should not issue restitution in an amount more than $63 million.[8]

---

[7] It should be noted that while the government has pointed to each of these as "comparators," the conduct in each of those cases was far more egregious than Mr. James's here. The defendant in *Mohammed* was convicted of running sham pharmacies through which he would submit fraudulent claims to Medicare and Medicaid for medications, including expensive medications to treat HIV, that were not actually dispensed, not medically necessary, and dispensed by an unlicensed pharmacy. In *Esformes*, the defendant was involved in a fraud double the length of the offense conduct here in which he submitted false billings to Medicaid and Medicare and was engaged in bribery, kickbacks, and obstruction of justice. And in *Walters*, the defendant altered the formulas of prescriptions for individuals enrolled in TRICARE, a benefit program serving U.S. military veterans and their families. Even with these distinctions in Mr. James's favor, the most that any of these courts ordered for restitution was still less than what the government is proposing here.

[8] The Court should stay all financial penalties pending appeal pursuant to Federal Rules of Criminal Procedure 32.2(d) and 38 because Mr. James has an appeal that presents substantial questions, he (and his family) will be irreparably harmed if he is forced to forfeit the remainder of his assets, and a stay will not injure the other parties interested in the proceedings, which are the government and private insurance companies that have profits in the billions each year. *See United States v. Razzouk*, 2018 WL 3574868 (E.D.N.Y. July 25, 2018) (discussing four factors considered on a motion to stay financial penalties pending appeal).

Thank you for your consideration of this matter.

                              Respectfully submitted,

                              KRIEGER KIM & LEWIN LLP

By: _____
                              Paul M. Krieger
                              Molly K. Webster

cc:    All counsel of record (via ECF)
       U.S. Probation Office